1   Matlock Law Group, PC
    Anne-Leith Matlock (SBN 244351)
2   1485 Treat Blvd., Suite 200
    Walnut Creek, CA 94597
3   Telephone: (925) 944-7131
    Facsimile: (925) 944-7138
4
    Attorney for Plaintiff,
5   Counterdefendant,
    THE TONYTAIL COMPANY, INC.
6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                     **SAN FRANCISCO DIVISION**

11

12

13  THE TONYTAIL COMPANY, INC., a          Case No.: 3:07-cv-05895-WHA
    Delaware Corporation,
14                                          **TONYTAIL COMPANY, INC.'S**
              Plaintiff, Counterdefendant,  **OPENING CLAIM CONSTRUCTION**
15                                          **BRIEF**
          v
16
    CONAIR CORPORATION, SCUNCI INT'L,
17  LTD., RITE AID CORPORATION., L&N
    SALES & MARKETING INC., and 1-10,
18  inclusive,
19            Defendant, Counterclaimant.
20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2    Table of Authorities.............................................................................iv

3    Table of Attachments..........................................................................v

4    The Independent Claim 4 of the Utility Patent.........................................v

5    The Dependent Claim 5 of the 884 Utility Patent.....................................vi

6    Five Claim Terms Proposed for Construction............................................vi

7    I.      Introduction.............................................................2

8    II.     Claim Construction Standard of Review...................................2

9    III.    Background of the Technology............................................4

10   IV.     **'884 Patent Claim Construction**......................................5

11           A.   Disputed Step 1: "...an elastic band having a pair of elastic

12                band ends...".................................................................5

13                       i.   *Preserving the term "band" in disputed Step 1 instead of substituting*

14                            *the term "cord" prevents the addition of a limitation only supported by*

15                            *extrinsic evidenc...............................................6*

16                       ii.  *The inclusion of Plaintiff's additional language clarifies the term*

17                            *"band" while Defendants' additional language impermissibly imposes*

18                            *a structural limitation created from the preferred embodiment which is*

19                            *not found in the ordinary meaning of the term "band"......................8*

20           B.   Disputed Step 2: "...synthetic hair fibers having an appearance similar to the

21                ponytail and having a pair of synthetic hair fiber ends..."........................10

22                       i.   *Defendants' proposed construction of Disputed Step 3 adds an*

23                            *impermissible extraneous structural limitation created from the*

24                            *language of the preferred embodiment.......................................10*

25           C.   Disputed Step 3: "...the synthetic hair fiber ends joined to the elastic band

26                ends...".......................................................................12

27

28

i. *Defendants' intrinsic evidence is irrelevant in the construction of Disputed Step 3 because the relied upon prosecution history adding the term "permanent" only refers to independent claims 1, 2 and 3 thus creating no ambiguity in terms for claims 4 and 5* ... ... ... ... ... ... ...13

ii. *Defendants' citation to the prosecution history is not on point because the relied upon office action and subsequent amendment does not demonstrate a narrowing of claims 4 or 5 that is "clear and deliberate."* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...14

iii. *Defendants' construction would violate the doctrine of claim differentiation because Defendants' introduction of the term "permanently" would read terms in claims 1-3 to be superfluous* ......15

D. **Disputed Step 4: "...to form a closed loop..."** ... ... ... ... ... ... ... ... ... ... ...15

E. **Disputed Step 5: "...covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers..."** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...16

F. **Disputed Step 6: "...encircling the ponytail with the device by inserting the ponytail through the closed loop of said device..."** ... ... ... ... ... ... ... ...17

V. **The Design Patents should not be construed during the claim construction hearing** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...19

VI. **The Disputed Steps or Terms in Design Patents: 'D693 and 'D239 Plaintiff's Design Patents** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...20

A. **D453,239 Claim Language** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ....21

i. **Figure 1** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...21

ii. **Figure 2** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...21

iii. **Figure 3** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...22

iv. **Figure 4** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...23

B. **D413,693 Claim Language** ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...24

Matlock Law
Group, PC.

1

    i. **Figure 1**..................................................................24

2      ii. **Figure 2**.................................................................24

3      iii. **Figure 3**................................................................25

4      iv. **Figure 4**................................................................26

5  VII. Conclusion........................................................................27

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF AUTHORITIES**

3

**United States Supreme Court Cases**

4

   1.  Gorham Co. v. White, 81 U.S. 511, 528 (U.S. 1872)....................................19, 21

5

   2.  Markman v. Westview Instruments, Inc., 527 U.S. 370, 389-90, 116 S. Ct. 1384, 134

6

      L.Ed. 2d 577 (1996)......................................................................3

7

**United States Court of Appeals for the Federal Circuit**

8

   1.  Bernhardt v. Collezione, 386 F.3d 1371 (Fed. Cir. 2004)..................................20

9

   2.  Comark Comms., Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998)..............3

10

   3.  Contessa Food Products v. Conagra, 282 F.3d 1370, 1377 (Fed. Cir. 2002).......19, 20

11

   4.  Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir.

12

      2006)..................................................................................15

13

   5.  CytoLogix Corp. v. Ventana Medical Systems, Inc. 424 F.3d 1168, 1172 (Fed. Cir.

14

      2005).................................................................................20

15

   6.  Demarini Sports v. Worth, Inc.,  239 F.3d 1314, 1326 (Fed. Cir. 2001)...................14

16

   7.  Electro Sci. Indus. v. Dynamic Details, Inc., 307 F.3d 1343, 1349 (Fed. Cir. 2002)......4

17

   8.  Gemstar-TV Guide, 383 F.3d at 1366 (Fed. Cir. 2004) ................................8, 11

18

   9.  Karsten Mfg. Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1384 (Fed. Cir. 2001)........4

19

   10. Liebel-Flarsheim, 358 F.3d at 906 (Fed. Cir. 2007).......................................4

20

   11. Phillips v. AWH Corp., 415 F.3d 1303, 1322 (Fed. Cir. 2005) (en banc)................3, 7

21

   12. Superguide Corp. v. DirecTV Enters., 358 F.3d 870,881 (Fed. Cir. 2004)................14

22

   13. Tate Access Floors, Inc. v. Maxcess Techs., Inc., 222 F.3d 958, 966 (Fed. Cir.

23

      2000)...................................................................................3

24

   14. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324

25

      (Fed. Cir. 2002)..............................................................3, 6, 8, 13

26

   15. Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325, 1330 (Fed. Cir. 2004)..................15

27

   16. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)..........3, 4, 7

28

TONYTAIL COMPANY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF        Case No. 3:07-cv-05895-WHA

1  **California District Court Cases**

2  1.  CNET Networks, Inc. v. Etilize, Inc., 2008 U.S. LEXIS 16531 at 20 (N.D. Ca. March

3      4, 2008)................................................................................8

4  2.  Intergraph Hardware Tech. Co. v. Toshiba Corp., 2007 U.S. Dist. LEXIS 56424, at 8-14

5      (N.D. Ca. August 2, 2007). ......................................3, 6, 7, 13

6  3.  Mobile Hi-Tech Wheels v. CIA Wheel Group, 514 F. Supp.2d 1172 (C.D. Cal.

7      2007)................................................................................19

8  **Treatises**

9  Donald S. Chisum, CHISUM ON PATENTS 18.03[2] n.1 (2002)................................3

10

11                          **TABLE OF ATTACHMENTS**

12  Attachment

13      1      The 884 Patent

14      2      The Independent Claim 4 of the Utility Patent 6,263,884 (884 Patent)

15      3      The Dependant Claim 5 of the 884 Utility Patent

16      4      Five Claim Terms Proposed for Construction

17      5      Comparative Claim Construction Chart

18

19  **THE INDEPENDENT CLAIM 4 OF THE UTILITY PATENT 6,263,884 (884 PATENT)**

20              *Reprinted for the Court's convenience at Attachment 2*

21                     (Disputed terms are in bold)

22  Claim 4

23  A hair binding method, for use by a person having a ponytail having a ponytail end for securing

24  said ponytail, using a device comprising **an elastic band having a pair of elastic band ends,**

25  **synthetic hair fibers having an appearance similar to the ponytail and having a pair of**

26  **synthetic hair fiber ends, the synthetic hair fiber ends joined to the elastic band ends to**

27  **form a closed loop,** comprising the steps of:

28

TONYTAIL COMPANY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF        Case No. 3:07-cv-05895-WHA

*Matlock Law Group, PC.*

a)  **encircling the ponytail with the device by inserting the ponytail end through the closed loop of said device;**

b)  tensioning the device around the ponytail by doubling up the device; and

c)  **covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers.**

### THE DEPENDENT CLAIM 5 OF THE 884 UTILITY PATENT

*Reprinted for the Court's convenience at Attachment 3*

<u>Claim 5</u>

The hair binding method as recited in claim 4, wherein the step of doubling up the device further comprises repeatedly:

a)  twisting the closed loop to form a secondary loop; and inserting the ponytail end through the secondary loop.

### FIVE CLAIM TERMS PROPOSED FOR CONSTRUCTION

*Reprinted for the Court's convenience at Attachment 4*

| Claim Term or Step | Plaintiff's Construction | Defendants' Construction | Pages in Brief |
|---|---|---|---|
| 1. "...an elastic band having a pair of elastic band ends..." | an elastic band whose two ends serve to join together and encircle... | ...an elastic cord whose two ends are not joined to one another... | 5 |
| 2. "...synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends..." | synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends | ...synthetic hair fibers whose two ends are not joined to one another... | 10 |
| 3. "...the synthetic hair fiber ends joined to the elastic band ends..." | the synthetic hair fiber ends joined to the elastic band ends | ...wherein one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends... | 12 |
| 4. "...to form a closed loop..." | to take on a closed loop shape | ...to form a single unbroken ring... | 15 |

Matlock Law Group, P.C.

| 5. "...covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers..." | covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed singly, to the exclusion of all else, by the synthetic hair fibers | ...adjusting the ring so that the outward appearance of the ring is formed only by synthetic hair fibers... | 16 |

**Sixth Step requested by Plaintiff**

| Claim Term or Step | Plaintiff's Construction | Defendants' Construction | Pages in Brief |
|---|---|---|---|
| 6. "...encircling the ponytail with the device by inserting the ponytail through the closed loop of said device..." | "...encircling the ponytail with the device by inserting the ponytail through the closed loop of said device..." | ...inserting the ponytail end through the ring so that the ring encircles the ponytail... | 17 |

1  **I.    INTRODUCTION**

2         This case involves one utility patent, U.S. Patent No. 6,263,884 (the "'the '884 Patent")

3  and two design patents, U.S. Design Patent No. D413,693 ("the 'D693 Patent") and U.S.

4  Design Patent ("the 'D239 Patent"). Although Tonytail has made an effort to limit the scope of

5  the patent claim terms selected for construction in the claim construction hearing set for May

6  28, 2008 to those asserted by Plaintiff in the '884 Patent, an agreement has not been reached.

7  As a result, the parties have selected five steps found in claims 4 and 5 of the '884 Patent to be

8  considered by the court during the claim construction hearing. Additionally, Plaintiff submits a

9  sixth step from claims 4 and 5 for the court's review. Beyond the '884 Patent, Defendants also

10  seek construction of the two design patents: the 'D693 Patent and the 'D239 Patent. The

11  parties disagree over whether these design patents should be construed during the claim

12  construction hearing. Plaintiff asserts that the two design patents in this case should be

13  construed by the Court during trial and not during the upcoming claim construction hearing. In

14  addition, Plaintiff asserts that claims 1-3 of the '884 utility patent are not a proper subject for

15  the scheduled claim construction hearing. Defendants have argued that the '884 Patent claims

16  1, 2 and 3 are invalid for indefiniteness in their preliminary invalidity contentions and

17  Defendants have subsequently counterclaimed for declaratory judgment against these claims.

18  Plaintiff moved to dismiss Defendant's counterclaim for declaratory judgment due to the

19  court's lack of subject matter jurisdiction due to a lack of "case or controversy" over the

20  unasserted claims 1, 2 and 3. The Pretrial Motion to Dismiss Hearing was scheduled 35 days

21  after service for June 5, 2008. Furthermore, a Motion to Shorten Time for the Court to Hear the

22  Motion to Partially Dismiss on May 22, 2008 has been filed.

23         With regard to the six selected steps found in claims 4 and 5 of the '884 Patent which

24  are submitted for the court's review, the disputed terms and the parties' current proposed

25  constructions are reprinted at Attachment 4.

26  **II.    CLAIM CONSTRUCTION STANDARD OF REVIEW**

27         The Court has set forth the standard of review for claim construction in recent cases.

28

*Matlock Law*
*Group, PC.*

TONYTAIL COMPANY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF    Case No. 3:07-cv-05895-WHA

1    Plaintiff incorporates by reference the framework announced by the Court.  Intergraph

2    Hardware Tech. Co. v. Toshiba Corp., 2007 U.S. Dist. LEXIS 56424, at 8-14 (N.D. Ca. August

3    2, 2007).  Under Markman v. Westview Instruments, Inc., 527 U.S. 370, 389-90, 116 S. Ct.

4    1384, 134 L.Ed. 2d 577 (1996), the court construes the scope and meaning of disputed patent

5    claims as a matter of law.  The first step of this analysis requires the court to consider the words

6    of the claims.  Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002).

7    "Claim construction begins, as it must, with the words of the claim."  Donald S. Chisum,

8    CHISUM ON PATENTS 18.03[2] n.1 (2002).  It is now well established that the language of a

9    claim should be given its "ordinary and accustomed meaning" as would be understood by a

10   person of skill in the relevant art as of the effective filing date.  Phillips v. AWH Corp., 415

11   F.3d 1303, 1322 (Fed. Cir. 2005) (en banc).  To determine the ordinary meaning, the court may

12   review other intrinsic evidence such as the written description, prosecution file history,

13   dictionaries, and treatises.  Teleflex, 299 F.3d at 1325.  The court must conduct this inquiry not

14   from the perspective of a lay observer, but from the perspective of a person of ordinary skill in

15   the relevant art.  Id.  However, the specification (written description) is the single best guide to

16   the meaning of a disputed term.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582

17   (Fed. Cir. 1996).  At the same time, the Federal Circuit has cautioned that the written

18   description should never trump the clear meaning of the claim terms.  Comark Comms., Inc. v.

19   Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).

20           Nonetheless, the specification may assist in resolving ambiguity where the ordinary and

21   accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope

22   of the claim to be ascertained from the words alone.  Teleflex, 299 F.3d at 1325.  However, it is

23   improper to read limitations from the written description into a claim.  Tate Access Floors, Inc.

24   v. Maxcess Techs., Inc., 222 F.3d 958, 966 (Fed. Cir. 2000).  Dictionary definitions may also

25   provide evidence of the ordinary meaning of a claim.  Phillips, 415 F.3d at 1322.  However,

26   there is no requirement that claim interpretation begin with a dictionary definition of the

27   disputed terms.  Phillips, 415 F.3d at 1320-21.  Although Phillips stands for the proposition that

28

1    claim terms must be interpreted in light of their context, especially the language used in other

2    claims and the specification,... it is entirely appropriate for a court, when conducting claim

3    construction, to rely heavily on the written description for guidance as to the meaning of the

4    claims. Id. The court may rely on dictionary definitions so long as the dictionary definition

5    does not contradict any definition found in or ascertained by a reading of the patent documents.

6    Vitronics, 90 F.3d at 1584 n.6.

7        Extrinsic evidence in general, and expert testimony in particular... may not be used to

8    vary or contradict the claim language. Indeed, where the patent documents are unambiguous,

9    expert testimony regarding the meaning of a claim is entitled to no weight. Vitronics, 90 F.3d

10    at 1584. Extrinsic evidence, including dictionaries and expert testimony, are viewed as less

11    reliable than the patent and prosecution history. Phillips, No. 03-1269 at 19-21.

12    It is error to limit a claim to the preferred embodiment if the specification supports a broader

13    interpretation. Liebel-Flarsheim, 358 F.3d at 906 (Fed. Cir. 2007); Electro Sci. Indus. v.

14    Dynamic Details, Inc., 307 F.3d 1343, 1349 (Fed. Cir. 2002). Finally, patent claims are

15    presumed valid, and, thus, if a court has the choice between two interpretations, one of which

16    would render the claim invalid, the court should ordinarily adopt the construction that retains

17    claim validity. Karsten Mfg. Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1384 (FedCirc 2001).

18    **III.    BACKGROUND OF THE TECHNOLOY**

19    **Plaintiff's '884 Patent**

20        The '884 Patent claims an apparatus and method for binding a ponytail where the

21    device securely attaches around a ponytail while providing an outward appearance of natural

22    hair. The patent application was filed by inventor Mia Minnelli on or about March 14, 2000

23    which was later issued as the '884 Patent on or about July 24, 2001. Ms. Minnelli also filed

24    related design patent applications which later issued as the 'D693 and 'D239 Patents on or

25    about September 7, 1999 and January 29, 2002 respectively. Ms. Minnelli later legally

26    assigned her intellectual property to Plaintiff, The Tonytail Company, Inc. which Ms. Minnelli

27    founded in the fall of 1997.

28

1      The object of the '884 patent is the production and use of a device which can firmly

2  maintain a ponytail while creating the natural appearance of human hair. *Patent* 1:40-50. Prior

3  to the issuance of the '884 patent, the traditional way of creating a "ponytail" hairstyle was to

4  encircle the hair with a ribbon tied into a knot which often times proved to be tedious requiring

5  coordination and dexterity. *Id.* 1:10-15. Hair clips and elastic bands have also been used to

6  create the "ponytail" hairstyle, however, their unnatural appearance rendered the clips and

7  bands to be noticeable when placed in the hair. *Id.* 1:17-30.

8      The invention disclosed in the '884 Patent solves these problems. The device disclosed

9  in the specification comprises two main parts: an elastic band and synthetic fibers which are

10  joined in order to form a loop. *Id.* 3:27 – 4:14. The claimed method is directed towards the use

11  of a similar loop to encircle and bind the ponytail by doubling up the loop and inserting the

12  ponytail into the subsequently formed secondary loop. *Id.* 4:15-33. Utilizing the claimed

13  method with an apparatus similar to the disclosed device allows the firm maintenance of a

14  ponytail appearance while simultaneously allowing the synthetic hair fibers to disguise the

15  apparatus when the secondary loop is formed. *Id.* 3:10-18. The desired end result is a ponytail

16  hairstyle bound by what appears to be a part of the person's natural hair. *Id.* 3:19-22.

17  **IV.    CLAIM CONSTRUCTION**

18  **The Disputed Steps or Terms in independent claim 4 and dependent claim 5**

19      The six selected steps submitted for the court's review are taught by independent

20  method claim 4 and incorporated by reference in dependent method claim 5.

21  **Disputed Step 1**: **"...an elastic band having a pair of elastic band ends..."** *Please see Item*

22  *1 of Comparative Claim Construction Chart at Attachment 5.*

23

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| an elastic band whose two ends serve to join together and encircle... | ...an elastic cord whose two ends are not joined to one another... |

26      The claim terms at issue in the first disputed step are (i) the replacement of the claim's

27  original term "band" with that of the Defendants' proffered term "cord"; and (ii) the inclusion

Matlock Law
Group, PC.

TONYTAIL COMPANY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF    Case No. 3:07-cv-05895-WHA

1   of additional language describing the original term "band" (or the proffered "cord" in the

2   Defendants' construction) as respectively offered by both parties. Plaintiff's construction

3   preserves the term "band" as it appears in the claim language and throughout the specification.

4   Further, Plaintiff's construction clarifies the function of the term "band" with the claimed

5   method in a way that is consistent with the patent's specifications without modifying the scope

6   of the claim. However, Defendant's construction seeks to replace the highly utilized term

7   "band" with the term "cord", a term which does not currently appear on the face of the patent.

8   By doing so, the Defendant seeks to add a limitation not taught by the claim or the

9   specification. The words "band" and "cord" as used by Defendants represents a distinction

10  without meaning in the context of the method claim. Further, the additional language offered

11  in Defendant's construction adds a second impermissible structural limitation to the method

12  claim's meaning by inserting the additional structural language "whose two ends are not joined

13  to one another" taken from the preferred embodiment, which is not found in the ordinary

14  meaning of the term "band."

15  ***Preserving the term "band" in disputed Step 1 instead of substituting the term "cord"***

16  ***prevents the addition of a limitation only supported by extrinsic evidence.*** During claim

17  construction, the court must first look at the claims themselves while "indulging a heavy

18  presumption that a claim term carries its ordinary and customary meaning." Intergraph, at 8

19  [citing Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002)]. In

20  determining the customary meaning, the court may review intrinsic evidence such as the

21  claims, the written description and the prosecution history and must review these sources from

22  the standpoint of a person of ordinary skill in the art. Id. at 9 [citing Teleflex 299 F.3d at 1325

23  and Zelinski v. Brunswick Corp., 185 F.3d 1311, 1316 (Fed. Cir 1999)]. Use of dictionary

24  definitions as extrinsic evidence is permitted to help the court understand the underlying

25  technology "so long as the dictionary definition does not contradict any definition in or

26  ascertained by a reading of the patent documents." Id. at 11 (citing Vitronics Corp. v.

27  Conceptronic, Inc., 90 F.3d 1576, 1584 n.6. (Fed. Cir. 1996). The Federal Circuit warned that

28

1  "a claim should not rise or fall based upon the preferences of a particular dictionary editor, or

2  the court's independent decision, uninformed by the specification, to rely on one dictionary

3  rather than another. Phillips, 415 F.3d at 1322. Defendants' replacement of the term "band"

4  with the term "cord" impermissibly relies heavily on Defendant's cited dictionary definition

5  unsupported by intrinsic sources. More importantly, use of the word "cord" artificially reads in

6  or inserts a limitation not found in or supported by intrinsic sources.

7          Allowing the use of the term "cord" impermissibly adds a new limitation requiring the

8  binding device to be constructed from cord-like material. In support for Defendants'

9  substitution of the term "band" for cord, Defendants' cite the dictionary definition of the word

10 "cord" [Corrected Joint Claim Construction and Prehearing Statement Exhibit C.] which

11 defines "cord" in the first instance as "a slender length of flexible material *usually made of*

12 *twisted strands or fibers* and used to bind, tie, connect or support." emphasis added. The

13 American Heritage Dictionary of the English Language Fourth Edition, 2000. However,

14 throughout the specification and all the claims in Patent '884, the term "band" is explicitly used

15 and the word "cord" does not appear at all. Both Plaintiff's and Defendants' cited dictionaries

16 define "band" as a strip that is used to encircle something. (American Heritage defining "band"

17 as a thin strip of flexible material used to encircle and bind...; Merriam-Webster's Online

18 Dictionary (2008) defining "band" as a thin flat encircling strip") Neither definition limits the

19 usual manufacturing of a "band" to that of a "cord's" manufacturing, being one "usually made

20 of twisted strands or fibers." In light of these dictionary definitions, it is clear that the term

21 "band" referred to in the device used in method claims 4 and 5 may be constructed of cord-like

22 material (usually made of twisted strands or fibers) but is not limited to the use of such

23 material. The only limitation discussed in both the specification and the claims themselves

24 regarding the material to be used in manufacturing of the "band" is that the material to be used

25 must be elastic. *Patent* 2:39-44; 3:30-33; 4:17. By allowing Defendant's construction in this

26 case, the court would impermissibly read in a limitation from an extrinsic source. As such,

27 Defendants' construction allowing the use of the word "cord" should be rejected.

28

1     *The inclusion of Plaintiff's additional language clarifies the term "band" while*

2   *Defendants' additional language impermissibly imposes a structural limitation created from*

3   *the preferred embodiment which is not found in the ordinary meaning of the term "band".*

4   An accused infringer cannot use the preferred embodiment to overcome the heavy presumption

5   that a claim term takes on its ordinary meaning. <u>CNET Networks, Inc. v. Etilize, Inc.</u>, 2008

6   U.S. LEXIS 16531 at 20 (N.D. Ca. March 4, 2008) (citing <u>Teleflex, 299 F.3d at 1327</u>).

7   Further, claims must not be construed to be limited to a single embodiment disclosed in the

8   specification. <u>Gemstar-TV Guide</u>, 383 F.3d at 1366 (Fed. Cir. 2004). Defendants'

9   construction includes the additional language "whose two ends are not joined to one another" in

10   order to modify the above discussed impermissible term "cord" in Defendants' construction

11   and possibly the term "band" in the original language of claims 4 and 5. Defendants' cite

12   language in the preferred embodiment to support the limitation that the band ends are not

13   joined together: "band ends joined to connectors or synthetic band ends directly." [Corrected

14   Joint Claim Construction and Prehearing Statement Exhibit C]. However, as discussed, the

15   definition of a "band" under both parties' definitions is merely something that encircles.

16   Neither this definition nor the disputed step at issue add any qualifications requiring that the

17   elastic band ends must not be joined to one another. *Patent* 4:14-20. Further, the patent

18   language that the Defendants' cite in support of their proffered additional language does not

19   explicitly state that the elastic band ends must not be joined to each other. *Patent* 2:29-31.

20   Rather, it appears that the Defendant is attempting to imply that the elastic band ends must not

21   be joined to each other since these ends are joined to the synthetic fiber ends. Even if such an

22   implication is a possible construction for the language found in the preferred embodiment,

23   limiting method claims 4 and 5 to one possible embodiment discussed in the specification runs

24   contrary to Gemstar.

25     Further, Defendants' construction would add a further limitation that the "band" ends

26   not be joined together in any fashion in order for one to practice method claims 4 and 5.

27   However, claim 4's language does not contemplate this limitation. In fact, a later step in claim

28

1   4's language indicates that the band ends and the synthetic fiber ends are joined in order to

2   form a loop ("the synthetic fiber ends joined to the elastic band ends to form a closed loop.")

3   *Patent* 4:18-20. This step does not contemplate how the band ends and the synthetic fiber ends

4   are joined thus allowing a possible practice of the claimed method to be one where all the ends

5   of both the elastic band and the synthetic fiber strands may be joined together in any fashion.

6   This contention is further supported by Figure 3 of the '884 patent which was discussed in the

7   preferred embodiment. *Patent* 2:57-67. Aforementioned Figure 3 illustrates the invention

8   being used to gather and hold the ponytail. *Patent* 2:16-17. The figure illustrates the synthetic

9   fiber ends and the elastic band ends joined together in one group at the base of the ponytail so

10  that the formed loop maybe twisted in order for the user to properly tension the device. *Id.*

11  2:57-67. Inclusion of Defendants' construction would prevent this possible joining of the

12  elastic band ends and the synthetic fiber ends at the base of the ponytail. As a result,

13  Defendant's construction creates an additional limitation not contemplated anywhere in the

14  patent and runs contrary to a possible practice of the claimed methods illustrated in the patent

15  itself. In fact, in Defendants' claim construction, without ultimately joining the ends, there is

16  no way for the ponytail to be held in place at all.

17       Plaintiff's construction avoids the pitfalls of Defendant's construction by adding

18  clarifying language without modifying the scope of the claim. The additional language in

19  Plaintiff's construction ("whose two ends serve to join together and encircle") clarifies the

20  function of the band ends in a way that complies with the ordinary meaning of the term "band."

21  Utilization of this language to describe the band end functions are evidenced by the claims

22  themselves, the specification, and both dictionaries cited by the parties. A later step in claim 4

23  describes the full device, including the bands, serving to encircle the ponytail. *Patent* 4:22-23

24  ("encircling the ponytail with the device"). Further, the specification for the '884 Patent

25  describe the bands of having a quality to allow the bands to "stretch *around* a group of hair",

26  thus allowing the bands to encircle around the user's ponytail. *Patent* 2:40-45 (emphasis

27  added). Finally, as previously mentioned, both parties' dictionary definitions define "band" as

28

1   something that encircles and joins or binds things together. In each of the aforementioned

2   instances, language describing a function of the band ends, being one that "serves to join and

3   encircle," merely stems from the ordinary meaning of the term "band." Further, since the band

4   is used to encircle a joined group of hair, Plaintiff's construction aids in the practice of claims 4

5   and 5 by teaching that the device, including the bands, must encircle a joined group of hair.

6   Because the addition of Plaintiff's language does not modify the ordinary meaning of the term

7   "band" and only teaches that the bands must encircle the hair, the inclusion of Plaintiff's

8   construction would not modify the scope of the claims. Since evidence in the claim itself, the

9   specification, and the extrinsic sources cited by both parties demonstrate that the Plaintiff's

10  construction complies with the ordinary meaning of the term without broadening the scope of

11  the claim, Plaintiff's construction in its entirety should be granted.

12  **Disputed Step 2**: "...synthetic hair fibers having an appearance similar to the ponytail

13  **and having a pair of synthetic hair fiber ends..."**

14

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends | ...synthetic hair fibers whose two ends are not joined to one another... |

15
16
17

18      The claim term at issue here is that Defendants seeks to add additional structural

19  language to Disputed Step 2 of the method claim similar to that of the impermissible additional

20  language Defendants sought to add in the abovementioned Disputed Step 1. Plaintiff seeks to

21  preserve the language and scope of this step as issued in the patent. Defendants' construction

22  must be rejected because (i) Defendants' construction reads in an extraneous structural

23  limitation into the method cliam; and (ii) Defendant's construction reads out a permissible way

24  of practicing method claims 4 and 5.

25      ***Defendants' proposed construction of Disputed Step 3 adds an impermissible

26  extraneous structural limitation created from the language of the preferred embodiment.*** As

27  stated for the construction of Disputed Step 1, claims must not be construed to be limited to a

28  single embodiment disclosed in the specification. Gemstar, 383 F.3d at 1366. Defendants'

1    addition of the language "whose two ends are not joined to one another" adds an impermissible

2    extraneous structural limitation to the method claim from language found in the preferred

3    embodiment of the device disclosed in the specification.  Defendants' cite language in the

4    preferred embodiment to support the limitation that the synthetic hair fibers ends are not joined

5    together.  [Corrected Joint Claim Construction and Prehearing Statement Exhibit C].   In doing

6    so, it appears that Defendants are attempting to make a similar implication Defendants made in

7    Disputed Step 1, that the synthetic hair fibers cannot be joined together.  However, this

8    implication is not stated in Defendants' cited language taken from the preferred embodiment or

9    from the language of the claims.  Even if Defendants' implication can possibly be construed

10   from the language of the preferred embodiment, Defendants' construction would import a

11   limitation from the preferred embodiment unsupported from the language of the claims 4 and 5.

12        In addition, Defendants' additional limitation would suggest that the method could not

13   be operative, which it clearly is for both the claimed method and the Defendant's accused

14   infringing method. As in the possible practice of the claimed method discussed in Disputed

15   Step 1 and in FIG. A2 (below). Defendants' construction adds a limitation that is not

16   contemplated by claim 4 or 5 and runs contrary to a possible practice of these method claims.

17   Defendants' construction requires that the synthetic hair fiber ends not be joined together.

18   However, when the original step language is read with a later step in claim 4's language ("the

19   synthetic fiber ends joined to the elastic band ends to form a closed loop"), the claim does not

20   teach that the synthetic fibers cannot be joined together. *Patent* 4:18-20.  Rather, within the

21   claim's scope is the possibility that all the ends, the elastic band ends and the synthetic hair

22   fiber ends, may be joined together in order to practice claims 4 and 5. See Fig. 1.  This possible

23   practice of claim 4 and 5 is illustrated in Figure 3 of the '884 patent and in the language of the

24   preferred embodiment where all the ends are joined at the base of the ponytail. *Patent* 2:57-67.

25   Inclusion of the Defendants' construction would prevent this permissible joining illustrated in

26   the patent itself.  In addition, Defendants' have also removed a limitation of the method that the

27   synthetic hair fibers have an appearance similar to the user's hair.  Surely, Defendants'

28



1   infringing method had as one purpose of the band having

2   the appearance similar to the user's ponytail.  Since

3   Defendants' construction would add an extraneous

4   limitation and read out a permissible way of practicing

5   method claims 4 and 5, Defendants' construction should

6   be rejected.

7   **Disputed Step 3**: **"...the synthetic hair fiber ends**

8   **joined to the elastic band ends..."**

9

| Plaintiff's Construction | Defendants' Construction |
| --- | --- |
| the synthetic hair fiber ends joined to the elastic band ends | ...wherein one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends... |

The claim term at issue here is whether the Defendants' construction should be allowed when it impermissibly introduces the word "permanently" into claims 4 and 5 effectively adding an extraneous limitation.  Plaintiff seeks to preserve the language and scope of this step as issued.  Defendants' construction must be rejected because; (i) Defendants' intrinsic evidence is irrelevant in the construction of this step because the relied upon Office Action from the United States Patent and Trademark Office and subsequent patent amendment adding the term "permanent" only refer to independent claims 1, 2 and 3 thus creating no ambiguity in terms in claims 4 and 5; (ii) Defendants' citation to the prosecution history in order to narrow claims 4 and 5 is not on point because the relied upon Office Action and subsequent claim amendment only pertains to claims 1-3 and does not demonstrate a narrowing of claims 4 or 5 that is a "clear and deliberate" and (iii)  Defendants' do not satisfy their burden under the "clear and convincing" standard to demonstrate that the patent examiner who caused a narrowing of claims 1, 2 and 3 unintentionally failed to require the patentee to make a similar structural limitation for independent claim 4 and related dependent claim 5.  There is nothing in

TONYTAIL COMPANY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF     Case No. 3:07-cv-05895-WHA

1   the specification or the prosecution history that applicant's or the examiner believed that the

2   word "permanent" in any way pertained to method claims 4 and 5.  In fact, the record proves

3   the exact contrary.

4       ***Defendants' intrinsic evidence is irrelevant in the construction of Disputed Step 3***

5   ***because the relied upon prosecution history adding the term "permanent" only refers to***

6   ***independent claims 1, 2 and 3 thus creating no ambiguity in terms for claims 4 and 5.***  Claim

7   construction begins with the words of the claim itself.  Intergraph at 8 (citing Teleflex, 299

8   F.3d 1313, 1324).  Since the claim itself defines the scope of the right to exclude, "claim

9   construction begins and ends with the actual words of the claim." Teleflex, 299 F.3d 1313,

10  1324.  During claim construction, court must "indulge a heavy presumption that a claim term

11  carries its ordinary and customary meaning." Intergraph at 8 (citing CCS Fitness, Inc. v.

12  Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).  Defendants' cite the prosecution

13  history in support of Defendants' construction introducing the term "permanently" in order to

14  modify the term "joined." [Corrected Joint Claim Construction and Prehearing Statement

15  Exhibit C].  Specifically, Defendants refer to the Response to Office Action dated October 17,

16  2000 which amends the '884 Patent's claims 1 and 2 to include the term "permanently."

17  However, under the remarks section of the aforementioned response, the patentee clearly states

18  that the patentee and the patent examiner agreed to the amendment only in relation to claims 1

19  and 2.  Response to Office Action dated October 17, 2000 p2.  Further, in the same remarks

20  section, the patentee reflects the previous allowance of claims 4 and 5 by the patent examiner

21  as stated in the prior Office Action dated October 4, 2000.  Id. and Office Action dated October

22  4, 2000 p3 item 4.  Therefore, while there was an intentional decision by the patentee to add the

23  term "permanently" in claim 1 in order to allow issuance of claim 1, the patentee did not intend

24  that the previously allowed claims 4 and 5 should also be amended to include the term

25  "permanently."  As such, there lies no ambiguity that the term "permanently" is excluded from

26  claims 4 and 5.  The dictionary definition of the word "joined", "to put or bring together," does

27  not include a temporal requirement as to how long the "joined" state is to last.  The inclusion of

28

1    the term "permanently" would superimpose an enduring temporal state of "bring together" on

2    the term "joined," effectively adding a limitation intentionally left out by the examiner and the

3    patentee. Adopting Defendants' construction would read in a temporal limitation intentionally

4    absent from claims 4 and 5 in order to change the ordinary meaning of the term "joined" which

5    is in violation of the heavy presumption that the court must afford the ordinary and customary

6    meaning of a term.

7        ***Defendants' citation to the prosecution history is not on point because the relied upon***

8    ***office action and subsequent amendment does not demonstrate a narrowing of claims 4 or 5***

9    ***that is "clear and deliberate."*** Absent arguments by the patentee during prosecution does not

10   necessarily indicate a clear and deliberate disavowal of subject matter. Superguide Corp. v.

11   DirecTV Enters., 358 F.3d 870,881 (Fed. Cir. 2004). Silence from the examiner or from the

12   patentee is an improper basis on which to construe a claim. Demarini Sports v. Worth, Inc.,

13   239 F.3d 1314, 1326 (Fed. Cir. 2001). The addition of the term "permanently" would serve to

14   disavow subject matter in method claims 4 and 5 effectively narrowing the claims scope to only

15   those situations where the device in the method solely used permanently joined elastic band

16   ends and synthetic hair fiber strands. In support of this narrowing limitation, Defendants' again

17   cite the Response to Office Action dated October 17, 2000, p 2-3. As discussed above, the

18   patentee only intended to amend claim 1 in response to the examiner's rejection of claims 1 and

19   2. Id. at p2. Patentee had no need to amend already allowed claims 4 and 5. Further, with

20   regards to claims 4 and 5, Patentee's remarks in the aforementioned response merely

21   acknowledges the examiners previous allows of claims 4 and 5. The acknowledgement by a

22   patentee that the examiner allowed patentee's claims can hardly qualify as a clear and

23   deliberate disavowal of any subject matter within claims 4 and 5. Even if patentee intended to

24   modify the scope of claims 4 and 5, the patentee failed to make arguments during prosecution

25   history to make such a modification. Such silence on the part of the patentee is not a proper

26   basis to narrowly construe claims 4 and 5 by adding the term "permanently." Demarini Sports,

27   239 F.3d 1314, 1326. Since the Defendants' proffered structural limitation is not properly

28

1   based on a clear and deliberate disavowal of subject matter by the patentee, Defendants'

2   construction should be rejected.

3          ***Defendants' construction would violate the doctrine of claim differentiation because***

4   ***Defendants' introduction of the term "permanently" would read terms in claims 1-3 to be***

5   ***superfluous.***  Beyond the specific interaction among dependent and independent claims, the

6   Federal Circuit has characterized claim differentiation to include the "presumption that each

7   claim in a patent has a different scope." Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438

8   F.3d 1374, 1380  (Fed. Cir. 2006) (citing Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325,

9   1330 (Fed. Cir. 2004).  When applying claim differentiation to two *independent* claims, (i)

10  claim differentiation applies when a claim construction would render additional language in

11  another independent claim superfluous; and (ii) claim differentiation cannot act to broaden the

12  claims beyond their proper scope. Curtiss-Wright Flow Corp., F.3d 1374, 1381. (emphasis

13  added).  Following these rules, Defendants' proffered construction introducing the term

14  "permanently" into Disputed Step 3 would render the use of the word "permanently" in claims

15  1-3 superfluous.  This contention is supported by the Office Action and the subsequent

16  Response to the Office Action. At the time of prosecution, had the patentee and the examiner

17  read the term "permanently" into claims 4 and 5, as Defendants' construction suggests, then the

18  amendment to Claim 1 would have been unnecessary.  Although claim 1 is an apparatus claim

19  and claim 4 is a method claim, the device disclosed by claim 1 is similar to the device utilized

20  in method claim 4.  Further, both claims 1 and 4 utilize the term "joined" to refer to the joining

21  of the elastic band and synthetic fiber ends.  Thus, the scope of the term "joined" would be

22  similar between claims 1 and 4 with the exception that the intentionally amended term

23  "permanently" in claim 1 explicitly narrows the term "joined" solely for claim 1.  To adopt

24  Defendants' construction would render the intentional addition of the word "permanently" as a

25  superfluous term and effectively declare the patentee's amendment unnecessary.  However,

26  Since Defendants' construction renders the scope of a term in another claim superfluous,

27  Defendants' construction should be rejected.

28

**Disputed Step 4: "…to form a closed loop…"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| to take on a closed loop shape | …to form a single unbroken ring… |

The claim term at issue here is whether the Defendants' substitution of the term "unbroken ring" for the term "closed loop" should be granted when doing so would read in an impermissible narrowing limitation similar to that found in Disputed Step 3. There is nothing in claim 4, the specification, or the file history of the '884 patent that suggests that the structural limitation of the band being "unbroken" should be allowed to be read into claim 4. Further, Defendant's construction attempts to add in the term "unbroken" as another veiled attempt to read in the word similar to "permanent" into claims 4 and 5, which is impermissible as discussed in the section under Disputed Step 3. The dictionary defines "unbroken" as an adjective describing something that is "uninterrupted or continuous." The American Heritage Dictionary of the English Language: Fourth Edition (2000). Additionally, the dictionary defines "ring" as a circular object. Id. The combination of these proffered terms, when read in context of the rest of the claim, would require that the band ends and the synthetic hair fiber ends form a circular object that is uninterrupted or continuous. The result would read in a narrowing limitation superimposing a temporal requirement having a similar effect to that of reading the impermissible term "permanently" into Disputed Step 3. Without support in the claim language, the specification, or the prosecution history and due to the danger of adding an impermissible temporal limitation, Defendants' claim construction attempting to introduce the term "unbroken ring" should be rejected.

**Disputed Step 5: "…covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers…"**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed singly, to the exclusion of all else, by the synthetic hair fibers | …adjusting the ring so that the outward appearance of the ring is formed only by synthetic hair fibers… |

1      The terms at issue here is whether Defendants' construction should be granted when the

2   proffered construction adds an extraneous limiting language impermissibly narrowing the

3   claim.  As aforementioned, the language of the claim must be given its "ordinary and

4   customary meaning."  Defendants' insertion of the "adjusting" language is an impermissible

5   narrowing of the claim which reads in a limitation that the method requires adjusting the band

6   in order for the method to achieve its end result.  The literal reading of the claim and Plaintiff's

7   construction read in light of the claim itself, the method, specifically indicate that synthetic hair

8   fibers are adjusted independently from the elastic bands in order to create the intended result of

9   the claimed method. *Patent* 3:15-20; 4:25-27.  The exact same adjustment is identical in the

10   Defendants' infringing method.  To allow Defendants' construction which requires the

11   adjustment of the band where the ordinary meaning of the claim itself requires the covering of

12   the band by the synthetic hair fiber would be an impermissible modification to the scope of

13   claim.  As such, Defendant's construction must be rejected.

14      Plaintiff's construction serves to add clarifying language without modifying the scope

15   of the claim.  The term "singly, to the exclusion of all else" merely stems from the ordinary

16   meaning of the word "solely."  Merriam-Webster's Online Dictionary, (2008).  Further, since

17   claims 4 and 5 disclose a "doubling up" of the device, Plaintiff's construction aids in the

18   practice of claims 4 and 5 by teaching that the "covering" of the elastic band by the synthetic

19   fibers occurs in a way allowing the outward appearance of the device to be formed by the

20   synthetic fibers "to the exclusion of all."  As such, other non-synthetic fiber portions of the

21   device, including those portions resulting from the "doubling up" of the device in claim 4 and

22   the repeated doubling up as disclosed in claim 5, must be excluded from the device's outward

23   appearance when practicing methods 4 and 5. *Patent* 4:24 and 4:30.  Since Plaintiff's

24   construction preserves the ordinary meaning of the term "solely" while aiding in the practice of

25   claims 4 and 5, Plaintiff's construction should be granted.

26   **Disputed Step 6:  "…encircling the ponytail with the device by inserting the**

27   **ponytail through the closed loop of said device…"**  (note: requested for review by Plaintiff

28

1    only)

2

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| …encircling the ponytail with the device by inserting the ponytail through the closed loop of said device… | …inserting the ponytail end through the ring so that the ring encircles the ponytail… |

The claim terms at issue here is whether Defendants' construction should be granted when such construction (i) unnecessarily reverses the order of the original claim's language; and (ii) adds the term "ring," a term not found anywhere in the patent. The organization of Defendants' construction reverses the order of the claim 4's use of the words "encircling" and "inserting." Such reversal is unnecessary and just confuses the interpretation, which is clear and unambiguous on its face, without any change. Further, as mentioned previously, adding the word "ring" adds impermissible structural language which is just an attempt to distort the clear meaning in the original language of step 5;. The Defendants' fortuitous insertion of the term "ring" is nothing more than another attempt to insert structural limitations relating back to impermissible structural language additions of the words of the terms "permanently" and "unbroken ring" which the Defendants attempt to do in disputed steps 3 and 4 as discussed above.

Plaintiff's construction seeks to preserve the language of claim 4 as it appears in the patent. The result of preserving the language of claim 4 assures that the clearly unambiguous terms of that claim is afforded their ordinary and customary meaning. Specifically, preserving the "closed loop" language prevents the addition of the impermissible narrowing limitation attempted by Defendants in Disputed Step 4. As discussed in Disputed Step 4, Defendants' inclusion of the proffered term "unbroken ring" is an attempt to add a lasting and permanent temporal limitation on the formation of the "closed loop." Since Plaintiff's construction is not a modification of the claim language but rather a clear preservation of the claim language's ordinary meaning as stated, the court should grant Plaintiff's construction in order to deny Defendants' attempt to read in another impermissible narrowing limitation.

**The Design Patents should not be construed during the claim construction hearing**

Plaintiff herein asserts that Design Patents 'D239 and 'D693 should not be construed during the claim construction hearing because the focus on such a hearing and relevant case law is an inappropriate methodology to determine the scope of Plaintiff's ornamental designs.  Indeed, each design patent contains exactly one claim directed to the ornamental appearance of the design, a completely different focus from the spate of case law directed to ordinary and customary meaning of terms found in multiple claims of a utility patent.   It is well settled that the meaning of claim terms must be determined to determine victory in an infringement suit. Markman, 517 US at 370.   However, it is an open question of law as to whether a claim construction hearing and claim construction itself is appropriate for interpretation of design patents claims and figures.  See Egyptian Goddess  Questions Presented before the Court of Appeals for the Federal Circuit (2008). The focus in design patents is the ornamental appearance in the eyes of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive an observer, inducing him to purchase one supposing to be the other.  Gorham Co. v. White, 81 U.S. 511, 528 (U.S. 1872).    Currently, there is no requirement that design patents be subject to a claim construction hearing given that each design patent only has one claim to the "ornamental design and appearance as described in Figures" …, etc. See Egyptian Goddess Amicus Briefs and Questions Presented before the Court of Appeals for the Federal Circuit (2008).  The "visual impression" standard of Contessa Food Products v. Conagra, 282 F.3d 1370, 1377 (Fed. Cir. 2002) (holding that he scope of the claim of a patented design "encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" and that such scope be determined as a question of claim construction), is unnecessarily rigid in its approach because that case merely reinforces previous holdings … that ornamental features cannot be excluded from the infringement analysis if such ornamental features were not excluded from the patent application.  Mobile Hi-Tech Wheels v. CIA Wheel Group, 514 F. Supp.2d 1172 (C.D. Cal. 2007).  Further, a claim construction analysis in

1    accordance with <u>Contessa</u> fails to apply the visual appearance as seen by the ordinary observer

2    giving such attention as a purchaser usually gives, as mandated by the <u>Gorham</u> test, <u>Gorham v.</u>

3    <u>White</u>, 81 US 511 (1871), nor does it apply the point of novelty test properly in construing the

4    scope and meaning of the design patent. Tonytail respectfully requests that this Court, in light

5    of the unsettled law in this area, in its discretion allow the fact finder to determine infringement

6    after the claim has been construed by this Court at trial.

7    Both the ordinary observer and the point of novelty tests are factual inquiries that are

8    undertaken by the fact finder during the infringement stage of proceedings, after the claim has

9    been construed by the Court.  <u>Bernhardt v. Collezione</u>, 386 F.3d 1371 (Fed. Cir. 2004).

10   Delaying claim construction (of the 'D173 design patent) until trial is not error because the

11   District Court has considerable latitude in determining when to resolve issues of claim

12   construction.  <u>CytoLogix Corp. v. Ventana Medical Systems, Inc.</u>, 424 F.3d 1168, 1172 (Fed.

13   Cir. 2005).  Accordingly, The Tonytail Company respectfully requests the Court in its

14   discretion allow the fact finder to determine infringement after the claim directed to the

15   ornamental appearance has been construed by this Court at trial and use its discretion to

16   interpret the scope and the meaning of the design patents as an issue at trial.

17

18   **The Disputed Steps or Terms in Design Patents: 'D693 & 'D239 Plaintiff's Design Patents**

19

20   <u>Plaintiff has asserted its ornamental designs of US Design Patent D453,239 ('D239) and US</u>

21   <u>Design Patent D413,693 ('D693) in its suit against Defendants.</u>  The Tonytail Company asserts

22   that the 'D693 and 'D239 Design Patents ornamental designs are infringed by Conair and Rite

23   Aid.  It is well settled that the meaning of claim terms must be determined to determine victory

24   in an infringement suit.  <u>Markman v. Westview Instruments</u>, 517 US 370 (1996).  Plaintiff

25   therefore respectfully requests the court to construe design patents based on the ornamental

26   appearance in the eyes of an ordinary observer, giving such attention as a purchaser usually

27   gives, <u>Gorham</u>, 81 US at 528 and not two designs are substantially the same, if the resemblance

28

Matlock Law
Group, PC.

TONYTAIL COMPANY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF    Case No. 3:07-cv-05895-WHA

1    is such as to deceive an observer, inducing him to purchase one supposing to be the other.

2    Gorham v. White, 81 US 511, 528.

3

4    **I. D453,239 Claim Language**

5    1. The ornamental design for a ponytail holder, as shown and described.

6    **A.  Figure 1**

7    " *a front view of a ponytail holder, the rear view being a mirror image of the front view*" -

8    The front view of the Tonytail D453,239 ponytail holder in its intended application shows a

9    product that looks like natural hair when worn by a user, as illustrated in its product packaging

10   and when the product itself is configured as used by a consumer.  Further, the product itself is

11   commonly mistaken by consumers and sales personnel for the Tonytail hair ponytail band

12   when stocked in its retail location.  The front view in its configuration when used, i.e. worn by

13   a user is an ornamental feature because it is designed to 'look' like it blends into the natural hair

14   of a ponytail holder and distinctly looks like natural hair used to wrap around in the shape and

15   location of a ponytail holder when viewed in its position to be worn by a user leaving the

16   functional features, such as elastic bands or other joining methods, not visible to a user in the

17   worn position.  As a result, with respect to the front view of the ponytail holder, the ornamental

18   design is constructed with a feature as claimed by patentee in its claim and related Fig. 1 such

19   that an ordinary observer intending to purchase such a device, supposing it to be the Tonytail

20   D453,239, if only looking at the front view in its typical configuration when used, i.e. worn by

21   a user, would find its rear view and front view to be a mirror image, as to its ornamental aspect

22   of looking like natural hair.

23   **B.  Figure 2**

24   " *a left side elevation view thereof, the right side elevation view being a mirror image of the*

25   *left side view*" - The left side elevation view of the patented design is an ornamental feature

26   because it is designed to 'look' like it blends into the natural hair of a ponytail holder and

27   distinctly looks like natural hair used to wrap around in the shape and location of a ponytail

28

1  holder. From the left side, the view includes stranded fibers that look like natural hair, a sewn

2  magnetic housing that hides an end of the stranded natural hair color and texture stranded fibers

3  joined to both ends of a non-stranded elastic band end.   As a result, with respect to the left side

4  elevation view of the ponytail holder, the right side elevation view is a mirror image of such an

5  ornamental feature as claimed by the patentee such that an observer is induced to purchase one

6  with a substantially similar design, here an ornamental design that looks like natural hair,

7  supposing it to be the Tonytail D453,239 if only looking at the left side elevation view because

8  the device when configured as used, i.e. worn by a user looks substantially similar to in the

9  eyes of an ordinary consumer, giving such attention as an ordinary consumer gives when

10  purchasing such a design, since functional features, such as a magnetic pouch or elastic band,

11  used to encircle the design, will be overlapping and will appear substantially the same to the

12  consumer.  The same analysis can be applied to a right side elevation view because the right

13  side elevation view is a mirror image in the D453,239.  The patented ponytail holder design

14  includes an ornamental appearance with natural hair colored and textured stranded fibers,

15  affixed to a functional feature such as clamped housings and magnetic pouches, that hide a first

16  and second end of the stranded natural hair color and texture stranded fibers, respectively

17  affixed to first and second end non-stranded elastic bands or other joining means, such as via a

18  common magnetic pouch, and the first and second stranded fiber ends and non-stranded elastic

19  band ends form a continuous loop when joined by the first and second end of a magnetic pouch

20  and configured as worn by a user.  As a result of the ornamental appearance in its configuration

21  when used, i.e. worn by a user, the D453,239, both the left side and right side elevation views

22  look substantially similar to natural hair wrapped around a ponytail in the eyes of an ordinary

23  observer.  Further, the design feature directed to stranded natural hair looking fibers, affixed to

24  clamped housings and elastic bands, forms a configuration novel with respect to the prior art,

25  when viewed from the left side or right side elevation of previous devices, and is therefore a

26  point of novelty of the patented design as well.

27  **C.  Figure 3**

28

1    " *a top plan view thereof* " - The top plan view of the Tonytail D453,239 ponytail holder is

2    directed to the ornamental feature because it is designed to 'look' like it blends into the natural

3    hair of a ponytail holder and distinctly looks like natural hair used to wrap around in the shape

4    and location of a ponytail holder.  From the top, the view includes stranded fibers that look like

5    natural hair and the functional feature, clamped housing that hides an end of the stranded

6    natural hair color and texture stranded fibers which is joined to an end of a non-stranded elastic

7    band end are not visible unless the top view is a perspective view and further hides the common

8    magnetic pouch or elastic band where a first and second end of stranded fibers are joined.   As a

9    result, with respect to the top plan view of the ponytail holder in its typical consumer

10    application configuration as used, the ornamental feature as claimed by patentee is directed to

11    an ornamental appearance such that an observer who purchases a ponytail holder, supposes it to

12    be the Tonytail D453,239 if only looking at the top plan view in its typical consumer

13    application configuration, when giving it the attention as a purchaser usually gives.

14    **D.  Figure 4**

15    " *a bottom plan view thereof* " - The bottom plan view of the Tonytail D453,239 ponytail

16    holder in its intended application shows a product that looks the same as illustrated in its

17    product packaging and when the product itself is configured as used by a consumer even

18    though this view might also reveal the magnetic pouch alongside the elastic band when

19    configured in a typical consumer application because such items are functional features and not

20    directed to the ornamental design.  However, the product is rarely viewed from the bottom by

21    the consumer as evidenced by typcial consumer packaging found on such products, and when

22    giving such attention as a purchaser usually gives such a product. The bottom plan view of the

23    patented device is therefore an ornamental feature because it is designed to 'look' like it blends

24    into the natural hair of a ponytail holder and distinctly looks like natural hair used to wrap

25    around in the shape and location of a ponytail holder.  From the bottom, the view includes first

26    the functional, elastic non-stranded fibers, then the functional magnetic pouch housing and the

27    ornamental, stranded fibers that look like natural hair. As a result, with respect to the bottom

28

1    plan view of the ponytail holder, the patented device is constructed to highlight the ornamental

2    feature as claimed by patentee such that an observer is induced to purchase such a product

3    supposing it to be the Tonytail D453,239 if only looking at the bottom plan view.  Further, the

4    design feature directed to stranded natural hair looking fibers, affixed to clamped housings and

5    elastic bands, forms a configuration novel when viewed from the bottom with respect to the

6    prior art and is therefore a point of novelty of the patented design as well.

7    The portions of the band and ponytail holder that are not shown in the drawings are not being

8    claimed.

9    **II. D413,693 Claim Language**

10    1. The ornamental design for a hair ponytail band, as shown and described.

11    **A. Figure 1**

12    " *a diagrammatic perspective view of the hair ponytail band in full lines"* - the natural head

13    shown in broken lines being for illustrative purposes only and forming no part of the claimed

14    invention.  The perspective view of the accused device is an ornamental feature because it is

15    designed to 'look' like it blends into the natural hair of a ponytail and distinctly looks like

16    natural hair used to wrap around an actual ponytail.

17    **B. Figure 2**

18    " *a top plan view of the hair ponytail band*" - The bottom plan view of the Tonytail D453,239

19    ponytail holder in its intended application shows a product that looks the same as illustrated in

20    its product packaging and when the product itself is configured as used by a consumer even

21    though this view might also reveal the magnetic pouch alongside the elastic band when

22    configured in a typical consumer application because such items are functional features and not

23    directed to the ornamental design.  However, the product is rarely viewed from the bottom by

24    the consumer as evidenced by typcial consumer packaging found on such products, and when

25    giving such attention as a purchaser usually gives such a product. The bottom plan view of the

26    patented device is therefore an ornamental feature because it is designed to 'look' like it blends

27    into the natural hair of a ponytail holder and distinctly looks like natural hair used to wrap

28

1  around in the shape and location of a ponytail holder. From the bottom, the view includes first

2  the functional, elastic non-stranded fibers, then the functional magnetic pouch housing and the

3  ornamental, stranded fibers that look like natural hair. As a result, with respect to the bottom

4  plan view of the ponytail holder, the patented device is constructed to highlight the ornamental

5  feature as claimed by patentee such that an observer is induced to purchase such a product

6  supposing it to be the Tonytail D453,239 if only looking at the bottom plan view. Further, the

7  design feature directed to stranded natural hair looking fibers, affixed to clamped housings and

8  elastic bands, forms a configuration novel when viewed from the bottom with respect to the

9  prior art and is therefore a point of novelty of the patented design as well.

10  **C. Figure 3**

11  " *a right side elevation view* " - the left side view being a mirror image of the right side view.

12  The left side elevation view of the patented design is an ornamental feature because it is

13  designed to 'look' like it blends into the natural hair of a ponytail holder and distinctly looks

14  like natural hair used to wrap around in the shape and location of a ponytail holder. From the

15  left side, the view includes stranded fibers that look like natural hair, a sewn magnetic housing

16  that hides an end of the stranded natural hair color and texture stranded fibers joined to both

17  ends of a non-stranded elastic band end.  As a result, with respect to the left side elevation

18  view of the ponytail holder, the right side elevation view is a mirror image of such an

19  ornamental feature as claimed by the patentee such that an observer is induced to purchase one

20  with a substantially similar design, here an ornamental design that looks like natural hair,

21  supposing it to be the Tonytail D453,239 if only looking at the left side elevation view because

22  the device when configured as used, i.e. worn by a user looks substantially similar to in the

23  eyes of an ordinary consumer, giving such attention as an ordinary consumer gives when

24  purchasing such a design, since functional features, such as a magnetic pouch or elastic band,

25  used to encircle the design, will be overlapping and will appear substantially the same to the

26  consumer. The same analysis can be applied to a right side elevation view because the right

27  side elevation view is a mirror image in the D453,239. The patented ponytail holder design

28

1    includes an ornamental appearance with natural hair colored and textured stranded fibers,

2    affixed to a functional feature such as clamped housings and magnetic pouches, that hide a first

3    and second end of the stranded natural hair color and texture stranded fibers, respectively

4    affixed to first and second end non-stranded elastic bands or other joining means, such as via a

5    common magnetic pouch, and the first and second stranded fiber ends and non-stranded elastic

6    band ends form a continuous loop when joined by the first and second end of a magnetic pouch

7    and configured as worn by a user.  As a result of the ornamental appearance in its configuration

8    when used, i.e. worn by a user, the D453,239, both the left side and right side elevation views

9    look substantially similar to natural hair wrapped around a ponytail in the eyes of an ordinary

10   observer.  Further, the design feature directed to stranded natural hair looking fibers, affixed to

11   clamped housings and elastic bands, forms a configuration novel with respect to the prior art,

12   when viewed from the left side or right side elevation of previous devices, and is therefore a

13   point of novelty of the patented design as well.

14   **D.  Figure 4**

15   " *a front elevation view* " - the rear elevation view being a mirror image of the front view.  The

16   front view of the Tonytail D453,239 ponytail holder in its intended application shows a product

17   that looks like natural hair when worn by a user, as illustrated in its product packaging and

18   when the product itself is configured as used by a consumer.  Further, the product itself is

19   commonly mistaken by consumers and sales personnel for the Tonytail hair ponytail band

20   when stocked in its retail location.  The front view in its configuration when used, i.e. worn by

21   a user is an ornamental feature because it is designed to 'look' like it blends into the natural hair

22   of a ponytail holder and distinctly looks like natural hair used to wrap around in the shape and

23   location of a ponytail holder when viewed in its position to be worn by a user leaving the

24   functional features, such as elastic bands or other joining methods, not visible to a user in the

25   worn position.  As a result, with respect to the front view of the ponytail holder, the ornamental

26   design is constructed with a feature as claimed by patentee in its claim and related Fig. 1 such

27   that an ordinary observer intending to purchase such a device, supposing it to be the Tonytail

28

1  D453,239, if only looking at the front view in its typical configuration when used, i.e. worn by

2  a user, would find its rear view and front view to be a mirror image, as to its ornamental aspect

3  of looking like natural hair.

4  The portions of the band and the ponytail holder that are not shown in the drawings are not

5  being claimed.

6  **V. CONCLUSION**

7

8  With regard to the '884 patent, Defendants' attempt to add structural limitations to the disputed

9  claim steps as set forth above is not legally supportable and there is no language found in the

10  patent, the file history or the plain language of method claims 4 and 5 that would even suggest

11  such structural limitations can be read into method claims 4 and 5. Plaintiffs believe, as

12  evidenced by its Motion to Dismiss claims 1-3 from this case because of lack of any

13  controversy over those claims, that since claims 1-3 should not even be in this case, there is no

14  basis for any of the structural limitations Defendants are urging this Court to read into method

15  claims 4 and 5. Furthermore, even if claims 1-3 were in this case, the law is clear that it is

16  impermissible to read structural limitations from descriptions of an embodiment of a device

17  from the specification into the method claims 4 and 5, which are the only claims at issue.

   With regard to the design patents ('D239 and 'D693), Defendants' request to construe the

18  design patent claims during the claim construction hearing is currently an open question of law.

19  Being such, the court should exercise its discretion to construe the scope and meaning of the

20  claims directed to the ornamental appearance during trial.

21

22

23  Dated: May 9, 2008                                    MATLOCK LAW GROUP, PC

24                                                        By: _____

25                                                        Anne-Leith Matlock
                                                          ATTORNEYS FOR PLAINTIFF
26                                                        THE TONYTAIL COMPANY, INC.

27

28