1  THOMAS F. FITZPATRICK
   GOODWIN PROCTER LLP
2  135 Commonwealth Drive
   Menlo Park, California 94025
3  Telephone: 650-752-3100
   Facsimile: 650-853-1038
4  E-Mail: TFitzpatrick@goodwinprocter.com

5  Attorneys For Defendants
   CONAIR CORPORATION and RITE AID HDQTRS. CORP.

6

7

8              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
9               **SAN FRANCISCO DIVISION**

10 THE TONYTAIL COMPANY, INC.,                  Case No.    3:07-cv-05895-WHA

11            *Plaintiff,*                       **DEFENDANTS CONAIR**
                                                 **CORPORATION'S AND RITE AID**
12            v.                                 **HDQTRS. CORP.'S OPENING**
                                                 **CLAIM CONSTRUCTION BRIEF**
13 CONAIR CORPORATION, SCUNCI INT'L,
   LTD., RITE AID HDQTRS. CORP., L&N            Date:  May 28, 2008
14 SALES & MARKETING, INC., and DOES, 1 –      Time:  1:30 p.m.
   10, inclusive,                                Dept:  Courtroom , 19th Floor
15                                               Judge: Hon. William H. Alsup
              *Defendants.*
16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ..................................................................................................... 5

   A.   THE LAW OF CLAIM CONSTRUCTION ......................................... 5

      1.   Claim Terms Must Be Read in Context ................................... 5

      2.   Claims Are Properly Limited to the Description of the Invention
           as Set Forth in the Specification ............................................. 5

      3.   The Prosecution Disclaimer Doctrine ..................................... 7

         a.   The "Reasonable Competitor" Doctrine.......................... 8

         b.   *PODS, Inc. v. Porta Stor, Inc.,* 484 F.3d 1359 (Fed. Cir.
              2007) ........................................................................... 9

   B.   APPLYING THE LAW OF CLAIM CONSTRUCTION TO THE '884
        PATENT .................................................................................... 11

      1.   Summary.............................................................................. 11

      2.   The term "an elastic band having a pair of elastic band ends"
           means an elastic cord whose two ends are not joined to one
           another. ............................................................................... 12

      3.   The term "synthetic hair fibers having an appearance similar to
           the ponytail and having a pair of synthetic hair fiber ends" means
           synthetic hair fibers whose two ends are not joined to one
           another. ............................................................................... 14

      4.   The term "the synthetic hair fiber ends joined to the elastic band
           ends" is limited to a device "where one of the elastic band ends is
           permanently joined with one of the synthetic hair fiber ends, and
           the other of the elastic band ends is permanently joined with the
           other of the synthetic hair fiber ends." ................................. 15

      5.   The claim term "to form a closed loop" means "to form a single,
           unbroken ring."..................................................................... 18

      6.   The claim term "covering the elastic band with the synthetic hair
           fibers so that the outward appearance of the device is formed
           solely by the synthetic hair fibers" means adjusting the ring so
           that the outward appearance of the ring is formed only by
           synthetic hair fibers. ............................................................ 20

   C.   THE LAW OF CLAIM CONSTRUCTION AS APPLIED TO THE '239
        PATENT .................................................................................... 21

III. CONCLUSION ................................................................................................ 22

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**

4
*Aguayo v. Universal Instruments Corp.,*
  356 F. Supp. 2d 699 (S.D. Tex. 2005)................................................................ 6

5
*Astrazeneca AB v. Mutual Pharm. Co.,*
  384 F.3d 1333 (Fed. Cir. 2004) ................................................................... 5, 6

6

7
*Athletic Alternatives, Inc. v. Prince Mfg., Inc.,*
  73 F.3d 1573 (Fed. Cir. 1996) ...................................................................... 10

8
*Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.,*
  262 F.3d 1258 (Fed. Cir. 2001) ....................................................................... 5

9

10
*Biodex Corp. v. Loredan Biomedical, Inc.,*
  946 F.2d 850 (Fed. Cir. 1991) ......................................................................... 7

11
*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
  388 F.3d 858 (Fed. Cir. 2004) ......................................................................... 6

12

13
*Contessa Food Products v. Conagra,*
  282 F.3d 1370 (Fed. Cir. 2002) ..................................................................... 21

14
*CVI/Beta Ventures, Inc. v. Tura LP,*
  112 F.3d 1146 (Fed. Cir. 1997) ....................................................................... 7

15

16
*Cybor Corp. v. FAS Techs., Inc.,*
  138 F.3d 1448 (Fed. Cir. 1998) ....................................................................... 9

17
*Elmer v. ICC Fabricating,*
  67 F.3d 1571 (Fed. Cir. 1995) ....................................................................... 21

18

19
*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
  222 F.3d 951 (Fed. Cir. 2000) ......................................................................... 8

20
*Honeywell Int'l., Inc. v. ITT Indus. Inc.,*
  452 F.3d 1312 (Fed. Cir. 2006) ....................................................................... 6

21

22
*In re Abbott Labs. Norvir Anti-Trust Litig.,*
  442 F. Supp. 2d 800 (N.D. Cal. 2006)........................................................... 20

23
*InPro II Licensing v. T-Mobile USA, Inc.,*
  450 F.3d 1350 (Fed. Cir. 2006) ....................................................................... 6

24

25
*Mars, Inc. v. H.J. Heinz Co.,*
  377 F.3d 1369 (Fed. Cir. 2004) ..................................................................... 21

26
*Microsoft Corp. v. Multi-Tech. Sys. Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ....................................................................... 6

27

28
*Multiform Dessicants Inc. v. Medzam, Ltd.,*
  133 F.3d 1473 (Fed. Cir. 1998) ..................................................................... 18

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................................ 7

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................................ 6

*PODS, Inc. v. Porta Stor, Inc.*,
  484 F.3d 1359 (Fed. Cir. 2007) ........................................... 4, 9, 10, 15, 16, 17

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ............................................................................ 8

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ...................................................................... 5, 14

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ........................................................................ 4, 7

*Wang Labs., Inc. v. Am. Online, Inc.*,
  197 F.3d 1377 (Fed. Cir. 1999) ...................................................................... 6, 13

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006) .......................................................................... 18

1    **I.    INTRODUCTION**

2    Pursuant to Patent Local Rule 4-5, Defendants Conair

3    Corporation and Rite Aid HDQTRS. Corp. ("Conair and Rite Aid" or

4    "Defendants") hereby submit their Opening Claim Construction Brief

5    in support of their constructions of the jointly proposed claim terms

6    of claim 4 of U.S. Patent No. 6,263,884 ("the '884 Patent").[1]



7    The "technology" in this case is straightforward; the three

8    patents-in-suit are each directed to ponytail holders. The ponytail, of

9    course, is one of the most universal of all hairstyles. Devices have been used to create ponytails for

10    centuries. *See, e.g.,* U.S. Patent Nos. 541,125 (issued 1895); 2,567,119 (issued 1948); D338,551

11    (issued 1993). Typically, one creates a ponytail by grasping the hair at the rear of the head, pulling it

12    together, and then twisting an elastic band around it.

13    In the last few decades the so-called "wrapped ponytail" style has become popular. In the

14    example of a "wrapped ponytail" pictured above, a section of hair is wrapped around an elastic band

15     to hide it. Many devices have been designed over

16    the years to help a wearer create this "wrapped

17    ponytail" look. *See* U.S. Patent Nos. 5,465,741 to

18    Dvorak and 5,899,211 to Brown ("the Brown '211

19    Patent").[2] The Brown '211 Patent, for example, was

20    the first to disclose a ponytail holder (shown left)

21    that combines both an elastic band for binding a

22    wearer's hair, and synthetic hair fibers attached to the elastic band to be wrapped around the elastic

23    _____

24    [1] *See* Exhibit A to the Declaration of Thomas F. Fitzpatrick in Support of Conair Corporation's and
     Rite Aid HDQTRS. Corp.'s Claim Construction Brief ("Fitzpatrick Decl."). Tonytail has also asserted

25    two design patents: U.S. Patent Nos. D453,239 and D413,693. To the extent the Court is willing to
     construe the claim of U.S. Patent No. D453,239 ("the '239 Patent," Fitzpatrick Decl., Exhibit B),

26    Defendants include their proposed construction of that claim.

27    [2] *See* Fitzpatrick Decl., Exhibit C.

28

1   band to create a "wrapped ponytail."

2        A few years after the Brown '211 Patent was filed, the patentee in the present case filed the

3   application that would mature into the '884 Patent currently at issue.[3]  Like the Brown '211 Patent, the

4   '884 Patent discloses a ponytail holder used to create a "wrapped ponytail," using synthetic rather than

5   real hair.  *See* Fig. 1 of the '884 Patent (reproduced below, ref. num. omitted, text added).  Generally

6   speaking, claims 4 and 5 of the '884 Patent claim a method of making a ponytail using a device like

7   the one shown.

8        While claim construction begins with the words of the

9   claims, the written description and the prosecution history play an

10  important role in understanding the scope of the claimed inventions

11  and the meaning of claim terms.  This Court must consider what the

12  patentee has said about the invention as a whole when construing

13  claim language.  Indeed, where the patentee specifically disavowed

14  claim scope in distinguishing its invention from the prior art, the

15  words of the claims cannot be construed so broadly as to

16  encompass such disavowed subject matter.  As discussed herein,

17  the patentee in this case made two significant statements in the specification and prosecution history

18  that limit the scope of claims 4 and 5 of the '884 Patent.



Fig. 1

19       First, the patentee explicitly disavowed the apparatus disclosed in the Brown '211 Patent

20  discussed above, namely, "a device which employs an elastic loop which can secure around a ponytail,

21  and a length of hair which is attached to the elastic loop at one end, but is free at its opposite end," by

22  stating in the '884 Patent's specification that "[while the Brown '211 devices] may be suitable for the

23  particular purpose employed, or for general use, they would not be as suitable for the purposes of the

24  present invention. . . ." (the '884 Patent, Col. 1, lines 31 – 35) (emphasis added).  In other words, the

25  '884 Patent's specification expressly distinguished the invention claimed therein from the prior art

26  _____

27  [3] As mentioned above, Plaintiff's '239 Patent is also addressed *infra*.

28

1  (the Brown '211 Patent) that disclosed an elastic band permanently attached to only one end of a

2  length of synthetic hair.  Accordingly, claims 4 and 5 of the '884 Patent cannot, as a matter of law, be

3  construed to cover a ponytail binding device like the one disclosed in the Brown '211 Patent having an

4  elastic band permanently attached to only one end of a length of synthetic hair.

5       Like the devices disclosed in the Brown '211 Patent, the ponytail devices manufactured and

6  sold by Conair and Rite Aid (hereinafter, "the Accused Products") have an elastic band permanently

7  attached to only one end of a length of synthetic hair (pictured below).  Indeed, not only are the

8  accused products nearly identical to those disclosed in the prior art Brown '211 Patent – the accused

9  products are in fact manufactured *under a license* to the Brown '211 Patent.  Fitzpatrick Decl. at ¶ 5.

10      Second, during prosecution, the patentee amended its claims to overcome an obviousness

11  rejection over U.S. Patent No. 2,567,119 to Naidor,[4] ("the Naidor '119 Patent") in light of the Brown

12  '211 Patent.  Specifically, the patentee amended the

13  claim term "wherein each of the elastic band ends is

14  permanently joined with one of the synthetic hair fiber

15  ends" of independent claim 1 to recite that "<u>one</u> of

16  elastic band ends is permanently joined with one of the

17  synthetic hair fiber ends, <u>and the other of the elastic</u>

18  <u>band ends is permanently joined with the other the</u>

19  <u>synthetic fiber ends</u>. . . ." *See* Patentee's Response to

20  Office Action dated Oct. 17, 2000 (attached as

21  Fitzpatrick Decl., Exhibit E) (emphasis added).  This



22  amendment was necessary to – in the patentee's words – "help clarify the claims and ensure they do

23  not inadvertently read upon Naidor," *id*.  Essentially, the patentee amended independent claim 1 (an

24  apparatus claim) to overcome the rejection by limiting the claimed ponytail holder to a device where

25  <u>both</u> ends of an elastic band are permanently joined to corresponding synthetic hair fiber ends.

---

27  [4] *See* Fitzpatrick Decl., Exhibit D.

DEFENDANTS CONAIR CORPORATION'S AND RITE AID HDQTRS. CORP'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 3:07-cv-05895-WHA

1     Even though the patentee did not amend the same claim term in independent claim 4 of the

2     '884 Patent during prosecution (a method claim for using an apparatus), this claim term must likewise

3     be limited to a method of using a hair binding device where both of the elastic band ends are

4     permanently joined to corresponding synthetic hair fiber ends.  The same terms appearing in different

5     portions of the claims should be given the same meaning absent a clear indication otherwise in the

6     specification and the prosecution history.  *See PODS, Inc. v. Porta Stor, Inc.,* 484 F.3d 1359, 1366

7     (Fed. Cir. 2007).  As the Federal Circuit stated just one year ago, "[c]lear assertions made during

8     prosecution in support of patentability, whether or not actually required to secure allowance of [any

9     one] claim, may also create an estoppel," because "[t]he relevant inquiry is whether a competitor

10    would reasonably believe that the applicant had surrendered the relevant subject matter." *Id.,* at 1368,

11    citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) (alterations in

12    original).  Accordingly, claims 4 and 5 must be limited to a method for using a hair binding device

13    where both elastic band ends are each permanently joined to corresponding synthetic hair fiber ends.

14        Despite the limiting statements in the specification, and the clear disavowal in the specification

15    and prosecution history, Plaintiff alleges that the Accused Products, which include a ponytail holder

16    having an elastic band permanently attached to only one end of a length of synthetic hair, fall within

17    the scope of claims 4 and 5 of the '884 Patent.  That is, Plaintiff urges a claim construction that would

18    broaden the scope of the patent to a method for using a ponytail holder with an elastic band and

19    synthetic hair to cover the invention disclosed in the prior art '211 Brown Patent.  According to the

20    doctrines of prosecution disclaimer and specification disavowal, Plaintiff's proposed construction

21    must be summarily rejected.

22

23

24

25

26

27

28

1    **II.    ARGUMENT**

2        **A.    THE LAW OF CLAIM CONSTRUCTION**

3        This Court already knows the rules governing claim construction, so Defendants will not

4    repeat them here. But it is worth discussing three claim construction principles that bear directly on

5    the issues that this case presents: first, claims terms must be read in the context of the invention's

6    purpose; second, claim terms should be interpreted in light of the description of the invention as set

7    forth in the specification; and third, claim terms should be interpreted in light of the prosecution

8    history so as to exclude any interpretation that was disclaimed during prosecution.

9                **1.    Claim Terms Must Be Read in Context**

10        The claims must be construed in light of the purpose of the invention and the problems the

11    invention was trying to solve. In the specification of the '884 Patent, the patentee states that the

12    Brown '211 Patent "would not be suitable for the purposes of the present invention," Col. 1, lines 36 –

13    39. When the specification purports to distinguish other devices because they have features different

14    from those of the device that is the subject of the patent, claims must be interpreted to exclude those

15    features:

16            Where the specification makes clear that the invention does <u>not</u> include a
            particular feature, that feature is deemed to be outside the reach of the
17            claims of the patent, <u>even though the language of the claims, read without
            reference to the specification, might be considered broad enough to</u>
18            <u>encompass the feature in question.</u>

19    *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)

20    (emphasis added).

21                **2.    Claims Are Properly Limited to the Description of the Invention as
                Set Forth in the Specification**

22        A term may be defined by the patentee in the specification without an explicit statement of the

23    form "I define ____ to mean ____." *Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339

24    (Fed. Cir. 2004). A patentee may define a term "by implication" when the patent uses a term

25    throughout the entire patent specification in a manner consistent with only a single meaning. *Bell Atl.*

26    *Network Servs. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1271, 1277 (Fed. Cir. 2001).

27    Statements in the Abstract, Background and Summary of the Invention, although not determinative,

28    can signal that the claim term is limited because they are more likely than a preferred embodiment to

1  describe the invention as a whole.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864, 865

2  (Fed. Cir. 2004).  Clear disavowal of a meaning does not require an explicit statement in the form "my

3  invention does not include _____."  *Astrazeneca*, 384 F.3d at 1340.  Similarly, when the specification

4  only describes and enables one embodiment, the claims are correctly limited to that embodiment.

5  *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999).

6      Sitting *en banc*, the Federal Circuit held that the specification often is the best source for

7  understanding the claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*)

8  ("the specification `is always highly relevant to the claim construction analysis.  Usually, it is

9  dispositive; it is the single best guide to the meaning of a disputed term'")(citation omitted).  Since the

10  *Phillips* decision, the Federal Circuit has had occasion to rely on the specification and prosecution

11  history of a patent to limit the scope of the patent claims, even though the language of the claims, read

12  without reference to specification, might be more broadly construed.  In *InPro II Licensing v. T-*

13  *Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006), the court noted that the specification disclosed only

14  one mechanism for carrying out the invention, and emphasized its importance in solving the problems

15  with the prior art.  *Id.* at 1354-1355.  The Federal Circuit also limited the claims to that one

16  mechanism because the specification characterized it as a "very important feature."  *Id.* at 450 F.3d at

17  1355.

18      The Federal Circuit limited Honeywell's "fuel injection system component" to a "fuel filter"

19  because the written description used language that led them to conclude that a fuel filter was the only

20  fuel injection system component that the claims covered.  *Honeywell Int'l., Inc. v. ITT Indus. Inc.*, 452

21  F.3d 1312 (Fed. Cir. 2006).  Honeywell's patent specification repeatedly stated that "the invention is. .

22  ." or "this invention relates to a fuel filter," and the court held:  "[t]he public is entitled to take the

23  patentee at his word and the word was that the invention is a fuel filter."  Honeywell, 452 F.3d, at

24  1318.  The Southern District of Texas has held similarly in *Aguayo v. Universal Instruments Corp.*,

25  356 F.Supp.2d 699, 727 (S.D. Tex. 2005) ("If the specification calls an embodiment `the invention' or

26  the 'present invention,' it is appropriate to limit the claims to that embodiment," citing *Microsoft*

27  *Corp. v. Multi-Tech. Sys. Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004).  Thus, the Federal Circuit has

28  limited claims after its *en banc Phillips* decision to the only embodiments adequately described, and

1    where the patent specification uses limiting language, such as "the invention is," "the present
2    invention is," and "a very important feature", etc.

3        **3.    The Prosecution Disclaimer Doctrine**

4        A patentee's statements during prosecution may serve to narrow otherwise broad claims,
5    particularly where a patentee's statement is made to distinguish the patentee's invention from the prior
6    art. This is known as the "doctrine of prosecution disclaimer," which operates to narrow the ordinary
7    meaning of claim terms by excluding specific claim term interpretations that were disclaimed during
8    prosecution. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

9        While prosecution history estoppel is a limit on expansion of patent claim protection under the
10   doctrine of equivalents, "prosecution disclaimer" is a limit on literal patent claim protection through
11   claim construction. *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862-63 (Fed. Cir. 1991)
12   (acknowledging the "clear line of distinction"). In this case, Plaintiff has expressly declined to assert
13   infringement of any claim under the doctrine of equivalents. *See* Plaintiff's Disclosure of Asserted
14   Claims and Infringement Contentions, at 12 (stating: "[e]ach limitation of each asserted claims, U.S.
15   Patent No. 431,693, Claim 1, U.S. Patent No. D453,239 S, Claim 1 and US Patent No. 6,263,884,
16   Claims 4 and 5 are literally present and are not alleged to be present under the doctrine of
17   equivalents," emphasis added)(submitted herewith as Exhibit F to the Fitzpatrick Decl.). Defendants
18   have relied upon this statement in preparing their case.

19       In *Southwall Technologies,* the Federal Circuit expressed both the concept and the underlying
20   rationale of the prosecution disclaimer doctrine: "[t]he prosecution history limits the interpretation of
21   claim terms so as to exclude any interpretation that was disclaimed during prosecution. . . . Claims
22   may not be construed one way in order to obtain their allowance and in a different way against
23   accused infringers." 54 F.3d at 1576; *see also CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146,
24   1159 (Fed. Cir. 1997) (finding the patentee could not turn its back on the meaning of "elasticity"
25   embraced during prosecution). The patent in issue in *Southwall Technologies* related to a heated
26   mirror that passes visible light, but reflects infrared light. 54 F.3d at 1573. The invention involved
27   sputter-deposited transparent metal layers separated by discrete dielectric layers. *Id.* The accused
28   sputtering process for forming a titanium oxide layer was a two-step process, while the accused

- 7 -

sputtering process for forming a zinc oxide layer was a one-step process.  *Id.* at 1574.  The claim

language in issue was "sputter-deposited dielectric."  *Id.* at 1575.  If the "sputter-deposited dielectric"

must be formed by a one-step sputtering process, then the accused titanium oxide layer would not be a

"sputter-deposited dielectric."  *Id.* at 1575-76.  In an office action, the examiner interpreted sputter

depositing as a two-step process.  *Id.* at 1576.  In response, Southwall amended the claims to recite

that the dielectric layer can be laid down "directly" and "directly" converted to the oxide by the

presence of a suitable gaseous reactant.  *Id.*  Southwall thereby disclaimed a two-step sputtering

process for forming a dielectric layer and emphasized its one-step reactive sputtering process.  *Id.*  The

Federal Circuit held that where an applicant argues that a claim possesses a feature that the prior art

does not possess in order to overcome a prior art rejection, the argument may serve to narrow the

scope of otherwise broad claim language.  Thus, the Federal Circuit found that the prosecution history

limited the ordinary meaning of "sputter-deposited dielectric" to exclude any dielectric layer formed

by a two-step process.  *Id.*

### a.    The "Reasonable Competitor" Doctrine

While claims are read from the standpoint of one of ordinary skill in the art, *Rexnord Corp. v.
Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001), the prosecution history is read from the

standpoint of a "reasonable competitor" – since it is the *competitor* seeking to avoid infringement who

must take its cue from the public record of the patent.  The Federal Circuit has held that the

prosecution history constitutes a public record of the patentee's representations concerning the scope

and meaning of the claims, and thus, competitors are entitled to rely on those representations to guide

their behavior.

In *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951, 957 (Fed. Cir. 2000),

the Federal Circuit examined the disclaimer issue in the context of a patent related to outer footwear.

*Id.* at 952.  The invention involved a heel having a central groove and a double fin.  *Id.* at 952-53.

During prosecution, the inventor canceled the original claims and replaced them with three new

independent claims reciting a "central longitudinal groove."  *Id.* at 953.  The inventor also submitted

drawings comparing the features of the claimed invention to a hypothetical prior art combination.  *Id.*

at 953, 956.  The inventor then distinguished the prior art by arguing the claimed invention provided a

1   "much narrower groove" for the "totally different purpose" of involving as much of the underneath

2   footwear surface as possible in a cushioning and supporting function.  *Id.* at 954, 956.  One of the

3   distinguished prior art references taught a shoe with a groove width greater than the combined width

4   of the two fins.  *Id.* at 956.  The Federal Circuit upheld the district court's decision holding that the

5   inventor necessarily defined the "central longitudinal groove" as requiring a width that must be less

6   than the combined width of the two fins.  *Id.*  The Court declined the patentee's invitation to erase the

7   inventor's disavowal from the prosecution history, emphasizing the importance of a public record

8   upon which reasonable competitors form their business strategies. *Id.*

9       A "reasonable competitor" vantage point was also employed in *Cybor Corp. v. FAS Techs.*,

10  Inc., 138 F.3d 1448 (Fed. Cir. 1998).  The patent in issue related to pumps used for dispensing

11  volumes of liquid onto semiconductor wafers.  *Id.* at 1451.  The initial claim language was a "second

12  pumping means."  *Id.* at 1458.  The accused product was a dual stage pump.  *Id.* at 1452.  In order to

13  overcome a prior art rejection, the inventors characterized the prior art as providing a container

14  separate from a conveying pump.  *Id.* at 1458.  The inventors emphasized the separateness of the

15  container, both physically and functionally, as compared to the claimed invention.  *Id.*  The *Cybor*

16  Court framed the question as "whether a competitor would reasonably believe that the applicant had

17  surrendered the relevant subject matter." *Id.* at 1457.

18          **b.     *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359 (Fed. Cir. 2007).**

19      Just one year ago, in a case nearly identical to the one at bar, the Federal Circuit held that

20  "[c]lear assertions made during prosecution in support of patentability, whether or not actually

21  required to secure allowance of [any one] claim, may also create an estoppel," because "[t]he relevant

22  inquiry is whether a competitor would reasonably believe that the applicant had surrendered the

23  relevant subject matter."  *PODS,* 484 F.3d 1359 (citation omitted) (alterations in original).

24  Accordingly, the Federal Circuit held that a prosecution disclaimer as to one claim may be applicable

25  to another claim not specifically addressed by the patentee during prosecution.

26      The asserted patent in *PODS* was directed to an apparatus and method for lifting a storage

27  container from the ground onto a transport vehicle.  During prosecution, the patentee amended at least

28  two apparatus claims to require a four-sided rectangular "carrier frame."  The patentee did not,

however, expressly amend a method claim that contained similar "carrier frame" claim terms. Porta Stor's accused apparatus for lifting storage containers was a three-sided structure with an open end that forms a U-shaped apparatus (and thus, the Porta Stor apparatus did not literally infringe the apparatus claims). Nevertheless, the district court found that because the "carrier frame" language in the *method* claim was not amended during prosecution, it was not limited to a four-sided rectangular-shaped frame. The district court thus found that this method claim was literally infringed (and the other apparatus claims to be infringed under the doctrine of equivalents).

On appeal, the Federal Circuit reversed the district court's claim construction, holding that the same terms in different claims should be given the same meaning unless the specification and prosecution history make expressly clear that the terms have different meanings. *Id.* In *PODS,* the Federal Circuit found no evidence in the specification or prosecution history that the common claim term "carrier frame" had different meanings in the apparatus claim as compared to the method claim. Indeed, the only embodiment disclosed in the specification had four sides, and during prosecution a reference was distinguished on the grounds that the patent claimed a rectangular-shaped frame. Thus, the Federal Circuit determined that the claim term "carrier frame" required a four-sided structure in all the claims – even though the patentee only expressly amended the apparatus claims during prosecution. Applying the "reasonable competitor" standard discussed above, the Federal Circuit found that a competitor would reasonably believe that PODS had surrendered any claim to a frame that was not rectangular or four-sided in shape, such as Porta Stor's three-sided, u-shaped device. *Id.*[5] Accordingly, a patentee's statements during prosecution are properly applied to limit the ordinary meaning of the claims.

---

[5] *See generally*, *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573 (Fed. Cir. 1996) (stating if two alternative interpretations are equally plausible, the court will choose the narrower one in order to avoid unfair surprise to the public).

1     **B.     APPLYING THE LAW OF CLAIM CONSTRUCTION TO THE '884 PATENT**

2          **1.     Summary**

3          Conair and Rite Aid believe that Tonytail is asserting claims 4 and 5 of the '884 Patent.  For

4     convenience, claim 4 is reproduced below (the claim terms jointly selected by the parties for

5     construction pursuant to the Court's Case Management Order are underscored):[6]

6          4.     A hair binding method, for use by a person having a ponytail having a
              ponytail end, for securing said ponytail, using a device comprising <u>an elastic band</u>
7              <u>having a pair of elastic band ends</u>, <u>synthetic hair fibers having an appearance</u>
              <u>similar to the ponytail and having a pair of synthetic hair fiber ends</u>, <u>the synthetic</u>
8              <u>hair fiber ends joined to the elastic band ends</u> <u>to form a closed loop</u>, comprising
              the steps of:
9                  encircling the ponytail with the device by inserting the ponytail end
              through the closed loop of said device;
10                  tensioning the device around the ponytail by doubling up the device; and
11                  <u>covering the elastic band with the synthetic hair fibers so that the outward</u>
12              <u>appearance of the device is formed solely by the synthetic hair fibers</u>.

13

14          The description of the invention in the '884 Patent could hardly be more clear.  Nevertheless,

15     the Plaintiff proposes an unsupportable construction in a misguided attempt to broaden the claim scope

16     of the '884 Patent to cover the device described by the Brown '211 Patent, and by extension, the

17     Accused Products.  While a Court should not use the Accused Products to construe the claims, the

18     Court should not be kept ignorant of the import of the claim construction disputes to the final

19     resolution of the case.

20          Specifically, Plaintiff alleges that the Accused Products, which include a ponytail holder

21     having an elastic band permanently attached <u>to only one</u> end of a length of synthetic hair, fall within

22     the scope of claim 4 of the '884 Patent.  Plaintiff's position must be summarily rejected for at least

23     two fundamental reasons.  First, the patentee explicitly disavowed the subject matter disclosed in the

24     Brown '211 Patent, and thus, the claims cannot be construed to cover the invention disclosed in

25     Brown '211.  The Accused Products are nearly identical to the devices disclosed in the Brown '211

26     _____

27     [6] The Defendants believe that the claim of U.S. Patent No. D453,239 should also be construed.

28

Patent.  Second, the patentee's own admissions during prosecution *confirmed* its intent that the '884 Patent not cover the subject matter disclosed in the Brown '211 Patent.  In particular, the patentee amended its claims to <u>not</u> cover a ponytail holder having an elastic band permanently attached <u>to only one</u> end of a length of synthetic hair.  *See* Fitzpatrick Decl., Exhibit E.  According to the doctrines of prosecution disclaimer and specification disavowal, Plaintiff's proposed construction must be rejected.

### 2.    The term "an elastic band having a pair of elastic band ends" means an elastic cord whose two ends are not joined to one another.



FIG. 3

Even though a person of ordinary skill in the art of hair accessories may comprehend the ordinary meaning of the claim term "an elastic band having a pair of band ends," this term should be construed under the doctrines of claim scope disavowal and prosecution disclaimer to have limited claim scope because of statements made by the patentee in the specification and during prosecution.  As discussed herein, the claim term "an elastic band having a pair of elastic band ends" should be limited to "an elastic cord whose two ends are not joined to one another."



FIG. 1

First, the '884 Patent's specification only describes a <u>single</u> embodiment of a hair binding device used to perform the method of independent claim 4.  Indeed, the written description in the specification detailing the method is only three paragraphs long, and explicitly states: "Fig. 3 illustrates [shown above] the binding device **10** <u>in use</u> binding the hair of a person…," Col. 2, lines 57 – 58 (emphasis added).  The hair binding device of reference numeral **10** (shown left) has an elastic cord **12** whose two ends **12E** <u>are not joined to one another</u>, but rather, "a pair of connectors **14E** are used to permanently join <u>each one of the elastic band ends **12E** to one of the hair fiber ends **14E**</u>.  Accordingly, the synthetic hair fibers **14** and elastic band **12** together form a closed loop," Col. 2, lines 31 – 32.  As a result, this claim term cannot be construed to cover a hair binding device having

1    an elastic band whose ends are joined to one another because, according to the specification's

2    teaching, the ends must be joined to the synthetic hair fiber ends.

3        Second, there is simply no disclosure in the specification for a hair binding device having an

4    elastic band or cord whose ends are joined to one another.  Plaintiff's proposed construction: "…an

5    elastic strip whose two ends serve to join together and encircle…" finds no support in the specification

6    and is flatly contrary to the one embodiment of the device described in the specification.  When, as

7    here, the specification only describes and enables one embodiment, the claims are correctly limited to

8    that embodiment.  *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d at 1383.  Moreover, practically

9    speaking, Plaintiff's proposed construction is illogical.  The elastic band ends of the device cannot

10    simultaneously "join together," "encircle," and later, form a "closed loop" with the synthetic hair fiber

11    ends as required later in the claim.

12        Third, the specification and prosecution history

13    also disparaged prior art by distinguishing the '884

14    patent claims from the Brown '211 Patent that

15    disclosed an elastic band having ends joined to one

16    another (see Brown '211, Fig. 1, ref. **15**, right).  The

17    patentee explicitly disavowed the apparatus disclosed

18    in the Brown '211 Patent by stating in the '884



19    Patent's specification that "[while the Brown '211 devices] may be suitable for the particular purpose

20    employed, or for general use, <u>they would not be suitable for the purposes of the present invention</u>…"

21    (the '884 Patent, Col. 1, lines 31 – 35)(emphasis added).  In other words, the '884 Patent's

22    specification expressly distinguished the invention claimed therein from prior art (the Brown '211

23    Patent) that disclosed an elastic band whose band ends are joined to one another.  When, as here, the

24    specification purports to distinguish other devices because they have features different from those of

25    the device that is the subject of the patent, claims must be interpreted to exclude those features:

26            Where the specification makes clear that the invention does <u>not</u> include a
            particular feature, that feature is deemed to be outside the reach of the
27            claims of the patent, <u>even though the language of the claims, read without
            reference to the specification, might be considered broad enough to</u>
28

- 13 -

1    <u>encompass the feature in question.</u>

2    *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d at 1341 (emphasis added).

3    Accordingly, the expression "pair of elastic band ends" therefore excludes from its scope elastic band

4    ends joined to one another.

5
6    **3.    The term "synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends" means synthetic hair fibers whose two ends are not joined to one another.**

7    Like the "elastic band…" claim term discussed above, a person of ordinary skill in the art may

8    comprehend the ordinary meaning of the claim term "synthetic hair fibers having an appearance

9    similar to the ponytail and having a pair of synthetic hair fiber ends."  However, this term should be

10   construed to have limited claim scope under the doctrines of claim scope disavowal and prosecution

11   disclaimer because of statements made by the patentee in the specification and during prosecution.

12   Specifically, the term should be limited to "synthetic hair fibers [having an appearance similar to the

13   ponytail] whose two ends are not joined to one another."  As a result, this claim term cannot be

14   construed to cover a hair binding device having synthetic hair ends joined to one another.

15   As discussed above, the specification only describes a single embodiment of the hair binding

16   device used in the method at issue. The specification defines the hair binding device as having

17   synthetic hair fibers, where "the synthetic hair fibers **14** are all of substantially the same length, and

18   collectively have a pair of synthetic hair fiber ends **14E**," Col. 2, lines 25 – 27.  As shown in Fig. 1,

19   reproduced above, the hair fiber ends are not joined to one another, but rather, "connectors are used to

20   permanently join <u>each one of the elastic band ends to one of the hair fiber ends…together form[ing] a</u>

21   <u>closed loop</u>," Col. 2, lines 31 – 32.  Accordingly, both the specification and the claim itself require a

22   device having synthetic hair fiber ends joined to elastic band ends – not to one another.

23   Additionally, the specification and prosecution history also disparaged prior art by

24   distinguishing the '884 patent claims from the Brown '211 Patent that disclosed a length of synthetic

25   hair whose ends <u>could</u> be joined to one another by jaws or a pin (*See* Brown '211 Patent, Col. 5, lines

26   5 – 8, stating "the user secures end 22 in place, wound around elastic 12, by opening jaws of hair pin

27   24, inserting the outer jaws <u>into, through or around the wrapped length of [synthetic] hair</u>,") (emphasis

28

- 14 -

added).  The expression "pair of synthetic hair fiber ends" therefore excludes from its scope synthetic hair fiber ends joined to one another.

> **4.     The term "the synthetic hair fiber ends joined to the elastic band ends" is limited to a device "where one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends."**

This proposed construction quotes verbatim the patentee's own description of the device used in the claimed method.  As noted above, the patentee amended its claims during prosecution to overcome an obviousness rejection over the Naidor '119 patent in light of the Brown '211 Patent. Specifically, the patentee amended the claim term "wherein each of the elastic band ends is permanently joined with one of the synthetic hair fiber ends" of independent claim 1 to specify that "one of elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other the synthetic fiber ends...," (*see* Fitzpatrick Decl., Exhibit E) (emphasis added).  This amendment was necessary to – in the patentee's own words – "help clarify the claims and ensure they do not inadvertently read upon Naidor," *id*. Essentially, the patentee amended independent claim 1 (an apparatus claim) to overcome the rejection by limiting the claimed ponytail holder to a device where both ends of an elastic band are permanently joined to synthetic hair fiber ends.  Even though the patentee did not amend independent claim 4 of the '884 Patent (a method claim for using the apparatus) during prosecution, Federal Circuit precedent instructs that this claim term must likewise be limited to a device where both of the elastic band ends are permanently joined to corresponding synthetic hair fiber ends.

The Federal Circuit has repeatedly stated that the same terms appearing in different portions of a claimset should be given the same meaning absent a clear indication otherwise in the specification and the prosecution history.  *See PODS,* 484 F.3d 1359.  As the Federal Circuit stated just one year ago in *PODS*, "[c]lear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of [any one] claim, may also create an estoppel," because "[t]he relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *PODS,* 484 F.3d 1359 (citation omitted) (emphasis added) (alterations in

1   original).  Accordingly, claims 4 and 5 must be limited to a method for using a hair binding device

2   according to claim 1 (and the specification) where – in the patentee's own words – both of the elastic

3   bands ends are joined to corresponding synthetic hair fiber ends.

4        The Federal Circuit's decision in *PODS* is particularly instructive in this case.  As discussed

5   above, PODS and Porta Star were competing storage and moving companies.  PODS sued Porta Stor

6   for patent infringement based on its patent directed to a method and apparatus for moving a storage

7   container in and out of a truck.  The claim term at issue was "carrier frame."  That term was used in

8   both claim 1 (an independent apparatus claim) and claim 29 (an independent method claim).  During

9   prosecution, the patentee amended claim 1 to overcome a prior art rejection by explicitly limiting the

10  "carrier frame" claim term to a carrier frame with four sides.  Claim 29 proceeded to issue reciting

11  only "a carrier frame."  The lower court applied diverging meanings to the claim term in claim 1 and

12  claim 29 on the basis that the patentee had amended the term in claim 1 during prosecution, but not the

13  term in claim 29.  The Federal Circuit reversed, holding that claim construction should not vary from

14  the traditional presumption that the same terms appearing in different portions of the claims should be

15  given the same meaning <u>unless it is clear from the specification and prosecution history that the terms</u>

16  <u>have different meanings at different portions of the claims</u>.  *Id.* (emphasis added).  This presumption

17  serves the public notice function of the prosecution history – particularly with respect to competitors.

18  Moreover, the patentee failed to point to evidence in the specification or the prosecution history that

19  the term "carrier frame" in claim 29 has any meaning other than the more limited meaning in claim 1.

20  Additionally, because "the only embodiments [of the carrier frame] disclosed in the specification

21  [were] four-sided," the Federal Circuit held that the claim 1 definition should prevail throughout the

22  claimset.  *Id.*

23        Here, like in *PODS*, the claim term referring to elastic band ends joined to synthetic hair fiber

24  ends appears in two independent claims: claim 1 (an apparatus claim) and claim 4 (a method claim).

25  Like the patentee in *PODS*, the patentee here amended the apparatus claim (claim 1) to explicitly limit

26  the shared claim term to overcome the prior art, but did not amend the corresponding claim term in the

27  method claim (claim 4).  Specifically, during prosecution, the patentee distinguished the Naidor '119

28  and Brown '211 prior art patents on the ground that the amendment to the "elastic band ends joined to

1    synthetic hair fiber ends" claim term limited the claimed invention to a device where <u>each</u> of the

2    elastic band ends is permanently joined with a corresponding synthetic hair fiber end.  *See* Fitzpatrick

3    Decl., Exhibit E.   Accordingly, the amendment of the term in claim 1, like the amendment made by

4    the patentee in *PODS*, unmistakably shows that the patentee limited its claims to a device where both

5    of the elastic band ends are permanently joined with synthetic hair fiber ends.  Thus, the patentee

6    surrendered any claim to a device having a single elastic band end joined to a single synthetic hair

7    end.

8         Additionally, the specification permits an even cleaner resolution of the question in this

9    instance.  As discussed above, like the patent-in-suit in *PODS*, the specification here describes only a

10   single embodiment of the hair binding device used in the method at issue.   According to the

11   specification, the device uses "connectors [to] <u>permanently join each one of the elastic band ends to</u>

12   <u>one of the hair fiber ends…together form[ing] a closed loop</u>,"  Col. 2, lines 31 – 32.  The patentee

13   chose the phrase "<u>each one</u> of the elastic band ends" to indicate to the public that both elastic band

14   ends are joined to the synthetic hair fiber ends.  Simply speaking, no other configuration is described

15   or even contemplated in the '884 Patent.

16        Moreover, the specification and prosecution history also disparaged prior art by distinguishing

17   the '884 patent claims from the Brown '211 Patent that disclosed a length of synthetic hair that was

18   attached <u>at only one end</u> to the elastic band.   The patentee explicitly disavowed the apparatus

19   disclosed in the Brown '211 Patent.   The patentee expressly characterized the Brown '211 Patent as

20   teaching "a device which employs an elastic loop which can secure around a ponytail, and a length of

21   hair which is attached to the elastic loop at one end, <u>but is free at the opposite end</u>," *Id.* (emphasis

22   added).   The Plaintiff's proposed construction of this claim term omits the requirement that the elastic

23   band ends be <u>permanently</u> joined to the synthetic hair ends.  This construction cannot be adopted in

24   light of the patentee's express statements disparaging the Brown '211 Patent.  If, as the Plaintiff

25   suggests, the claim term covers a device where both elastic band ends are selectively or not

26   permanently joined to the synthetic hair fiber ends, the claim would necessarily and impermissibly

27   cover a device like that described in Brown, where a length of synthetic hair is attached to the elastic

28   band at one end but free at the opposite end.

At the very least, this claim term and the other claim terms at issue must exclude the device shown and described in the Brown '211 Patent. Notably, the Accused Products, like the device of the Brown '211 Patent, do not have a pair of elastic band ends joined to corresponding synthetic hair fiber ends to form a closed loop. The Plaintiff proposes an unsupportable construction in a misguided attempt to broaden the claim scope of the '884 Patent to cover the device described by the Brown '211 Patent, and by extension, the Accused Products. The Federal Circuit has emphasized the importance of understanding the context of the claim construction arguments. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326-27 (Fed. Cir. 2006). "While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Id.* In reciting this approach, the Federal Circuit positively cited its prior decision in *Multiform Dessicants Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476-78 (Fed. Cir. 1998), as an example. In *Multiform Dessicants*, the court considered the construction of the term "degradable" when the accused product burst open rather than dissolving. Rather than provide an affirmative construction of the full scope of the term "degradable," the Federal Circuit affirmed the district court's construction that "degradable" did not include the different mode of action of the accused product – bursting open. *Id.* Applying this approach here, this Court need not provide a construction that sets forth the metes and bounds of the '884 patent – rather, to be in a position to resolve the question of infringement, the Court can merely conclude that the '884 Patent does not include "a length of hair which is attached to the elastic loop at one end, but is free at its opposite end," Col. 1, lines 34 – 35. Since claims 4 and 5 of the '884 Patent cannot, as a matter of law, be construed to cover a ponytail binding device like the one disclosed in the Brown '211 Patent having elastic band attached to <u>only one</u> end of a length of synthetic hair, Plaintiff's proposed construction must be rejected.

### 5. The claim term "to form a closed loop" means "to form a single, unbroken ring."

The claim term "to form a closed loop" is not a term of art in the field of the invention, nor is it explicitly defined in the specification. Nevertheless, as discussed above, the specification describes

a single embodiment of the hair binding device used in the method at issue, and thus, this embodiment is instructive with respect to claim construction. With respect to the "closed" portion of the claim term, the patentee uses the terms "closed" and "continuous" interchangeably in the specification. *See* Col. 3, lines 8 – 10 ("since the elastic band portion <u>forms a continuous loop</u> with the less stretchable synthetic hair fibers…," emphasis added). Thus, the term "closed" should be construed as equivalent to "continuous." At the time the application that matured into the '884 Patent was filed, the definition of "continuous" was "uninterrupted in extent; without a break," The American Heritage® Dictionary of the English Language, Fourth Edition, Houghton Mifflin Company (2000). *See* Fitzpatrick Decl., Exhibit G. Accordingly, the "closed" portion of the claim term should be construed as "unbroken."

The term "loop" is also not explicitly defined in the specification. However, according to the embodiment described in the specification and figures of the '884 Patent, the elastic band and synthetic hair fibers are shown as arranged in a "ring" formation, *i.e.*, "a circular object, form, line, or arrangement with a vacant circular center," *id.* Notably, the specification describes prior art devices as having "elastic bands…<u>generally in the shape of a ring</u> which is stretched over the hair grouping, and released to hold the ponytail in place," Col. 1, lines 22 – 25 (emphasis added). The claim term "closed loop" should thus be construed as "unbroken ring." This construction is supported by the specification. Simply speaking, the disclosed embodiment does not contemplate a device having a "separable," "interrupted," or an otherwise "broken" ring. Indeed, a broken ring would either: (1) render the device inoperable for use in the claimed method; or (2) cover the prior art device described in the Brown '211 Patent. Neither alternative can be accepted.

In every description and figure of the '884 Patent, the invention is consistently shown and described as a single, unbroken ring. The specification describes the elastic band as having "a pair" of band ends joined to a corresponding pair of synthetic hair ends. Logically, the device can only be arranged in a single ring (since additional rings would require joining additional band ends and synthetic hair ends). Additionally, the patentee expressly amended claim 1 during prosecution to recite a device where "one of the elastic band ends is <u>permanently</u> joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is <u>permanently</u> joined with the other of the

1   synthetic fiber ends <u>so that the elastic bands and synthetic hair fibers together form a closed loop.</u>"

2   Fitzpatrick Decl., Exhibit E.  Accordingly, the expression "to form a closed loop" excludes from its

3   scope a device having more than one loop and a "broken" loop, and thus, should be construed as "a

4   single, unbroken ring."

> **6.    The claim term "covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers" means "adjusting the ring so that the outward appearance of the ring is formed only by synthetic hair fibers."**

9   As discussed above, the specification is limited to a single embodiment of the claimed method.

10  The specification states:

> Since the elastic band portion forms a continuous loop with the less stretchable synthetic hair fibers, the tensioned elastic band acts to pull the synthetic hair fibers tightly around the ponytail 52.
>
> Referring now to FIG. 4, once the binding device 10 has been looped or wrapped around the ponytail 52 numerous times, some of the loops consist of the elastic band, and several of which should consist entirely of the synthetic hair fibers 14.  <u>Accordingly, the synthetic hair fibers 14 may be pulled over the elastic band to conceal the elastic band and the connectors, so that the outward appearance of the binding device 10 is provided solely by the synthetic hair fibers, as seen in FIG. 4.</u>

18  Col. 3, lines 9 – 18 (emphasis added).  Fig. 4 is reproduced below.  In the context of the claim and the

19  description provided in the specification quoted above, the device – the ring formed by permanently

20  joining the elastic band ends to the synthetic hair fiber ends – is twisted around the ponytail numerous

21  times, and thereafter, the synthetic hair fibers are arranged to cover the elastic band.

22  Plaintiff's  proposed  construction  appears  to

23  divorce  the  synthetic  hair  fibers  from  the  "closed

24  loop"  structure.   This construction is unsupportable.

25  This Court has held that the context in which a term is

26  used in the asserted claim can be highly instructive.  *In*

27  *re Abbott Labs. Norvir Anti-Trust Litig.*, 442 F. Supp.

28  2d  800,  808-809  (N.D.  Cal.  2006).    There  exist



FIG. 4

1   numerous similar examples in which the use of a term within the claim provides a firm basis for

2   construing the term. *See, e.g., Mars, Inc. v. H.J. Heinz Co.,* 377 F.3d 1369, 1374 (Fed. Cir. 2004)

3   (claim term "ingredients" construed in light of the use of the term "mixture" in the same claim phrase).

4   Accordingly, the claimed step of "covering the elastic band with the synthetic hair fibers so that the

5   outward appearance of the device is formed solely by the synthetic hair fibers" cannot be construed as

6   separate and apart from the limitations set forth in the earlier portion of the claim, in particular,

7   "synthetic hair fibers joined to elastic band ends to form a closed loop."  Since the earlier portion of

8   the claim refers to the "closed loop" (construed above to be a "single, unbroken ring"), the step of

9   "covering the elastic band with synthetic hair fibers" should be construed as "adjusting the ring so that

10  the outward appearance of the ring is formed only by synthetic hair fibers."

11  ### C.     THE LAW OF CLAIM CONSTRUCTION AS APPLIED TO THE '239 PATENT

12          To the extent the Court is willing to construe the design patents, the Defendants believe that in

13  the interests of judicial economy, such attention by the Court may be dispositive.  In particular, a

14  claim construction issued by the Court at this stage may permit the parties to readily dispose of this

15  action on summary judgment.

16          Defendants most respectfully note that the Federal Circuit has determined that claim

17  construction is a requirement of design patent litigation.  *See Elmer v. ICC Fabricating,* 67 F.3d 1571

18  (Fed. Cir. 1995).  Accordingly, Conair and Rite Aid request the Court prepare a written description of

19  the "visual impression" created by the drawings in the '239 design patent pursuant to *Contessa Food*

20  *Products v. Conagra,* 282 F.3d 1370, 1377 (Fed. Cir. 2002) (holding that he scope of the claim of a

21  patented design "encompasses 'its visual appearance as

22  a whole,' and in particular 'the visual impression it

23  creates.'")(citation omitted).

24          Conair and Rite Aid propose the following

25  description of the "visual impression" created by the

26  figures of the '239 Patent:  "A ponytail holder in the

27  shape of a single oval having a top (or upper) half, a

28  bottom (or lower) half, and two small, identical



U.S. Patent          Jan. 29, 2002     Sheet 1 of 2          US D453,239 S

Fig. 1

- 21 -

1   cylinders connecting the top half of the oval to the bottom half of the oval.  The top half of the oval is

2   made up of multiple, identical, and textured fibers.  All of the fibers are approximately the same

3   length, and collectively they shaped into a semi-circle.  The bottom of the oval is formed by a single,

4   smooth cord, shaped into a reciprocal semi-circle.  Each of the two cylinders connecting the top half

5   of the oval to the bottom half of the oval has a top opening, a bottom opening, and a portion that

6   generally tapers from the top opening towards the bottom opening.  The fibers of the top half of the

7   oval are collected together at either lengthwise end of the semi-circle.  The fibers at one end are

8   inserted into a top opening of one of the two cylinders.  The fibers at the other end are inserted into the

9   top opening of the other of the two cylinders.  Similarly, a portion at the lengthwise end of the single,

10  smooth cord is inserted into a bottom opening of one of the two cylinders.  A portion at the otherwise

11  lengthwise end of the cord is inserted into the bottom opening of the other of the two cylinders."  This

12  proposed construction addresses each of the features of the ornamental design shown in the figures.

13  **III.    CONCLUSION**

14          For the foregoing reasons, Conair and Rite Aid respectfully request that the Court adopt their

15  proposed constructions.

16

17

18  Dated: May 9, 2008                              CONAIR CORPORATION AND RITE AID
                                                    HDQTRS. CORP.

19                                                  By its attorneys,

20
                                                    /s/ Thomas F. Fitzpatrick
21                                                  Thomas F. Fitzpatrick
                                                    tfitzpatrick@goodwinprocter.com
22                                                  GOODWIN PROCTER LLP
                                                    135 Commonwealth Drive
23                                                  Menlo Park, California 94025
                                                    Tel.:  650-752-3144
24                                                  Fax:  650-853-1038

25

26

27

28

DEFENDANTS CONAIR CORPORATION'S AND RITE AID HDQTRS. CORP'S OPENING CLAIM CONSTRUCTION BRIEF
Case No. 3:07-cv-05895-WHA