1  Matlock Law Group, PC
   Anne-Leith Matlock (SBN 244351)
2  1485 Treat Blvd., Suite 200
   Walnut Creek, CA 94597
3  Telephone: (925) 944-7131
   Facsimile: (925) 944-7138
4
   Attorney for Plaintiff,
5  Counterdefendant,
   THE TONYTAIL COMPANY, INC.
6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10              SAN FRANCISCO DIVISION

11

12

13  THE TONYTAIL COMPANY, INC., a      Case No.: 3:07-cv-05895-WHA
    Delaware Corporation,
14                                      TONYTAIL COMPANY INC.'S
              Plaintiff, Counterdefendant,   RESPONSE IN OPPOSITION TO
15                                      DEFENDANTS' CONAIR
         v                              CORPORATION'S AND RITE AID
16                                      HDGTRS CORP.'S OPENING CLAIM
    CONAIR CORPORATION, SCUNCI INT'L,   CONSTRUCTION BRIEF
17  LTD., RITE AID CORPORATION., L&N
    SALES & MARKETING INC., and 1-10,   Date:   May 28, 2008
18  inclusive,                          Time:   1:30 p.m.
                                        Dept.:  Courtroom 9, 19th Floor
19            Defendant, Counterclaimant.   Judge:  Honorable William H. Alsup

20

21

22

23

24

25

26

27

28

Matlock Law
Group, PC.

                                    i

# TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................................ 1

II.      ARGUMENT:  Construction of the '884 Patent.................................................. 1

     A.   Disputed Step 1:  "...an elastic band having a pair of elastic band ends..."............. 1

        1.   The '884 Patent's specification describes more than a single embodiment because the method disclosed in the Summary of the Invention section of the specification is broader than the method disclosed in the Preferred Embodiment section of the specification. ............................................................. 1

        2.   The reference to the Brown '211 patent in the Background of the Invention Section of the '884 Patent does not clearly disavow the joining of the elastic band ends together.................................................................................................. 6

        3.   Defendants' Opening Brief does not argue for the use of the word "cord" in replacement of the word "band" therefore the original term "band" as used in claims 4 and 5 must stand.............................................................................. 8

     B.   Disputed Step 2:  "...synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends..." ........................................ 9

        1.   With regard to the synthetic fiber ends, the '884 Patent's specification describes more than a single embodiment because the method disclosed in the Summary of the Invention section of the specification is broader that the method disclosed in the Preferred Embodiment section of the specification... 9

        2.   Citation of the Brown '211 patent in the specification and the prosecution history is not a clear disavowal of claim scope in the '884 patent.................... 10

        3.   Even if one can use an element in the Brown Patent that was not cited as grounds for rejection to limit a claim's scope, the Brown '211 patent does not preclude a construction allowing the synthetic hair fiber ends to be joined to one another. ........................................................................................................ 11

     C.   Disputed Step 3:  "...the synthetic hair fiber ends joined to the elastic band ends..." ...................................................................................................................... 12

        1.   The original claim language of Disputed Step 3 does not violate the rule from PODS, Inc. v. Porta Stor, Inc. as cited by the Defendants because "joined" and "permanently joined" are two different terms.......................................... 12

        2.   Notwithstanding that the terms "permanently joined" and "joined" are two different terms, PODS is also distinguishable from the present case because PODS uses a term definition to limit an element whereas Defendants' seeks to use an element in claim 1 to limit a different element in claim 4. ................... 14

Matlock Law
Group, PC.

3.   Construing the proper bounds of Disputed Step 3 is necessary to resolve the parties' dispute over the term and necessary to place the court in a proper position to resolved the ultimate question of infringement............................ 15

D.   Disputed Step 4: "...to form a closed loop..." ........................................... 16

1.   The term "closed loop" is not equivalent to "unbroken ring" because "unbroken" impermissibly imports a temporal limitation and "ring" imports an impermissible circular limitation. ................................................................. 16

E.   Disputed Step 5: "...covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers..." ........................................................................................................... 19

1.   Separately adjusting the synthetic fibers does not require the adjustment of the entire hair binding device. ........................................................................... 19

F.   Disputed Step 6: "...encircling the ponytail with the device by inserting the ponytail through the closed loop of said device..." ...................................... 20

G.   Plaintiff does not disavow any claim scope that might have been determined under the doctrine of equivalents' and its use of prosecution history. ............................... 20

III.        ARGUMENT:  Construction of the ''D239 and 'D693 Design Patents.......... 21

IV.         CONCLUSION ................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# <u>TABLE OF AUTHORITES</u>

2

<u>Aguayo v. Universal Instruments Corp.</u>,

3

356 F.Supp.2d 699, 727 (S.D. Tex 2005) ................................................................ 3, 5

4

<u>Arminak & Assoc., Inc. v. Saint-Gobain Calmar, Inc.</u>,

501 F.3d 1314 (Fed. Cir. 2007) ............................................................................... 23

5

<u>Bernhardt v. Collezione</u>,

6

386 F.3d 1371 (Fed. Cir. 2004) ............................................................................... 25

7

<u>Biodex Corp. v. Loredan Biomedical, Inc.</u>,

8

946 F.2d 850, 862-63 (Fed. Cir. 1991) ............................................................. 20, 21

9

<u>C.R. Bard, Inc. v. U.S. Surgical Corp.</u>,

388 F.3d 858, 864, 865 (Fed. Cir. 2004) .................................................................. 5

10

11

<u>Comark Comms., Inc. v. Harris Corp.</u>,

156 F.3d 1182, 1187 (Fed. Cir. 1998) ..................................................................... 17

12

<u>Conco, Inc. v. Energy Environ. Int'l, L.C.</u>,

13

460 F.3d 1349, 1364 ............................................................................................... 13

14

<u>Contessa Food Products v. Conagra</u>,

15

282 F.3d 1370, 1377 (Fed. Cir. 2002) ........................................................ 21, 22, 24

16

<u>Cultor Corp. v. A.E. Staley Manufacturing Co.</u>,

224 F.3d 1328,56 (Fed. Cir. 2000) ........................................................................... 7

17

18

<u>CytoLogix Corp. v. Ventana Med. Sys., Inc.</u>,

424 F.3d 1168, 1172 (Fed. Cir. 2005) ..................................................................... 23

19

<u>Door-Master Corp. v. Yorktowne, Inc.</u>,

20

256 F.3d 1308, 1313 (Fed. Cir. 2001) ............................................................... 24, 25

21

<u>Egyptian Goddess</u>  Questions Presented before

22

the Court of Appeals for the Federal Circuit (2008)…………...……...............................21

23

<u>Gorham Co. v. White</u>,

24

81 U.S. 511, 528 (U.S. 1872) ..................................................................... 1, 22, 24

25

<u>In Pro II Licensing v. TMobile USA, Inc.</u>,

450 F.3d 1350, 1353 (Fed. Cir. 2006) .......................................................... 3, 4, 9, 10

26

27

<u>Klausner Technoloigies, Inc. v. Vonage Holdings Corp.</u>,

2007 U.S. Dist. LEXIS 57604, 22 n.6. (E.D. Tex. 2007) ........................................ 15

28

iv

Liebel-Flarsheim,
358 F.3d 898, 906 (Fed. Cir. 2007) ............................................................................ 2, 17

Markman v. Westview Instruments, Inc., 527 U.S. 370 (1996) ................................. 23, 25

Microsoft Corp. v. Multi-Tech Sys. Inc.,
357 F.3d 1340, 1348 (Fed. Cir. 2005) ................................................................... 2, 3, 5

Mobile Hi-Tech Wheels v. CIA Wheel Group,
514 F. Supp.2d 1172 (C.D. Cal. 2007) ................................................................... 22, 23

Multiform Dessicants Inc. v. Medzam, Ltd.,
133 F.3d 1473, 1476-78 (Fed. Cir. 1998) ............................................................... 15, 16

O.I. Corp. v. Tekmar Co.,
115 F.3d 1576, 1581 (Fed. Cir. 1997) ......................................................................... 7

Omega Eng'g, Inc. v. Raytek Corp.,
334 F.3d 1313, 1325-26 (Fed. Cir. 2003 ...................................................................... 1

Phillips v. AWH Corp., 415 F.3d 1303, (Fed. Cir. 2005) (en banc) ............................. 23, 25

PODS, Inc. v. Porta Stor Inc.,
2006 U.S. Dist. LEXIS 36486, 12-13 (Fl Middle Dist. 2006) ........................................ 12

PODS, Inc. v. Porta Stor, Inc.,
484 F.3d 1359 (Fed. Cir. 2007) .......................................................................... 12, 13, 14

Saint-Gobain Calmer, Inc. v. Arminak, Brief of Amicus Curiae
Industrial Designers Society of America in support of Petition for
Writ of Certiorari before the Supreme Court of the United States,
No. 07-1263, May 5, 2008 (2008) ........................................................................... 23, 24

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,
242 F.3d 1337, 1341 (Fed. Cir. 2001) ................................................................... 6, 7, 8

Southwall Techs., Inc. v. Cardinal IG Co.,
54 F.3d 1570 ............................................................................................................. 13

Toro Co. v. White Consolidated Industries, Inc.,
199 F.3d 1295,53 (Fed. Cir. 1999) .............................................................................. 7

Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999) ....... 3, 4, 9, 10

Matlock Law
Group, PC.

v

1    I.      **INTRODUCTION**

2           Plaintiff Tonytail Company, Inc. respectfully submits its response in opposition to

3    Defendants Conair Corporation's and Rite Aid's Opening Claim Construction Brief.  Generally

4    speaking, Defendants' proposed claim constructions for claim 4-5 of the '884 patent seeks to

5    impermissibly narrow clear claim language by (i) erroneously importing narrow embodiments

6    from the specification despite the disclosure of broader embodiments in the same specification;

7    (ii) improperly importing elements from cited prior art where such elements were not a basis of

8    rejecting for the method claims at issue; (iii) attributing the same definition for clearly two

9    different terms; (iv) forcing dictionary definitions of non-disclosed terms on unambiguous

10   terms in order to import impermissible limitations and (v) employ a strained reading of the

11   claim language itself in order to impose structural limitations not supported by the claims, the

12   specification, or the prosecution history.  These attempts to narrow claims 4-5 fall short of

13   demonstrating that the patentee made a "clear and unmistakable" disavowal of claim scope.

14   <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d 1313, 1325-26 (Fed. Cir. 2003).

15          Additionally, despite being an open question of law, Defendants request the court to

16   construe the design patents 'D239 and 'D693.  In support, Defendants briefly argue the

17   interests of judicial economy.  However, in light of the longstanding Supreme Court test

18   announced in <u>Gorham Co. v. White</u>, 81 U.S. 511, 528 (U.S. 1872), construction of the

19   ornamental appearance claimed in the questioned design patents from the viewpoint of the

20   ordinary observer would best occur during trial.

21   II.     **ARGUMENT:  Construction of the '884 Patent**

22          A. <u>Disputed Step 1</u>:  **"...an elastic band having a pair of elastic band ends..."**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| an elastic band whose two ends serve to join together and encircle... | ...an elastic cord whose two ends are not joined to one another... |

          1.    **The '884 Patent's specification describes more than a single
          embodiment because the method disclosed in the Summary of the Invention
          section of the specification is <u>broader</u> than the method disclosed in the
          Preferred Embodiment section of the specification.**

1    The specification discloses a broader method than Defendants' cited method.  It is error

2    to limit a claim to the preferred embodiment if the specification supports a broader

3    interpretation.  Liebel-Flarsheim, 358 F.3d 898, 906 (Fed. Cir. 2007).  Further, as Defendants

4    cited, if a specification calls an embodiment 'the invention'…it is appropriate to limit the

5    claims to that embodiment." Microsoft Corp. v. Multi-Tech Sys. Inc., 357 F.3d 1340, 1348

6    (Fed. Cir. 2005).  Therefore, claims must not be narrowed to the preferred embodiment when a

7    broader embodiment contained in the specification is described as "the invention."

8    The claim language of Disputed Step 1 does not contemplate a limitation requiring the

9    elastic bands ends to be joined to one another.  Defendants cite language from the Preferred

10   Embodiment section in support of their argument that the '884 Patent's specification only

11   describes one embodiment.  Defendants' Opening Claim Construction Brief ("Defendants'

12   Brief") p12 lines 18-28.  However, the Summary of the Invention section describes the method

13   as a "system…using a device comprising synthetic hair fibers joined to an elastic band to form

14   a closed loop.  The synthetic hair fibers are joined to the elastic band with a pair of connectors."

15   (See Exhibit A to the Declaration of Anne-Leith W. Matlock in Support of Tonytail Company,

16   Inc.'s Response in Opposition to Defendants' Brief ("Matlock Decl.") Patent 1:53-57.)

17   Notably absent from this language is Defendants' construction that the elastic band ends are not

18   joined to one another.  Further, a proper reading of the referenced portion of the Summary of

19   the Invention section of the specification only requires that the synthetic hair fibers are joined

20   to the elastic band via a pair of connectors in order to form a closed loop.  Thus a number of

21   embodiments are possible, where the elastic band ends may be joined to one another and to the

22   synthetic hair fibers ends which are also joined to each other.  (See Matlock Decl. Exhibit B.)

23   This joining of all the ends (hair fibers and elastic band) naturally occurs during the practice of

24   the claim 4 method as indicated at the base of the ponytail 52 as illustrated in FIG. 3 (See

25   Matlock Decl. Exhibit A).  Further, nothing prevents said joining from occurring on the same

26   end of the device during the practice of the method recited in claim 4.  Reading Defendants'

27

28

1  construction would add a limitation to claim 4 that is contrary to the actual practice of the

2  method as illustrated in the patentee's Summary of the Invention portion of the specification.

3       Defendants' argument incorrectly assumes that the specification only disclosed a single

4  embodiment. In pointing to the Detailed Description portion that describes one embodiment

5  directed to the Preferred Embodiment, the Defendants mischaracterizes the '884 Patent as

6  disclosing only a single embodiment. Defendants dedicated much of their argument in support

7  of the claim disavowal doctrine by discussing the rule that when a specification discloses only a

8  single embodiment, the construction of the claims are properly limited to that single

9  embodiment. Defendants' Brief p6 lines 12-28 and p13 lines 4-8. In so doing, Defendants cite

10  a number of cases including: InPro II Licensing v. TMobile USA, Inc., 450 F.3d 1350 (Fed.

11  Cir. 2006); Aguayo v. Universal Instruments Corp., 356 F.Supp.2d 699, 727 (S.D. Tex 2005)

12  citing Microsoft Corp. at 1348 and Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1383

13  (Fed. Cir. 1999). Id. Despite this litany of cases, Defendants' application of the rules in these

14  cases mischaracterizes the '884 patent as disclosing only one embodiment. Specifically,

15  Defendants discuss InPro and Wang Labs for the proposition that when a specification

16  discloses only one embodiment, it is proper to limit the claims to that embodiment. However,

17  Defendants cited cases are not on point because the '884 Patent's specification discloses more

18  than one embodiment. Both the specifications in InPro II and Wang Labs clearly describe only

19  one embodiment whereas the '884 Patent's specification, read as a whole, clearly contemplates

20  more than one embodiment as recited at least in Patentee' Summary of Invention.

21       *a. InPro II Licensing.* At issue in InPro II was whether the term "host interface" for a

22  personal digital assistant should be construed narrowly as "a direct parallel bus interface" or

23  more broadly as to include any interface for providing communication, which would include

24  "indirect" or "serial" interface. In Pro II Licensing, 450 F.3d 1350, 1353. In construing the

25  claims narrowly, the Federal Circuit found that the specification in question (i) did not suggest

26  use of a serial connection with regard to the term "host interface" whereas the specification

27  explicitly described "serial" connection with another term in the specification; and (ii)

28  described the "direct bus interface" as a "very important feature" of the invention. Id. at 1355.

1    The instant case is distinguishable from InPro II, because (i) the '884 patent

2  specification discloses more than one embodiment; and (ii) Defendants' proffered construction

3  does not appear anywhere in the patent as a "very important" feature.  First, as discussed above,

4  the Summary of Invention in the '884 specification discloses a broader embodiment than that

5  disclosed by Defendants' cited language.  Unlike the term "host interference" in InPro II  the

6  term "elastic band ends" does not have the narrowing terms as advocated by the Defendant

7  because the broader embodiment was not explicitly narrowed by a requirement that the band

8  ends cannot be joined.    Secondly, unlike InPro II, nowhere in the patent are the elements of

9  Defendants' proposed construction described as a "very important" feature.  Since the present

10  case is distinguishable from InPro II on both counts, Defendants' InPro II argument must fail.

11    **b. _Wang Labs._**  Defendants similarly use the Wang Labs case to support their erroneous

12  contention that the '884 Patent contains only a single embodiment.  At issue in Wang Labs was

13  whether the term "frame" (used in processing and displaying computer generated data in a

14  videotex system) should be construed broadly to encompass both character display protocol and

15  bit-map based protocol.  In construing the claim narrowly, the Federal Circuit cited a typical

16  example of the term "frame" as used and defined in the subject patent: "in form of hundreds of

17  thousands of pages (frames) each representing a collection…of alphanumeric and graphic

18  characters to be displayed."  Wang Labs, 197 F.3d 1377, 1381.  Thus, the more narrow

19  definition "alphanumeric and graphic character" was typically used in the subject patent to

20  define the term "frames" and was the only embodiment described in the subject patent.  Unlike

21  the questioned term in Wang Labs, elastic band ends are not typically defined throughout the

22  '884 patent as "not being connected to one another."  In fact, as discussed above, the Summary

23  of the Invention and the '884 patent figures, read in context of claims 4 and 5, demonstrate a

24  joining of the elastic band ends in order to properly practice the subject method.  Since Wang

25  Labs is distinguished from the present case, Defendants' argument based on said case must fail.

26    **c. _C.R. Bard and Aguayo/Microsoft._**  Defendants attempt to narrow claim 4 by pointing

27  to the preferred embodiment, however, such narrowing would prevent the aforementioned

28  proper practice of the claim 4 and run contrary to two rules relied upon by the Defendant.  The

1  first of such rules state that "Statements in the Abstract, Background and Summary of the

2  Invention, although not determinative can signal that the claim term is limited because they are

3  more likely than a preferred embodiment to describe the invention as a whole." Defendants'

4  Brief p5 (citing C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 864, 865 (Fed. Cir. 2004).

5  Defendants' argument for their construction of Disputed Step 1 runs afoul of their cited rule

6  from C.R. Bard because Defendants' only point to language contained in the Preferred

7  Embodiment section of the '884 patent while ignoring the broader language in the Summary of

8  the Invention section. Defendants' Brief p12. Further, Defendants' argument ignores the

9  Patentee's drawings and the Detailed Description of the Preferred Embodiments, both of which

10  contemplate more than a single embodiment.

11        The second rule Defendants' cite is that "if the specification calls an embodiment 'the

12  invention' or the 'present invention', it is appropriate to limit the claims to that embodiment"

13  citing Aguayo 356 F.Supp.2d 699, 727 (S.D. Tex. 2005) (citing Microsoft Corp, 357 F.3d

14  1340, 1348). Defendants' cited language from the Preferred Embodiment does not describe the

15  disclosed method as "the invention." To the contrary, the Summary of the Invention language

16  discussed above explicitly uses the qualifier "the invention" to describe the ponytail binding

17  system claimed in claims 4 and 5. Patent 1:53-60. Therefore, Defendants' cannot rely on

18  Aguayo and Microsoft because the qualifying language "the invention" does not describe

19  Defendants' narrow construction but rather describes the broader embodiment in the

20  specification. Thus, under Aguayo and Microsoft, the claims must not be limited to

21  Defendants' proffered construction but must be construed to include the broader language

22  describing the method in the Summary of the Invention section.

23        Allowing Defendants' construction under their cited claim construction rules would

24  create greater ambiguity in patent terms, contrary to the public notice objective underlying most

25  claim construction rules. Specifically, Defendants' strained construction based on the preferred

26  embodiment despite disclosure of broader embodiments (i) in the Summary of the Invention

27  section; (ii) that occurs during the practice of the method claim; and (iii) described as "the

28  invention" would only serve to confuse the public into reading the preferred embodiment as

1  being the claims themselves as opposed to properly reading the claims in context of the entire

2  patent including the claims, figures, and entire specification.

3
### 2.    The reference to the Brown '211 patent in the Background of the Invention Section of the '884 Patent does not clearly disavow the joining of the elastic band ends together.

4

5       Defendants use the rule cited in <u>SciMed Life Sys., Inc. v. Advanced Cardiovascular

6  Sys., Inc.</u>, 242 F.3d 1337, 1341 (Fed. Cir. 2001) to erroneously support their argument that the

7  reference to the Brown '211 patent in the Background of the Invention section disavows

8  Plaintiff's construction for Disputed Step 1. Defendants' Brief p 13-14. Specifically,

9  Defendants cite the language stating that the Brown '211 patent is not suitable for the purposes

10  of the '884 patent. <u>Id</u>. Essentially, Defendants' argument attempts to convince the court that

11  when a questioned patent merely cites a prior art as not being able to fulfill the purpose of a

12  questioned patent then one can pick and choose any element in the prior art to narrow the claim

13  of the questioned patent. However, adopting such an illogical rule would create massive

14  ambiguity in a given patent because prior art elements, divorced from the totality of the prior

15  art, would be used to negate elements of the subject patent, divorced from reading the

16  questioned element in the context of the whole subject patent. In the present case, the examiner

17  rejected claims 1-3 based on 35 U.S.C. 103(a) for obviousness in based on the Naidor patent in

18  light of the Brown patent. The only feature from Brown discussed by the examiner was the

19  "synthetic hair fiber ends." *See* Matlock Decl. Exhibit C p2. In the same office action, the

20  examiner allowed claims 4-5. <u>Id</u>. at p3. In response, the Patentee responded by <u>first</u>

21  acknowledging the allowance of claims 4-5 <u>then subsequently</u> amending claims 1-3. To allow

22  Defendants' argument in this case would lead to the illogical conclusion that an element in the

23  Brown '211 Patent (the unattached synthetic hair fiber strand) that was reviewed by the

24  examiner but not cited for the basis of rejection could later operate to limit allowed claims that

25  were never rejected (claims 4-5).

26       **a. *SciMed Discussion*.** A proper reading of <u>SciMed</u> denies Defendants' arguments for

27  applying the <u>SciMed</u> rule solely on the reference to the Brown '211 patent. In <u>SciMed</u>, the

28

1  Federal Circuit held that when "the specification makes clear that the invention does not

2  include a particular feature, that feature is deemed to be outside the reach of the claims of the

3  patent, even though the language of the claims, read without reference to the specification,

4  might be construed broad enough to encompass the feature in question. SciMed, 242 F.3d at

5  1341 (emphasis added).  At issue in SciMed, was whether a specification describing dilation

6  catheters used in coronary angioplasty limits the scope of the asserted claims to catheters with

7  coaxial lumens, effectively excluding dual (or side-by-side) lumen arrangements. Id. at 1340.

8  The court applied the aforementioned rule by first discussing a number of cases where the

9  common underlying rule is that a specification can limit the scope of claims so long as the

10  specification explicitly makes such a limitation. Id., at 1341, 1342. (discussing Cultor Corp. v.

11  A.E. Staley Manufacturing Co., 224 F.3d 1328,56 (Fed. Cir. 2000) where an explicit reference

12  in the specification to the invention as a process limited to one prepared with a citric acid

13  catalyst is an effective disclaimer of the other prior art acids. (emphasis added) (discussing O.I.

14  Corp. v. Tekmar Co., 115 F.3d 1576, 1581 (Fed. Cir. 1997) where the written description

15  "expressly distinguished over prior art passages by stating that those passages are generally

16  smooth-walled" (emphasis added.)  (discussing Toro Co. v. White Consolidated Industries,

17  Inc., 199 F.3d 1295,53 (Fed. Cir. 1999) where a reading of the drawings and the specification

18  showed a permanently attached cover and described the advantages of the unitary structure as

19  important to the invention (emphasis added).

20         After discussing these cases, the Federal Court stated that at various points, the

21  specification used the coaxial lumens rather than the dual lumens in the following ways: (i) the

22  abstract of the patent referred to the questioned structure as "annular" (i.e. coaxial rather than

23  dual) in structure; (ii) the written description described a prior art disadvantage being based on

24  the dual lumen structure, thus effectively distinguishing prior art based on the advantages of the

25  coaxial structure over the dual structure; (iii) the Summary of the Invention section of the

26  subject patent cites several references to coxial or annular structures to describe the "present

27  invention"; and (iv) "most compelling" is language that includes an annular (or coaxial)

28

PLAINTIFF'S RESPONSIVE BRIEF TO DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

1   structure as being a basic structure for *"all embodiments of the present invention contemplated*

2   *and disclosed herein."* SciMed, at 1343, 1344.

3       ***b. SciMed Application.*** The above SciMed discussion demonstrates that the Federal

4   Circuit relied on clear and explicit language of scope disavowal contained throughout the

5   specification in order to narrow the questioned term. Applying this rule in the present case, the

6   '884 patent is strikingly different than the patent in SciMed. The '884 Patent is distinguishable

7   from the SciMed case on at least four grounds. First, the '884 Patent does not have an abstract

8   that requires the elastic bands not to be joined whereas the abstract in SciMed specifically

9   referred to the "annular" structure. Second, the '884 Patent does not distinguish prior art based

10  on a shortcoming of a particular element within the prior art where as the patentee in SciMed

11  distinguished prior art shortcomings based on the dual lumen structure. Third, the '884 Patent

12  does not state the "present invention" as including a requirement that the elastic band ends must

13  not be joined whereas, in the SciMed patent, "coxial" or "annual" structures were described as

14  "the present invention." Further, as previously discussed, the '884 patent uses "the invention"

15  language to describe a broader embodiment than the one supported by the Defendant. Lastly,

16  the '884 patent does not contain clear language that remotely suggest that "all embodiments of

17  the present invention contemplated and disclosed" by the '884 Patent must have elastic bands

18  that are not joined whereas the SciMed case used such language to limit structures to coaxial or

19  annular structures. Contrary to a clear application of the rule of law in SciMed requiring a

20  showing of a clear disavowal of subject matter, the Defendants' argument based on the sole

21  reference to the Brown '211 patent must fail. Accordingly, Disputed Step 1 must not be

22  construed to limit the joining of the elastic band ends to each other.

23       **3.    Defendants' Opening Brief does not argue for the use of the word**
        **"cord" in replacement of the word "band" therefore the original term**
        **"band" as used in claims 4 and 5 must stand.**

24

25  As discussed in Plaintiff's Opening Claim Construction Brief, replacement of the term "band"

26  by the word "cord" would add a structural limitation not supported by the claims, the

27  specification or the prosecution history. See Plaintiff's Opening Claim Construction Brief pp

28  6-7. In summary, since "cord" is defined as usually made of rope-like material, replacement of

8

1   the term "band" with "cord" would import the rope-like material limitation where there is no

2   such support found in the claims, specification or prosecution history.  Id.

3       **B.  Disputed Step 2: "…synthetic hair fibers having an appearance similar to the**
4           **ponytail and having a pair of synthetic hair fiber ends…"**

5   | Plaintiff's Construction | Defendants' Construction |
6   |---|---|
7   | synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends | …synthetic hair fibers whose two ends are not joined to one another… |

8   Defendants import much of their arguments for Disputed Step 1 in arguing for their

9   construction of Disputed Step 2.  First, Defendants argue that the specification only discloses

10  one embodiment where the synthetic fiber ends are not joined.  Second, Defendants cite the

11  language of the Brown '211 patent in conjunction with the reference to the Brown '211 patent

12  found in the specification and prosecution history in order to support their narrow construction

13  preventing the synthetic fiber ends from being joined.  Much of Defendants' arguments here

14  must fail in the same fashion Defendants' arguments for Disputed Step 1 fail.  Namely, (i) the

15  '884 patent disclosed more than one embodiment unlike the patents at issue in InPro II and

16  Wang Labs; and (ii) Defendants use of the Brown '211 is not a clear disavowal of claim scope

17  in the '884 patent.   Additionally, any purported "disavowal" could not possibly include a

18  joining of the synthetic fiber ends to each other because the Brown '211 patent does not

19  preclude a construction allowing the synthetic hair fiber ends to be joined to one another.

20          **1.      With regard to the synthetic fiber ends, the '884 Patent's**
            **specification describes more than a single embodiment because the method**
21          **disclosed in the Summary of the Invention section of the specification is**
            **broader than the method disclosed in the Preferred Embodiment section of**
22          **the specification.**

23  As discussed above, InPro II and Wang Labs allows an embodiment described in a

24  specification to limit the scope of a claim so long as the embodiment described is the only

25  embodiment disclosed in the specification.  InPro II Licensing at 1354-1355.  Wang Labs at

26  1383.  As discussed for Disputed Step 1, the Federal Circuit found that the specification only

27  disclosed one embodiment (a "direct" not a "serial" interface) because (i) the term "serial" was

28  not used in conjunction with the term "host interface" but was used with other terms; and (ii)

1   the specification described the term "host interface" as being a "very important feature" of the

2   invention. InPro II Licensing, at 1355. Unlike InPro II, the '884 patent specification does not

3   use the term "whose two ends are not joined to one another" in conjunction with the synthetic

4   hair fiber ends nor does the '884 patent specification describes such term as being a "very

5   important feature" of the invention." Further, Wang Labs cannot support Defendants'

6   contention that the '884 patent is a single embodiment. As discussed above, the Federal Circuit

7   stated that the specification typically referred to the term "frames" as limited to character

8   display protocols as oppose to bit-map based protocols. Wang Labs at 1383. (emphasis added.)

9   Unlike Wang Labs, the synthetic fibers are not typically described throughout the patent as "not

10  being connected to one another." Further, the '884 patent specification contemplates

11  embodiments broader than Defendants' cited language in the Preferred Embodiment section of

12  the patent. The Defendants' erroneously argue that the preferred embodiment language stating

13  that connectors joins "each one of the elastic band ends to one of the hair fiber ends" is the only

14  embodiment in the specification. Defendants' Brief p14 lines 16-22. However, as discussed in

15  Disputed Step 1, the Summary of the Invention and the '884 figures, read in context of claims 4

16  and 5, demonstrates a joining of the synthetic hair fiber ends to each other in order to properly

    practice the questioned method.

17              2.      Citation of the Brown '211 patent in the specification and the
                        prosecution history is not a clear disavowal of claim scope in the '884
18                      patent.

19          As discussed in Disputed Step 1, Defendants rely on SciMed to support the erroneous

20  argument that a specification citation to a prior art, absent clear and explicit language of scope

21  disavowal, may negate an element in the subject matter. However, as previously mentioned, the

22  Federal Circuit in SciMed took great care to cite a number of cases to demonstrate a clear and

23  explicit disavowal of scope necessary to allow a specification to narrow a claim's scope. Just

24  as there is no clear and explicit disavowal that the elastic band ends can be joined in Disputed

25  Step 1, there is no similar clear and explicit disavowal that the synthetic hair fiber ends cannot

26  be joined. This contention is further supported by the fact that the Office Action from the

27  United States Patent and Trademark Office (See Matlock Decl. Exhibit C) and subsequent

28  patent amendment (See Matlock Decl. Exhibit D) do not clearly and explicitly disavow the

1   joining of the synthetic fiber ends to each other.  In fact, the patent examiner's reason for

2   rejection states that:

3       "with regard to claims 1-2, Naidor discloses a hair binding device comprising an
4       elastic band with a pair of elastic band ends, a fur element having two ends and
        a pair of connectors joining each end of the band to each end of the fur element.
5       Naidor does not disclose synthetic hair fiber, however, Brown discloses a hair
        binding device comprising synthetic hair fibers" Office Action dated October 4,
6       2000.  (figure and patent citations omitted.) (see Matlock Decl. Exhibit C).

7
8   In response to this office action, the patentee specifically amended only claims 1-2 so that they

9   do not inadvertently read on Naidor and pursuant to a telephonic agreement between the

10  patentee and the office examiner.  (See Matlock Decl., Exhibit F p2.).  In this exchange

11  between the PTO and the patentee, it is clear that the only element from Brown discussed is

12  "synthetic hair fibers" being read into the Naidor claim.  Notably absent are elements

13  describing any sort of required joining of the elastic band ends to each other or the synthetic

14  fiber ends to each other.  At the very least, the absence of such limiting language in the

15  prosecution history cannot serve as a clear and deliberate disavowal of subject matter not

16  explicitly referenced in relation to Brown.  Since Defendants' citation to the Brown patent in

17  both the specification and in the prosecution history does not rise to the level of a clear

18  disavowal of subject matter as demonstrated in SciMed,  Defendants use of the Brown patent

19  citations cannot support Defendants' proffered construction of Disputed Step 2 impermissibly

20  limiting claims 4 and 5.

21          **3.    Even if one can use an element in the Brown Patent that was not
            cited as grounds for rejection to limit a claim's scope, the Brown '211
22          patent does not preclude a construction allowing the synthetic hair fiber
            ends to be joined to one another.**

23          Defendants cite language from the Preferred Embodiment section of the Brown patent

24  in support of their argument for claim disavowal. Defendants' Brief p14 lines 28-28..

25  However, upon a proper reading of this portion of the specification with the Brown patent Fig.

26  7, the synthetic hair fiber ends are not joined to one another. (See Matlock Decl. Exhibit E)

27  Instead, the cited language demonstrates that the unattached end of the synthetic hair fiber end

28  **22** is secured to the Brown device after the hair fiber length **14** is wound around elastic **12** by

1   utilizing a hair pin **24** that is inserted "into, through and/or around" the wrapped length of hair

2   **14**. Id. 5:5-8 and Fig. 7. Thus, the unattached end is attached to the device via some point on

3   the synthetic hair fiber <u>length</u> **14** and not the ends indicated at **22** or end **16**. Id. Therefore, this

4   language from Brown <u>does not</u> teach that the synthetic hair fiber ends could not be joined

5   together. Rather, the point of attachment of the unattached hair fiber end **22** must occur at

6   some point on the hair fiber <u>other than</u> the hair fiber ends. Since the relied upon language in

7   Brown does not teach a joining of the synthetic fiber ends, Brown cannot be used to preclude a

8   construction of the '884 patent where the synthetic fibers may be joined to one another.

9   **C.** <u>**Disputed Step 3**</u>**: "...the synthetic hair fiber ends joined to the elastic band**
10   **ends..."**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| the synthetic hair fiber ends joined to the elastic band ends | ...wherein one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends... |

15   **1.    The original claim language of Disputed Step 3 does not violate the**
         **rule from** <u>**PODS, Inc. v. Porta Stor, Inc.**</u> **as cited by the Defendants because**
16       **"joined" and "permanently joined" are two different terms.**

17   Defendants rely heavily on the rule they cite from <u>PODS</u>: that "the same terms

18   appearing in different portions of a claimset should be given the same meaning absent a clear

19   indication otherwise in the specification and the prosecution history." Defendants' Brief (citing

20   <u>PODS, Inc. v. Porta Stor, Inc.</u>, 484 F.3d 1359 (Fed. Cir. 2007). At issue in <u>PODS</u> is whether

21   the definition for "carrier frame" as described in claim 1 must be imported to the same term

22   "carrier frame" found in method claim 29 when claim 29 is silent as to the definition of the

23   questioned term. <u>PODS</u> at 1366. During prosecution, the examiner rejected a number of

24   claims due to the indefiniteness created by the patentee's use of the terms "carrier frame",

25   "frame" and "carrier" which appeared to refer to the same structural element. (*See* Matlock

26   Decl. Exhibit F p2). Included in this rejection, which was based on a statutory 35 U.S.C. 112

27   indefiniteness rejection, claim 22 (which later became claim 29) was also rejected. Id. and

28   <u>PODS, Inc. v. Porta Stor Inc.</u>, 2006 U.S. Dist. LEXIS 36486, 12-13 (Fl Middle Dist. 2006).

1   Thus, the examiner's office understood "carrier frame" as cited in both claim 1 and claim 22 to

2   refer to the same structural element, and ultimately the same term.  Here, unlike the prosecution

3   history in PODS, the examiner and the patentee did not understand "permanently joined" from

4   claim 1 and "joined" in claim 4 to be the same term.  In fact, the prosecution history

5   demonstrates that the two terms are different.  In the Office Action on or about October 4, 2000

6   (See Matlock Decl. Exhibit C), the examiner explicitly cites a rejection of claim 1 and

7   explicitly cites an allowance of claims 4 and 5 simultaneously.  Likewise, in patentee's

8   response to the aforementioned office action, the patentee first acknowledged that "claims 4-5

9   are allowed" and then subsequently amends claim 1 to essentially replace the term "joined"

10  with the term "permanently joined."  Since both the examiner and the patentee treated the terms

11  "permanently joined" in claim 1 and the term "joined" in claims 4-5 differently (where one

12  term was a result of an amendment and the other was allowed as drafted), the two terms must

13  be different.  As such, the rule in PODS does not apply.  Further, to allow Defendants

14  application of the PODS rule to force the same meaning on explicitly different terms as well as

15  require the same meaning for two terms that are exactly the same would only serve to create

16  greater ambiguity in claim construction.  Nowhere is such a result of claim construction

17  contemplated in the prosecution history.  To the contrary, such a result effectively obliterates

18  the public notice function and basic underlying objectives of claim construction by improperly

19  broadening the rule cited in the PODS case.  PODS at 1368 ("clear assertions made during

20  prosecution in support of patentability, whether or not actually required to secure allowance of

21  the claim, may also create an estoppel (citing Southwall Techs., Inc. v. Cardinal IG Co., 54

22  F.3d 1570) because the relevant inquiry is whether a competitor would reasonably believe that

23  the application had surrendered the relevant subject matter." (citing Conco, Inc. v. Energy

24  Environ. Int'l, L.C., 460 F.3d 1349, 1364. ) Since the prosecution history demonstrates that the

25  term "joined" as allowed in claims 4-5 is a different term than the term "permanently joined" in

26  the subsequently amended claim 1, a reasonable competitor could not reasonably believe that

27  these two different terms have the same meaning.  Therefore, Defendants' arguments based on

28  PODS must fail.

1

2. **Notwithstanding that the terms "permanently joined" and "joined"**
**are two different terms, PODS is also distinguishable from the present case**
**because PODS uses a term definition to limit an element whereas**
**Defendants' seeks to use an element in claim 1 to limit a different element in**
**claim 4.**

2

3

4    Defendants' mischaracterize <u>PODS</u> by stating that "[d]uring prosecution, the patentee

5    amended claim 1 to overcome a prior art rejection by explicitly limiting the "carrier frame"

6    claim term to a carrier frame with four sides." Defendants' Brief p16. Further, Defendants'

7    state that Claim 29 proceeded to issue reciting only "a carrier frame" while Claim 1 was only

8    allowed when claim 1's carrier frame was <u>explicitly</u> limited to a carrier frame with four sides.

9    <u>Id.</u> (emphasis added). In so doing, the Defendants' analogize <u>PODS</u> to the prosecution history

10   for the '884 patent for the proposition that an amendment replacing a term in claim 1 with a

11   completely different term should be superimposed on claims 4-5 even when claims were

12   intentionally allowed to issue prior to the amendment. <u>Id.</u> All of the references cited by the

13   Defendants' in its <u>PODS</u> argument was before the Examiner during prosecution and none of it

14   was considered to render Patentee's Claims 4-5 anticipated nor unpatentable. Therefore, with

15   respect to both Brown '211 and Naidor '119, no claim scope limitation should be read into

16   these claims with respect to these references. However, nothing found in <u>PODS</u> cite that Claim

17   1 was amended to limit the term "carrier frame" to a "carrier frame" having four sides. Further,

18   a reading of the response to the examiner's office action in <u>PODS</u> (<i>See</i> Matlock Decl. Exhibit

19   G) demonstrate that the claim 1 amendments pertain to the words "container", "vehicle", and

20   the ability of the "carrier frame" to be elevated and lowered. <u>Id.</u> at 2-4. Further, in order to

21   overcome the obviousness in light of the combination of prior art as stated in the office action

22   item 3, the patentee traversed such rejection and requested reconsideration based on an

23   argument that the prior art cannot be combined because there was a lack of suggestion or

24   teaching and ultimately no motivation. <u>Id.</u> at 17-20. Rather, the Federal Circuit explicitly

25   states in <u>PODS</u> that the <u>parties agreed</u> that the term "carrier frame" is a frame that has four

26   sides. <u>PODS</u> 484 F.3d at 1366. The Federal Circuit buttressed this <u>agreed definition</u> by citing

27   that (i) the sole embodiment disclosed in the specification and (ii) the subject patents distinction

28   from prior art described a four-sided device. <u>Id.</u> Thus, in support of superimposing definition

14

1   of a term in claim over the same term in another claim, the Federal Circuit: (i) relied on a

2   definition agreed to by the parties; and (ii) relied on the fact that the specification only

3   disclosed one embodiment.  However, in the present case, the parties did not agree on the

4   definition of "joined" and the specification does not disclose a single embodiment.  Recently, a

5   district court distinguished <u>PODS</u> on similar grounds.  <u>Klausner Technoloigies, Inc. v. Vonage

6   Holdings Corp.</u>, 2007 U.S. Dist. LEXIS 57604, 22 n.6.  (E.D. Tex. 2007) (explaining that a

7   distinguishing factor in <u>PODS</u> was that the parties agreed on the definition of carrier frame).

8       The same district court further distinguish <u>PODS</u> by stating that defendant Vonage

9   attempted to restrict a term meaning by using an element in a means-plus-function claim and

10  "not by way of some sort of definition" and that "claim elements establish the boundaries of

11  that claim rather than define a particular claim term."  <u>Id.</u> at 22.  Similarly, in the present case,

12  Defendants' attempt to restrict the meaning of "joined" in claim 4 by an <u>element</u>

13  ("permanently") where the proper function of this is to restrict claim 1's boundaries not act as a

14  definition of a claim term. Absent similar supporting evidence relied upon by the Federal

15  Circuit in <u>PODS</u>, applying Defendants' mischaracterization of <u>PODS</u> to the present case would

16  allow accused infringers to cherry-pick <u>elements</u> (in this case "permanently") in order to

17  operate as a <u>definition</u> for claim terms,  effectively bypassing the rule that terms must be given

18  their ordinary meaning.

19   **3.    Construing the proper bounds of Disputed Step 3 is necessary to

20   resolve the parties' dispute over the term and necessary to place the court
     in a proper position to resolved the ultimate question of infringement.**

21      Defendants cite <u>Multiform Dessicants Inc. v. Medzam, Ltd.</u>, 133 F.3d 1473, 1476-78

22  (Fed. Cir. 1998) to support Defendants erroneous argument that the full scope of the '884

23  patent need not be construed by the court.  Defendants' Brief at 18.  Rather, the Defendants

24  erroneously argue that the court must at least find that an element of the Brown '211 patent

25  must be excluded from the scope of the '884 patent.  At issue in <u>Multiform</u>, was whether the

26  term "degradable" includes the ability of the accused product to burst open rather than to

27  dissolve.  <u>Id.</u> at 1476.  The full holding with regard to the construction of the term "degradable"

28  is that this term (i) "is limited to the dissolution/degradation of the envelope as described in the

PLAINTIFF'S RESPONSIVE BRIEF TO DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

Case No. 3:07-cv-05895-WHA

1   specification," (ii) excludes the "meaning whereby the envelope "degrades" by bursting instead

2   of dissolving and (iii) that "degradable" "<u>means</u> that there must be at least partial dissolution of

3   the envelope." <u>Id.</u> at 1478.  Thus, not only did the court exclude the "bursting" feature of the

4   accused product but also defined "degradable" to mean at least a partial dissolution.  In

5   supporting this holding, the Federal Circuit emphasized that the specification described the

6   degradation as a "dissolution."  <u>Id.</u> at 1477.  Therefore, the court relied heavily on a definition

7   in the specification in order to (i) hold that a feature was not within the scope of a term; and (ii)

8   define the term itself.  Here, Defendants argue that the court should exclude an element in the

9   Brown patent from the scope of Disputed Step 3.  However, as discussed above, there is

10  nothing in the specification or the prosecution history that suggests that Defendants' cited

11  element from Brown cannot also be one of the elements of claim 4 of the '884 Patent.  Further,

12  the court must construe Dispute Step 3 because the points of attachments of the elastic band

13  ends and the synthetic hair fiber ends will be a central issue during the infringement analysis.

14  As demonstrated above, Defendants' have vigorously argued that an element in the Brown

15  Patent (the unattached end of the synthetic fiber) should be exclude from the '884 patent.

16  Further, Defendants' have stated their comparison of the Brown Patent with the accused device

17  and explained that the Defendants have obtained a license for the Brown Patent.  Defendants'

18  Brief p3.  Thus, it appears that Defendants are positioning to argue that the accused product is a

19  practice of the Brown Patent and not the '884 Patent.  However, the fact that Defendants'

20  obtained a license for the Brown Patent does not negate the requirement that the Defendants

21  needed to obtain a license for the '884 Patent.  Therefore, in order to properly resolve the

22  infringement analysis at trial, the scope of Disputed Step 3 must be considered.

23      **D.  Disputed Step 4:  "…to form a closed loop…"**

24

25

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| to take on a closed loop shape | …to form a single unbroken ring… |

26      **1.    The term "closed loop" is not equivalent to "unbroken ring" because**

27      **"unbroken" impermissibly imports a temporal limitation and "ring"**

        **imports an impermissible circular limitation.**

28

1        ***a. Defendants' proffered construction "unbroken."*** As previously stated, it is

2    improper to limit a claim to the preferred embodiment if the specification supports a broader

3    interpretation. Liebel-Flarsheim at 906. Further, the written description should never trump

4    the clear meaning of the claim terms. Comark Comms., Inc. v. Harris Corp., 156 F.3d 1182,

5    1187 (Fed. Cir. 1998). Defendants' employ the following line of reasoning in an attempt to

6    trump the clear meaning of the term "closed": (i) in one instance in the preferred embodiment

7    the term "continuous" is used instead of the term "closed"; (ii) as defined by one dictionary, the

8    term "continuous" includes "uninterrupted in extent, without break" (iii) thus, the term "closed"

9    in claim 4 should mean "unbroken." This line of reasoning fails at every step. First,

10   Defendants err by only focusing on the use of "continuous" in the preferred embodiment. As

11   discussed for Disputed Step 1, the specification and the claims disclose a broader scope than

12   the preferred embodiment. Thus, focusing on the single occurrence of the word "continuous"

13   in the preferred embodiment ignores the rest of the specification. Second, importing the term

14   "unbroken" or "uninterrupted" from the singular use of the word "continuous" would add a

15   temporal limitation. Under Defendants' dictionary definition of "continuous" includes the

16   definition "uninterrupted in time." Declaration of Thomas F. Fitzpatrick in Support of

17   Defendants' Brief Exhibit G. Such temporal limitation does not appear in the claims, other

18   portions of the specification, or during prosecution history. Third, replacing the term "closed"

19   in claim 4 with the term "unbroken" would signal a differentiation between the term

20   "unbroken" in claim 4 with the intentionally repeated use of the term "closed" as modifying

21   "loop" throughout the claims and specification. Further, notably absent from Defendants' line

22   of reasoning is any explanation that the ordinary meaning of the term "closed" was ambiguous

23   and that such ambiguity required a replacement of the term. Since Defendants' fail to

24   demonstrate that the ordinary meaning of the term "closed" is ambiguous and attempts to

25   import an impermissible temporal limitation, the Defendants' proffered construction cannot

26   stand.

27       ***b. Defendants' proffered construction "ring."*** Defendants' also attempt to add an

28   extraneous structural limitation in their support for the replacement of the term "loop" for their

1  proffered term "ring." In doing so, Defendants argue that the citation of the term "ring" in

2  prior art referenced in the Background of the Invention section of the '884 patent should

3  replace the term "loop" which was intentionally used by the patentee throughout the patent. As

4  a result, the Defendants attempt to add the "circular" structural limitation found in the term

5  "ring." Defendants' Brief p19. However, as with the Defendants' proffered term "unbroken,"

6  Defendants strain to argue for the use of the word "ring." As above, Defendants' focus on the

7  single use of the word "ring" in the Background of the Invention whereas the portions of the

8  specification describing the invention and the claims themselves repeatedly use the term

9  "loop." Even more telling is that Defendants' cited language use of the term "ring" only refers

10  to prior art and not the '884 invention. (*See* Matlock Decl. Exhibit A 1:22-25.) Finally,

11  Defendants fails to demonstrate that the current use of the term "loop" is ambiguous such that

12  the term needed the Defendants' proffered replacement term. Since granting Defendants' use

13  of the term "ring" does not resolve an identified ambiguity and serves only to add an

14  extraneous structural limitation to method claims 4-5, the Defendants' proffered construction

15  should be denied.

16        Defendants also argue that a "broken ring" would (i) render the '884 patent inoperable;

17  and (ii) cover the prior art in Brown '211. However, Defendants' assertions are baseless.

18  Refusing to replace the term "closed loop" with "unbroken ring" does not mean that the term

19  "closed loop" is equivalent to the term "broken ring." When one dissects the term "broken

20  ring" into its components, the term "broken ring" imports similar temporal and structural

21  limitations as would "unbroken ring." For example, "broken" is naturally the opposite of

22  "unbroken." Logically, the "uninterrupted" temporal limitation imported by "unbroken" would

23  be the opposite in "broken" (a temporal limitation of a state of "not uninterrupted"). Thus, use

24  of "broken" would still add a temporal limitation into the term "closed." Further, as previously

25  discussed, the term "ring" adds an impermissible structural limitation. Therefore, denying

26  Defendants' construction would not mean that the scope of claims 4-5 would limited the broad

27  term "closed ring" to the narrower "broken ring." As such, any argument based on the

28  erroneous idea that "closed loop" and "broken ring" are equivalents is baseless.

1    Defendants remaining arguments for their proffered construction of Disputed Step 4 are

2    two fold: (i) Defendants erroneously argue that the only arrangement for the '884 device is a

3    single ring; and (ii) Defendants erroneously make another attempt to import "permanently"

4    from claim 1 into claim 4. In support of their first contention, Defendants again point to the

5    specification. As previously state, the specification contemplates more than one embodiment.

6    Especially important is the joining of all ends (elastic band and synthetic fibers) in order to

7    practice the claim 4 method at the base of the ponytail. (*See* Matlock Decl. Exhibit B.) Thus,

8    Defendants are incorrect that the only embodiment for the device used in practice of the claim 4

9    method is a single ring. Regarding their second contention, Defendants conclude that an

10   amendment to claim 1 must be read into claim 4. However, as previously stated for Disputed

11   Step 3, there is nothing in the claims, specification, or prosecution history demonstrating a clear

12   disavowal of subject matter allowing such a limitation to be read into claim 4. In fact, the

13   prosecution history makes clear that claims 4-5 are to be treated differently from clams 1-3

14   because the examiner allowed claim 4-5 without amendment. More importantly, the patentee

15   clearly acknowledge that claims 4-5 were allowed <u>before</u> explicitly amending claims 1-3.

16   **E.  Disputed Step 5: "...covering the elastic band with the synthetic hair fibers so**

17   **that the outward appearance of the device is formed solely by the synthetic hair fibers..."**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed singly, to the exclusion of all else, by the synthetic hair fibers | ...adjusting the ring so that the outward appearance of the ring is formed only by synthetic hair fibers... |

22   **1.    Separately adjusting the synthetic fibers does not require the adjustment of the entire hair binding device.**

23   In support of their proposed construction, Defendants argue that the synthetic fibers

24   cannot be divorced from the closed loop (in Defendants' construction "ring") such that the

25   entire closed loop must be adjusted in order to practice claims 4-5. However, upon reading

26   Disputed Step 5 in the context of the claim and the specification, the synthetic fibers are

27   adjusted <u>independently</u> of the remaining structures of the device. First, the claim itself is

28

Matlock Law
Group,PC.

1   highly instructive. Earlier in claim 4, as Defendants state, the synthetic hair fibers join to

2   elastic band ends to form a closed loop. (*See* Matlock Decl. Exhibit A 4:20-21.) Defendants

3   do not demonstrate how adjustment of either the bands or the fibers would cause the adjustment

4   of the entire loop. In fact, the patent states that the band is made of stretchable material. Id. at

5   2:40. Thus, it is possible for the elastic band to remain primarily in place while the synthetic

6   hair fibers are separately adjusted to cover the elastic band. This contention is further

7   supported by the actual language of Disputed Step 5 ("covering the elastic band with the

8   synthetic hair fibers"). Secondly, a proper reading of the specification supports the language of

9   Disputed Step 5 as it stands. The specification does not describe the adjustment of the entire

10  device. Id. at 1:61-65. Rather, the specification specifically discussed the adjustment of the

11  synthetic hair fibers. Id. 3:15-19. Since the both the claim language and the specification

12  describes such separate adjustment, the Defendants' construction must be denied.

13  **F.   Disputed Step 6: "…encircling the ponytail with the device by inserting the
          ponytail through the closed loop of said device…"**

14

15

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| …encircling the ponytail with the device by inserting the ponytail through the closed loop of said device… | …inserting the ponytail end through the ring so that the ring encircles the ponytail… |

16

17

18  **Defendants' Opening Brief does not argue for Defendants' proposed construction of
    Disputed Step 6.**

19          As discussed in Plaintiff's Opening Claim Construction Brief, Defendants' proposed

20  construction unnecessarily reverses the language order of Disputed Step 6 and amounts to

21  another veiled attempt to add a structural limitation by replacing the term "loop" with

22  Defendants' proffered term "ring." See Plaintiff's Opening Claim Construction Brief pp 17-18.

23  **G.   Plaintiff does not disavow any claim scope that might have been determined
          under the doctrine of equivalents' and its use of prosecution history.**

24

25          Defendants point to Plaintiff's statement that Plaintiff's do not allege the doctrine of

26  equivalents over claims 4-5.   In connection with this statement, Defendants cite the differences

27  between prosecution history estoppel and prosecution disclaimer as discussed in Biodex Corp.

28  v. Loredan Biomedical, Inc., 946 F.2d 850, 862-63 (Fed. Cir. 1991). Defendants may be

1    arguing that Plaintiff has disavowed any claim scope that may be determined under the doctrine

2    of equivalents, which utilizes prosecution history in its analysis.  However, Plaintiff's reference

3    to doctrine of equivalents operates to clarify the literal infringement allegation, not as a waiver

4    to doctrine of equivalents claim scope.  See Matlock Decl. Exhibit H at 12.  Further, as Biodex

5    discusses, prosecution history is utilized in the analysis of both the doctrines of equivalents and

6    prosecution disclaimer. Biodex Corp. at 862-63.  Even Defendants' own arguments utilize the

7    prosecution disclaimer doctrine.  Since the use of prosecution history is important in both

8    doctrines, Plaintiff has not surrendered use of the prosecution history in determining claim

9    scope in this case.

10   **III.    ARGUMENT:  Construction of the ''D239 and 'D693 Design Patents**

11   **There is no current requirement under existing law requiring claim construction to be
conducted during a claim construction hearing for design patents and due to the entirely**

12   **different analysis for construing the scope of design patents 'D239 and 'D693, it would be
confusing to determine such scope at the claim construction hearing for the '884 Patent.**

13         Defendants rely on Contessa Food Products for the proposition that the scope of the

14   claim of a patented design encompasses 'its visual appearance as a whole' and in particular 'the

15   visual impression it creates' as an appropriate "written description" of the "visual impression"

16   created by the drawings in the '239 design patent.  Contessa Food Products v. Conagra, 282

17   F.3d 1370, 1377 (Fed. Cir. 2002).  However, Defendants are silent on the visual impression of

18   the asserted design patent 'D693.  Nonetheless, Plaintiff herein asserts that Design Patents

19   'D239 and 'D693 should not be construed during the claim construction hearing because the

20   focus on such a hearing and relevant case law is an inappropriate methodology to determine the

21   scope of Plaintiff's ornamental designs.  Indeed, each design patent contains exactly one claim

22   directed to the ornamental appearance, a completely different focus from the spate of case law

23   directed to the ordinary and customary meaning of terms found in multiple claims of a utility

24   patent leading to a determination of a term construction in the form of a written description.

25         However, it is an open question of law as to whether a claim construction hearing and

26   claim term construction itself is appropriate for interpretation of design patents claims and

27   figures.  See Egyptian Goddess Questions Presented before the Court of Appeals for the

28

Matlock Law
Group, PC.

1   Federal Circuit (2008). First, the focus in design patents is the "ornamental appearance in the

2   eyes of an ordinary observer, giving such attention as a purchaser usually gives, two designs

3   are substantially the same, if the resemblance is such as to deceive an observer, inducing him to

4   purchase one supposing to be the other." Gorham Co. v. White, 81 U.S. 511, 528 (U.S. 1872).

5   Nowhere within this methodology of one hundred years of controlling Supreme Court

6   precedent is a mention of a "written description" of the visual impression created by the

7   drawings.  To the contrary, Gorham has made it clear that the focus is on the eye of an ordinary

8   observer as stated above in the Gorham rule, and not on a written description of the visual

9   impression as proposed by Defendants.  The "visual impression" standard of Contessa Food

10  Products v. Conagra, 282 F.3d 1370, 1377 (Fed. Cir. 2002) (holding that the scope of the claim

11  of a patented design "encompasses 'its visual appearance as a whole,' and in particular 'the

12  visual impression it creates'" and that such scope be determined as a question of claim

13  construction), is unnecessarily rigid in its approach because Contessa, according to the court in

14  Mobile Hi-Tech Wheels, merely reinforces previous holdings ... that ornamental features

15  cannot be excluded from the infringement analysis if such ornamental features were not

16  excluded from the patent application.  Mobile Hi-Tech Wheels v. CIA Wheel Group, 514 F.

17  Supp.2d 1172 (C.D. Cal. 2007).  Further, a claim construction analysis in accordance with

18  Contessa would fail to apply the Supreme Court's Gorham test. Id., nor does it apply the point

19  of novelty test properly in construing the scope and meaning of a design patent.

20          Defendants propose describing the visual impression created by the figures of the 'D239

21  patent as "[A] ponytail holder in the shape of a single oval having a top (or upper) half, a

22  bottom (or lower) half, and two small, identical cylinders connecting the top half of the oval to

23  the bottom half of the oval.  Further, Defendants propose a detailed written description

24  describing the textured fibers, and various functional aspects of Plaintiff's patented ornamental

25  designs, describing aspects of the construction and interrelationship of the components.

26  Defendants' Brief pp 21-22.  For example, Defendants describe in their proposed construction

27  that the written description include "The fibers at one end are inserted into a top opening of one

28  of the two cylinders", presumably describing how such a device might be constructed rather

1   than its *"ornamental design and appearance in the eyes of an ordinary observer"* as required by

2   Gorham.

3     Ornamental features can only be excluded from the scope of a design patent through the

4   use of broken lines but features which are merely functional are not a part of the ornamental

5   patented design and are therefore not proper bases for design patent protection, Mobile Hi-Tech

6   Wheels, 514 F. Supp.2d at 1188, nor should such features be included in determining the scope

7   of a patented design claim construction.  Nowhere is the traditional methodology found in a

8   claim construction analysis dealing with issues of the ornamental patented design and the

9   exclusion of improper functional features.  To the contrary, the traditional claim construction

10  methodology deals with plain and ordinary meaning of terms, dictionary definitions of the

11  meaning of terms, claim terms found in the Patentee's specification, and file history.  See

12  Markman and Phillips.  Instead, the design patent scope of claim construction is a much

13  different analysis as cited above.  Therefore, delaying such claim construction until trial would

14  not be inappropriate.   Further, delaying claim construction …until trial is not error because the

15  District Court has considerable latitude in determining when to resolve issues of claim

16  construction.  CytoLogix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1172 (Fed. Cir.

17  2005).

18    Next, although recent case law has put forth the rule that the ordinary observer may be

19  someone other than the retail consumer, such a rule is not supported in the one hundred years of

20  Supreme Court precedent.  See Gorham.  See Saint-Gobain Calmer, Inc. v. Arminak, Brief of

21  Amicus Curiae Industrial Designers Society of America in support of Petition for Writ of

22  Certiorari before the Supreme Court of the United States, No. 07-1263, May 5, 2008 (2008).

23  *See* Arminak & Assoc., Inc. v. Saint-Gobain Calmar, Inc., 501 F.3d 1314 (Fed. Cir. 2007).

24    The Supreme Court in Gorham expressly prohibited the use of perceptions of "persons

25  in the trade" for making design patent infringement determination and to determine the

26  ornamental appearance according to the ordinary observer test it outlined and as described

27  above.  It would be entirely appropriate and completely within the discretion of this court to

28  construe the design patents at trial or perhaps even give the issue to the jury since over the

1    years the <u>Gorham</u> rule has come to stand for construing the patented design in the "eyes of men

2    generally". *See* Brief of Amicus Curiae Industrial Designers Society of America in support of

3    Petition for Writ of Certiorari before the Supreme Court of the United States, No. 07-1263 at

4    pg. 7. Indeed, the test has become one of substantial similarity of the ornamental features

5    through the eyes of men generally, in this case, perhaps the jury at trial.

6        In <u>Gorham</u>, the Court considered the patented handle design and an accused handle

7    design as shown in Matlock Decl. Exhibit I. Thus, in addition to holding that design patent

8    infringement is to be judged through the eye of the ordinary observer, in the "eyes of men

9    generally,"the Court also expressly disqualified the observations of the "persons in the trade."

10   <u>Gorham</u>, 81 U.S. at 527. Nothing herein makes such an analysis appropriate at a claim

11   construction hearing focused to an entirely different analytical approach (based on the "written

12   description"). For at least this precise reason, Plaintiff respectfully requests this Court to

13   exercise its discretion and construe the design patents at trial.

14       Next, Defendants rely heavily on <u>Contessa</u> and propose to create a written description

15   of the visual impression by arguing that in the interests of judicial economy, such a claim

16   construction may be dispositive. However, Defendants mischaracterize the scope of the rule

17   set forth in <u>Contessa</u>. Although the Court there held that the ordinary observer analysis is not

18   limited to those features visible at point of sale, the Court laid down a rule requiring the

19   consideration of all ornamental features visible at any time during normal use of the product.

20   <u>Contessa</u>, 282 F.3d at 1381. A proper design patent scope includes those ornamental features

21   of the patented design and must exclude the functional features found in Defendant's proposed

22   "written description" of the visual impression and thereby violates even the <u>Contessa</u> rule itself.

23       Further, the Court in <u>Contessa</u> relied upon a case involving a cabinet door and frame

24   where it was determined that "rear features were proper bases for design protection, in part

25   because the rear features were visible at some time during the normal use of the product. <u>Door-</u>

26   <u>Master Corp. v. Yorktowne, Inc.</u>, 256 F.3d 1308, 1313 (Fed. Cir. 2001). However, that case is

27   distinguishable from the case at bar. There, the rear features of the cabinet door and frame

28   were visible during normal use. Thus these features were considered to be part of the

1  ornamental design.  However, here, all functional features found in the accused device are not

2  visible during the normal use of the device nor at point of sale.  As a result, any analogous

3  features found in the accused device are therefore not appropriate bases for design protection

4  and cannot be considered as a part of the ornamental design.  Id.

5      In addition to the ordinary observer test, a point of novelty test is also helpful in

6  determining the scope of a design patent.  Both the ordinary observer and the point of novelty

7  tests are factual inquiries that are undertaken by the fact finder during the infringement stage of

8  proceedings, after the claim has been construed by the Court.  Bernhardt v. Collezione, 386

9  F.3d 1371 (Fed. Cir. 2004).   However, nowhere within the traditional claim construction

10  analysis written description approach in accordance with the leading cases is such a

11  requirement for such a two step analysis.  See Markman and Phillips.  Accordingly, The

12  Tonytail Company respectfully requests the Court in its discretion allow the fact finder to

13  determine infringement after the claim directed to the ornamental appearance has been

14  construed by this Court at trial.

15  **IV.    CONCLUSION**

16      For the foregoing reasons, Plaintiff respectfully requests that the Court adopt their

17  proposed constructions and deny Defendants' proposed constructions.  Additionally, Plaintiff

18  respectfully requests that the Court reserve the construction of the design patents in this case

19  during trial and apply the discussed Supreme Court rule in Gorham.

20

21  Dated: May 15, 2008                          THE TONYTAIL COMPANY, INC.
                                                 By its attorneys,

22                                               _Anne-Leith W Matlock_

23                                               Anne-Leith Matlock
                                                 MATLOCK LAW GROUP, PC

24                                               1485 Treat Blvd., Suite 200
                                                 Walnut Creek, CA4597

25                                               Tel.:   925-944-7131

26                                               Fax:   925-944-7138
                                                 Anne-leith@matlocklawgroup.com

27

28

PLAINTIFF'S RESPONSIVE BRIEF TO DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF
                                                 Case No. 3:07-cv-05895-WHA