1

Matlock Law Group, A Professional Corporation
Anne-Leith Matlock, SBN 244351,

2

1485 Treat Blvd., Suite 200
Walnut Creek, CA 94597

3

Phone: 925 944-7131

4

Facsimile: 925 944-7138
Email: anne-leith@matlocklawgroup.com

5

Attorneys for

6

The Tonytail Company, Inc.

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                          **SAN FRANCISCO DIVISION**

11

12    THE TONYTAIL COMPANY, INC.                **CASE NO. 3:07-cv-05895-WHA**
      a Delaware Corporation,
                                                **DECLARATION OF ANNE-LEITH**
13                                              **MATLOCK IN SUPPORT OF**
                          Plaintiff,            **PLAINTIFF'S RESPONSE  IN**
14                                              **OPPOSITION TO DEFENDANTS'**
                 v.                             **CONAIR CORPORATION'S AND RITE**
15                                              **AID HDGTRS CORP.'S OPENING CLAIM**
                                                **CONSTRUCTION BRIEF**
16    CONAIR, a Delaware Corporation;
      SCUNCI INTL., Ltd., a Delaware
17    Corporation; RITE AID, a Delaware         **Date:    May 28, 2008**
      Corporation; L&N Sales & Marketing,       **Time:    1:30 p.m.**
18    Inc., a Pennsylvania Corporation and      **Dept.:   Courtroom 9, 19th Floor**
      DOES 1-10, inclusive,                     **Judge:   Honorable William H. Alsup**
19

20

21                       Defendants.

22                              .

23

24

25

26

27
                                          1
28    DECLARATION OF ANNE-LEITH MATLOCK IN SUPPORT OF PLAINTIFF'S RESONSE IN OPPOSITION TO
      DEFENDANTS' CONAIR CORPORATION'S AND RITE AID HDQTRS. CORPORATION'S OPENING CLAIM
      CONSTRUCTION BRIEF
                                                      CASE NO. 3:07-CV-05895-WHA

I, ANNE-LEITH W. MATLOCK, declare:

1.    I, ANNE-LEITH W. MATLOCK, am an attorney at law licensed to practice before the courts of the State of California, admitted in the Northern and Eastern Districts of California, and a Principal of the law firm Matlock Law Group, attorneys of record for The Tonytail Company, Inc.

2.    I have personally reviewed the facts set forth in the Opposition to Defendants' Opening Claim Construction Brief.

3.    A true and accurate copy of the utility patent at issue in this case, U.S. Patent No. 6,263,884 ("the '884 Patent), is attached hereto as Exhibit A.

4.    In its Opening Claim Construction Brief, Plaintiff attached a Comparative Claim Construction Chart as Attachment 5 depicting illustrative aids based on the '884 Patent.  A true and accurate copy of one of the illustrative aids has been enlarged and attached hereto as Exhibit B.

5.    During prosecution, the patent examiner of the '884 Patent sent an Office Action on or about October 4, 2000 that claims 1-2 are rejected and claims 4-5 are allowed. ("the '884 Office Action")  A true and accurate copy of the '884 Office Action is attached hereto as Exhibit C.

6.    During prosecution, the patentee responded to the '884 Office Action by acknowledging the examiner's allowance of claims 4-5 and subsequently amending claims 1-2. ("the '884 Response")  A true and accurate copy of the '884 Response is attached hereto as Exhibit D.

7.    In their Opening Claim Construction Brief, Defendants' refer to U.S. Patent No. 5,899,211 (the Brown Patent).  A true and accurate copy of the Brown Patent is attached hereto as Exhibit E.

8.    In their Opening Claim Construction Brief, Defendants' refer to the prosecution history in PODS v. Porta, Stor, Inc., 484 F.3d 1359 (Fed. Cir. 2007).

2

DECLARATION OF ANNE-LEITH MATLOCK IN SUPPORT OF PLAINTIFF'S RESONSE IN OPPOSITION TO DEFENDANTS' CONAIR CORPORATION'S AND RITE AID HDQTRS. CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

CASE NO. 3:07-CV-05895-WHA

1    During the prosecution in said case, the patent examiner sent an Office Action on or

2    about September 22, 1999. ("PODS Office Action")  At true and correct copy of the

3    PODS Office Action is attached hereto as Exhibit F.

4        9.    A true and accurate copy of the patentee's response to the PODS Office

5    Action dated November 23, 1999 is attached hereto as Exhibit G.

6        10.    In their Opening Claim Construction Brief, Defendants' refer to Plaintiff's

7    Disclosure of Asserted and Infringement Contentions. ("Plaintiff's Disclosures")  A

8    true and accurate copy of Plaintiff's Disclosures is attached hereto as Exhibit H.

9        11.    In their Opening Claim Construction Brief, Defendants' refer to <u>Contessa</u>

10    <u>Food Products v. Conagra</u>, 282 F.3d 1370 (Fed. Cir. 2002).  In response, Plaintiff's

11    cite <u>Gorham Co. v. White</u>, 81 U.S. 511 (U.S. 1872) and the Brief of Amicus Curiae

12    Industrial Designers Society of America in support of Petition for Writ of Certiorari

13    before the Supreme Court of the United States, No. 07-1263 ("Amicus Brief").  A

14    true and correct copy of the illustrative aids from the Amicus Brief is attached hereto

15    as Exhibit I.

16        I declare under penalty of perjury under the laws of the State of California that the

17    foregoing is true and correct, if called upon to testify, I could or would competently

18    testify thereto and that this declaration was executed this 15th day of May 2008, at

19    Walnut Creek, California.

20        DATED: May 15, 2008

21

22                              Respectfully Submitted,

23                              MATLOCK LAW GROUP

24

25                              Anne-Leith W. Matlock

26                              Attorneys for The Tonytail Company, Inc.

27

28

DECLARATION OF ANNE-LEITH MATLOCK IN SUPPORT OF PLAINTIFF'S RESONSE IN OPPOSITION TO
DEFENDANTS' CONAIR CORPORATION'S AND RITE AID HDQTRS. CORPORATION'S OPENING CLAIM
CONSTRUCTION BRIEF

                                              CASE NO. 3:07-CV-05895-WHA

# EXHIBIT A

US006263884B1

(12) **United States Patent**
Minnelli

(10) Patent No.: **US 6,263,884 B1**
(45) Date of Patent: **Jul. 24, 2001**

(54) **DEVICE FOR BINDING A PONYTAIL HAVING A NATURAL HAIR APPEARANCE**

(76) Inventor: **Mia Minnelli**, 1770 Broadway #101, San Francisco, CA (US) 94109

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/525,601

(22) Filed: **Mar. 14, 2000**

(51) Int. Cl.[7] .................................. A41G 3/00; A45D 8/04; A45D 8/12

(52) U.S. Cl. ................ 132/273; 132/201; 132/275; 132/53

(58) Field of Search ................ 132/273, 53, 55, 132/201, 275

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D. 52,258 | * | 8/1918 | Upton | D2/344 |
| D. 59,261 | * | 10/1921 | Muller | D2/344 |
| D. 229,240 | * | 11/1973 | Fox | D28/41 |
| D. 273,341 | * | 4/1984 | Roi | D2/344 |
| D. 273,342 | * | 4/1984 | Roi | D28/41 |
| D. 368,983 | * | 4/1996 | Gruters et al. | 132/273 |
| 1,713,616 | * | 5/1929 | Oppenheim | 132/53 |
| 2,567,119 | * | 9/1951 | Naldor | 132/53 |
| 2,651,310 | * | 9/1953 | Selson | 132/273 |
| 2,847,016 | * | 8/1958 | Rabinowitz | 132/273 |
| 3,000,384 | * | 9/1961 | Piers | 132/273 |
| 4,600,029 | * | 7/1986 | Ueberschaar | 132/53 |
| 4,830,029 | * | 5/1989 | Bird | 132/54 |
| 5,303,724 | * | 4/1994 | Azzivino | 132/278 |
| 5,465,741 | * | 11/1995 | Dvorak | 132/275 |
| 5,501,239 | * | 3/1996 | Walker | 132/275 |
| 5,551,452 | * | 9/1996 | Barlow | 132/54 |
| 5,899,211 | * | 5/1999 | Brown | 132/201 |

* cited by examiner

Primary Examiner—John J. Wilson
Assistant Examiner—Robyn Kieu Doan
(74) Attorney, Agent, or Firm—Goldstein & Canino

(57) **ABSTRACT**

A ponytail binding system, for use by a person having a ponytail having a ponytail end, using a device comprising synthetic hair fibers joined to an elastic band to form a closed loop. The synthetic hair fibers are joined to the elastic band with a pair of connectors. The ponytail is inserted into the closed loop, and the device is tensioned around the ponytail by twisting the closed loop and inserting the ponytail end into the secondary loop formed thereby. Once the device is suitably tensioned on the ponytail, the synthetic hair fibers are pulled over the elastic band so that the outward appearance of the device is formed solely by the synthetic hair fibers, which are selected so as to blend with the hair of the person.

**5 Claims, 2 Drawing Sheets**





FIG. 2



FIG. 1



FIG. 3

FIG. 4

US 6,263,884 B1

1

# DEVICE FOR BINDING A PONYTAIL HAVING A NATURAL HAIR APPEARANCE

## BACKGROUND OF THE INVENTION

The invention relates to a device for binding a ponytail having a natural hair appearance. More particularly, the invention relates to a device which securely attaches around a ponytail, but which provides the outward appearance of natural hair.

Certain hair styles dictate that a portion of the hair is gathered and grouped into a "ponytail". The most traditional way to gather and group hair is by tying it with a ribbon. However, tying the hair in the ponytail with a ribbon requires coordination and dexterity. In addition, removing the ribbons can be difficult and tedious as one attempts to blindly undo a knot.

Hair clips and elastic bands are also used to gather and bind groups of hair. Hair clips grab the hair between a pair of jaws which are spring-tensioned against one another. The jaws are flexed apart, placed around the hair grouping, and are released to clamp and hold the hair grouping. Elastic bands are generally in the shape of a ring which is stretched over the hair grouping and released to hold the ponytail in place.

The main drawback of hair clips and elastic bands is their unnatural appearance. Although they are available in a variety of colors, decorated with synthetic and precious stones, and even covered in fabrics, they are always noticeable when in the hair.

U.S. Pat. No. 5,899,211 to Brown discloses an apparatus and method for securing a ponytail. Brown uses a device which employs an elastic loop which can secure around a ponytail, and a length of hair which is attached to the elastic loop at one end, but is free at its opposite end.

While these units may be suitable for the particular purpose employed, or for general use, they would not be as suitable for the purposes of the present invention as disclosed hereafter.

## SUMMARY OF THE INVENTION

It is an object of the invention to produce a device for binding a ponytail which has a natural hair appearance. Accordingly, the device employs fine fibers which simulate natural human hair.

It is a further object of the invention to provide a device which securely binds a ponytail. Accordingly, the device employs an elastic band which can be tensioned to firmly maintain a ponytail. The elastic band is then hidden by the simulated human hair fibers to maintain a natural appearance.

The invention is a ponytail binding system, for use by a person having a ponytail having a ponytail end, using a device comprising synthetic hair fibers joined to an elastic band to form a closed loop. The synthetic hair fibers are joined to the elastic band with a pair of connectors. The ponytail is inserted into the closed loop, and the device is tensioned around the ponytail by twisting the closed loop and inserting the ponytail end into the secondary loop formed thereby. Once the device is suitably tensioned on the ponytail, the synthetic hair fibers are pulled over the elastic band so that the outward appearance of the device is formed solely by the synthetic hair fibers, which are selected so as to blend with the hair of the person.

To the accomplishment of the above and related objects the invention may be embodied in the form illustrated in the

2

accompanying drawings. Attention is called to the fact, however, that the drawings are illustrative only. Variations are contemplated as being part of the invention, limited only by the scope of the claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like elements are depicted by like reference numerals. The drawings are briefly described as follows.

FIG. 1 is a diagrammatic perspective view, illustrating the invention, per se.

FIG. 2 is a cross sectional view with parts broken away, illustrating one of the two connectors according to the present invention.

FIG. 3 is a side elevational view, illustrating the invention in use, being used to gather and hold a ponytail.

FIG. 4 is a side elevational view, illustrating the invention in use, wherein the ponytail has been gathered, and wherein the elastic band is concealed with the synthetic hair fibers.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 illustrates a device for binding a ponytail 10, comprising an elastic band 12, and a group of synthetic hair fibers 14. The elastic band 12 has a pair of elastic band ends 12E. The synthetic hair fibers 14 are all of substantially the same length, and collectively have a pair of synthetic hair fiber ends 14E. A pair of connectors 16 are used to permanently join each one of the elastic band ends 12E to one of the hair fiber ends 14E. Accordingly, the synthetic hair fibers 14 and elastic band 12S together form a closed loop.

The synthetic hair fibers 14 are made of a material which greatly resembles human hair. Suitable materials are commonly used in wigs, hair extensions, and hair pieces. However, typically these materials resist tensile deformation. In other words, they typically cannot be stretched without breaking.

The elastic band 12 is made of a stretchable material, such as rubber, or the like. The elastic band 12 thus provides the binding device 10 with the necessary elasticity so that it can stretch around a group of hair, and then exert a constricting tension against that group of hair to hold it in place.

Referring to FIG. 1, each connector 16 is a sleeve having a pair of connector open ends 18. One of the elastic band ends 12E is inserted into one of the connector open ends 18, and one of the synthetic hair fiber ends 14E is inserted into the other connector open end 18E. Once inside the connector, the synthetic hair fibers and elastic band are fused together using heat, adhesives, chemicals, mechanical friction, or any other suitable means. The fibers and elastic band need not be directly fused to one another, since the connector 16 joins them indirectly. As seen in FIG. 1, using two connectors 16 completes the closed loop to form the binding device 10.

FIG. 3 illustrates the binding device 10 in use binding the hair of a person 50, having a ponytail 52 having a ponytail end 54. The binding device 10 has been placed over the ponytail 52 by inserting the ponytail end 54 through the closed loop of the binding device 10 so that the binding device 10 fully encircles the ponytail 52. At this point, the closed loop fits loosely over the ponytail 52.

In order to make the binding device 10 fit tightly over the ponytail 52, the binding device 10 is twisted to form a secondary loop 30. Then, the ponytail end 54 is inserted through the secondary loop 30. This doubling up of the

US 6,263,884 B1

3

binding device 10 causes a tighter fit around the ponytail 52, and is repeated until numerous loops are formed around the ponytail 52 and the binding device 10 fits tightly around the ponytail 52.

When the binding device 10 has been looped around the ponytail 52 numerous times, the elastic band portion thereof becomes stretched and thus tensioned. Since the elastic band portion forms a continuous loop with the less stretchable synthetic hair fibers, the tensioned elastic band acts to pull the synthetic hair fibers tightly around the ponytail 52.

Referring now to FIG. 4, once the binding device 10 has been looped or wrapped around the ponytail 52 numerous times, some of the loops consist of the elastic band, and several of which should consist entirely of the synthetic hair fibers 14. Accordingly, the synthetic hair fibers 14 may be pulled over the elastic band to conceal the elastic band and the connectors, so that the outward appearance of the binding device 10 is provided solely by the synthetic hair fibers, as seen in FIG. 4. Accordingly, if the synthetic hair fibers are suitably matched to the hair of the person, the binding device 10 then appears to be part of that person's natural hair.

In conclusion, herein is presented a binding device suitable for maintaining a ponytail, which provides the outward appearance of natural human hair, while tightly binding and maintaining the ponytail.

What is claimed is:

1. A hair binding device, for binding and maintaining a ponytail, comprising:

an elastic band, having a pair of elastic band ends;

synthetic hair fibers, collectively having a pair of synthetic hair fiber ends; and

wherein one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends and the

4

other of the elastic band ends is permanently joined with the other of the synthetic fiber ends so that the elastic bands and synthetic hair fibers together form a closed loop.

2. The hair binding device as recited in claim 1, further comprising a pair of connectors, wherein each of the elastic band ends is joined with one of the synthetic hair fiber ends with one of the connectors.

3. The hair binding device as recited in claim 2, wherein each of the connectors comprises a sleeve and has two connector ends, wherein for each connector one of the elastic band ends is secured in one of its connector ends and one of the synthetic hair fiber ends is secured in the other of its connector ends.

4. A hair binding method, for use by a person having a ponytail having a ponytail end, for securing said ponytail, using a device comprising an elastic band having a pair of elastic band ends, synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends, the synthetic hair fiber ends joined to the elastic band ends to form a closed loop, comprising the steps of:

encircling the ponytail with the device by inserting the ponytail end through the closed loop of said device;

tensioning the device around the ponytail by doubling up the device; and

covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers.

5. The hair binding method as recited in claim 4, wherein the step of doubling up the device further comprises repeatedly:

twisting the closed loop to form a secondary loop; and

inserting the ponytail end through the secondary loop.

* * * * *

# EXHIBIT B

## Illustrative Aid taken from Plaintiff's Comparative Claim Construction Chart attached to Plaintiff's Opening Claim Construction Brief



FIG. A2

# EXHIBIT C

| *Office Action Summary* | Application No. 09/526,601 | Applicant(s) Minnelli |
|---|---|---|
| | Examiner Robyn Kieu Doan | Group Art Unit 3732 |

☒ Responsive to communication(s) filed on *Mar 14, 2000*

☐ This action is FINAL.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ___*THREE*___ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) *1-5* _____ is/are pending in the application.

   Of the above, claim(s) _____ is/are withdrawn from consideration.

☒ Claim(s) *4 and 5* _____ is/are allowed.

☒ Claim(s) *1 and 2* _____ is/are rejected.

☒ Claim(s) *3* _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐approved ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

   ☐ All ☐ Some* ☐ None   of the CERTIFIED copies of the priority documents have been

      ☐ received.

      ☐ received in Application No. (Series Code/Serial Number) _____ .

      ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   *Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☒ Notice of References Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

☐ Interview Summary, PTO-413

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- *SEE OFFICE ACTION ON THE FOLLOWING PAGES* ---

U. S. Patent and Trademark Office
PTO-326 (Rev. 9-95)                              Office Action Summary                          Part of Paper No. __2__

Application/Control Number: 09/525,601                                    Page 2

Art Unit:

## DETAILED ACTION

### *Claim Rejections - 35 USC § 103*

1.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness
rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

2.    Claims 1-2 are rejected under 35 U.S.C. 103(a) as being unpatentable over Naidor in view
of Brown.

With regard to claims 1-2, Naidor discloses a hair binding device (fig. 2) comprising an
elastic band (15 col. 2, lines 33-36) with a pair of elastic band ends, a fur (13) element having two
ends and a pair of connectors (16) joining each end of the band to each end of the fur element.
Naidor does not disclose synthetic hair fiber, however, Brown discloses a hair binding device
(fig. 1) comprising synthetic hair fibers (14). It would have been obvious to one having an
ordinary skill in the art at the time the invention was made to employ the synthetic hair fibers as
taught by brown into the hair device of Naidor for the purpose of having a natural look.

Application/Control Number: 09/525,601                                          Page 3

Art Unit:

3.     Claim 3 is objected to as being dependent upon a rejected base claim, but would be

allowable if rewritten in independent form including all of the limitations of the base claim and any

intervening claims.

4.     Claims 4-5 are allowable over prior art.

5.     The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure. Stearman, Selson, Upton, Muller, Barlow, Oppenheim, Walker, Gruters et al,

Rabinowitz, Rol, Piers, Anzivino, Dvorak, Bird and Ueberschaar are cited to show the state of the

art with respect to a hair device having synthetic hair fibers and elastic band.

6.     This application has been filed with informal drawings which are acceptable for

examination purposes only.  Formal drawings will be required when the application is allowed.

7.     Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Robyn Kieu Doan whose telephone number is (703) 306-9182.

Robyn Kieu Doan

Examiner

September 25, 2000

John J. Wilson
Primary Examiner

| *Notice of References Cited* | Application No. 09/525,601 | | Applicant Minnelli | | | |
|---|---|---|---|---|---|---|
| | Examiner Robyn Kieu Doan | | | Group Art Unit 3732 | | Page 1 of 2 |

### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|
| A | 4,830,029 | 05/1989 | Bird | 132 | 54 |
| B | 5,465,741 | 11/1995 | Dvorak | 132 | 275 |
| C | 5,303,724 | 04/1994 | Anzivino | 132 | 278 |
| D | 3,000,384 | 09/1961 | Piers | 132 | 273 |
| E | D273341 | 04/1984 | Rol | D28 | 41 |
| F | D273342 | 04/1984 | Rol | D2 | 344 |
| G | 2,847,016 | 08/1958 | Rabinowitz | 132 | 273 |
| H | D368983 | 04/1996 | Gruters et al | D28 | 41 |
| I | 5,501,239 | 03/1996 | Walker | 132 | 275 |
| J | 1,713,616 | 05/1929 | Oppenheim | 132 | 273 |
| K | 5,551,452 | 09/1996 | Barlow | 132 | 54 |
| L | 59,261 | 10/1921 | Muller | D28 | 41 |
| M | D52258 | 08/1918 | Upton | D2 | 344 |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

### NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
|---|---|---|
| U | | |
| V | | |
| W | | |
| X | | |

U. S. Patent and Trademark Office
PTO-892 (Rev. 9-95)          Notice of References Cited          Part of Paper No. __2__

| *Notice of References Cited* | Application No. 09/525,601 | | Applican: | Minnelii | | |
|---|---|---|---|---|---|---|
| | Examiner Robyn Kieu Doan | | Group Art Unit 3732 | | Page 2 of 2 | |

### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|
| A | 2,651,310 | 09/1953 | Selson | 132 | 273 |
| B | D229240 | 11/1973 | Fox | D2 | 344 |
| C | 5,899,211 | 05/1999 | Brown | 132 | 201 |
| D | 2,567,119 | 09/1951 | Neidor | 132 | 53 |
| E | 4,600,029 | 07/1986 | Ueberscheer | 132 | 53 |
| F | | | | | |
| G | | | | | |
| H | | | | | |
| I | | | | | |
| J | | | | | |
| K | | | | | |
| L | | | | | |
| M | | | | | |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

### NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
|---|---|---|
| U | | |
| V | | |
| W | | |
| X | | |

**EXHIBIT D**

CERTIFICATE OF FACSIMILE

I HEREBY CERTIFY THAT THIS PAPER, IS BEING TRANSMITTED BY FACSIMILE
TO (703) 308-2708 ON:

_____ OCTOBER 17, 2000_____  (DATE OF DEPOSIT)

_10/17/00_          _____
DATE          RICHARD W. GOLDSTEIN

                                        DOC NO. G264

        IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of: Minnelli

Serial No: 09/525,601              Group Art Unit: G264

Filed: March 14, 2000              Examiner: Doan

For: DEVICE FOR BINDING A PONYTAIL HAVING A NATURAL HAIR
     APPEARANCE

----------------------------------------------------

                        AMENDMENT

Hon. Commissioner of
Patents and Trademarks
Washington, DC   20231

Sir:

        In response to the Office Action dated October 4, 2000,

please amend the above identified application as follows:


In the Claims

1. (amended) A hair binding device, for binding and maintaining a

ponytail, comprising:

an elastic band, having a pair of elastic band ends;

synthetic hair fibers, collectively having a pair of synthetic hair fiber ends; and

wherein one [each] of the elastic band ends is permanently joined with one of the synthetic hair fiber ends and the other of the elastic band ends is permanently joined with the other of the synthetic fiber ends so that the elastic bands and synthetic hair fibers together form a closed loop.

**Remarks**

Claims 1-5 are pending in the application.  Claims 4-5 are allowed.  Claim 3 is objected to.  Claims 1-2 have been rejected under 35 U.S.C. § 103(a) as being unpatentable over Naidor in view of Brown.

In a telephonic interview conducted with the Examiner on October 16 and 17, 2000, the relevance of Naidor to the patentability of claims 1 and 2 was discussed.  An agreement was reached that amending claim 1 to recited that one of the elastic band ends is permanently joined with one of the synthetic hair ends, and that the other of the elastic band ends is permanently joined with the other of the synthetic fiber ends would help clarify the claims and ensure that they do not inadvertantly read upon Naidor.  Accordingly, such amendment is made herein.

In view of the foregoing amendment, claims 1-5 should now be

allowable.

In view of the above, reconsideration and allowance of the

pending claims are respectfully solicited:

Respectfully submitted,

Richard W. Goldstein
Reg. No. 36,527
Attorney For Applicant(s)
2071 Clove Road
Staten Island, New York 10304
(718) 727-9780

# EXHIBIT E

US005899211A

# United States Patent [19]

## Brown

[11] **Patent Number:** 5,899,211

[45] **Date of Patent:** May 4, 1999

[54] **APPARATUS AND METHOD FOR SECURING PONY TAIL**

[75] Inventor: **Thomas A. Brown**, Fairfield, Iowa

[73] Assignee: **Pony Pal, L.C.**, Fairfield, Iowa

[21] Appl. No.: **09/030,733**

[22] Filed: **Feb. 25, 1998**

[51] Int. Cl.⁶ ........................................... A41G 3/00
[52] U.S. Cl. ............................. 132/201; 132/53; 132/273
[58] Field of Search ............................. 132/53, 55, 201, 132/273, 275

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 32,146 | 1/1900 | Leick . | |
| D. 52,258 | 8/1918 | Upton . | |
| 57,328 | 8/1866 | Iverson . | |
| D. 59,261 | 4/1921 | Muller | 132/53 |
| D. 229,240 | 11/1973 | Fox . | |
| D. 273,341 | 4/1984 | Rol . | |
| D. 273,342 | 4/1984 | Rol . | |
| D. 368,983 | 4/1996 | Gruters et al. . | |
| 541,125 | 6/1895 | Simonson . | |
| 1,713,616 | 5/1929 | Oppenheim | 132/53 |
| 2,567,119 | 9/1951 | Naidor | 132/53 |
| 2,651,310 | 9/1953 | Selson | 132/53 |
| 2,847,016 | 8/1958 | Rabinowitz . | |
| 3,000,384 | 9/1961 | Piers, Jr. . | |
| 4,600,029 | 7/1986 | Ueberschaar | 132/53 |
| 4,830,029 | 5/1989 | Bird | 132/53 |
| 5,303,724 | 4/1994 | Anzivino | 132/53 |
| 5,465,741 | 11/1995 | Dvorak . | |
| 5,501,239 | 3/1996 | Walker | 132/53 |
| 5,551,452 | 9/1996 | Barlow | 132/53 |

### OTHER PUBLICATIONS

4 pgs. of magazines including Modern Salon, May 1997 p. 169, Modern Salon Magazine; May 1997.
Pg. 169 Modern Salon Magazine; May 1997.
Pg. 52, Sophisticate's Hairstyle Guide; Jun. 1996.
Pg. 77, Hair Cut & Style magazine; Date: Unknown; Advertisment for "Hair Band–it#".

*Primary Examiner*—Todd E. Manahan
*Attorney, Agent, or Firm*—Zarley, McKee, Thomte, Voorhees & Sease

[57] **ABSTRACT**

An artificial hair piece includes an independent extension of synthetic human hair secured at one end to a stretchable, twistable, and foldable elastic loop or band. The opposite end of the extension can either be free or can be gathered and tied or otherwise bound. The elastic loop can be used to secure gathered actual hair of a user into, for example, a ponytail. The hair extension can then be wrapped around the elastic loop to hide it from view and give the impression that the hair extension is securing the ponytail in place. The hair extension can be selected to match one or more characteristic of the user's own hair.

**21 Claims, 3 Drawing Sheets**



**U.S. Patent**          May 4, 1999          Sheet 1 of 3          **5,899,211**



*Fig. 1*

*Fig. 2*

*Fig. 3*



*Fig. 4*

*Fig. 5*

U.S. Patent          May 4, 1999          Sheet 3 of 3          5,899,211



*Fig. 6*

*Fig. 7*

5,899,211

# 1

## APPARATUS AND METHOD FOR SECURING PONY TAIL

### BACKGROUND OF THE INVENTION

A. Field of the Invention

The present invention relates to hair styling, and in particular, to devices and methods of adding artificial hair pieces to a person's own natural hair, for example, in securing, wrapping, and styling pony tails.

B. Problems in the Art

A currently popular, but long used, hair style is the pony tail. The person's hair is gathered and secured by a rubber band or other looped elastic device at a location at or near the person's head, all as is well-known.

There are actually many variations of pony tails or similar hair configurations. For example, the place of gathering and securing the pony tail (hereafter referred to as the "base" of the pony tail) can be at the lower back of the head, or in the back of the head but quite high on the head. Another example is "pig tails" or double pony tails, usually spaced laterally towards opposite sides of the back of the head. Therefore, for purposes of this description, the term pony tail is intended to mean traditional pony tails and any similar or analogous hair configuration where actual hair is gathered and secured at a base near the head in a gathered configuration then extends either freely, braided, or otherwise away from the base.

As mentioned, the pony tail is secured most times by a rubber band or elastic member. To secure and maintain the pony tail, the elastic or rubber band must be wound tightly around the pony tail. Since the rubber band or elastic member is usually a loop, the hair gathered for the ponytail is most times first threaded through the loop, the loop is twisted to form another loop (the first loop surrounding the gathered hair) and the outer end of the gathered hair is threaded back through the second loop, and so on until the base of the pony tail is tightly secured. As a result, the band or elastic is usually visible.

Some people cover the elastic with a ribbon, bow, or other ornamentation. There are devices that attempt to combine the securing function of elastic with an ornamental aspect. An example is called a "scrunchie", which basically consists of an elastic material in a loop covered with a decorative elastic or gathered loose fitting cloth-like material. Even though the device must be wrapped like a rubber band is wrapped around the pony tail, when in place it is usually more appealing than simply a rubber band or elastic loop. Many times a smaller rubber band or elastic loop must first be used to secure the pony tail and the decorative scrunchie is then placed over it.

An alternative and presently increasingly popular way to cover the band or elastic is to use some of the person's own hair. There are different ways to do so, but one way to do so is described and shown at page 169 of MODERN SALON magazine, May 1997 issue. After the pony tail is created, by use of an elastic band (and possibly a hair pin), a narrow section of the person's own hair from the base of the ponytail is pulled out, saturated with hair spray and wrapped around the elastic band. It is sprayed again with hair spray and secured in place, by one or more hair pins, for example. The person's own hair, therefore, conceals the elastic securing the base of the pony tail and makes an appealing style. The arrangement also gives the illusion that the person's own hair was used to create and secure the pony tail.

The above method is fairly time-consuming. It also requires the use of substantial hair spray. Furthermore,

# 2

although the hair will perfectly match because it is the user's own, that part of the hair used to wrap the elastic must be manipulated, stretched and styled into a tightly wound configuration, which risks damage to the hair. It also treats that portion of the hair much differently than adjacent portions. Therefore, when not worn as a wrap around the base of the pony tail, it may look different than other adjacent portions of the person's hair. In addition, it is desirable to exhibit the maximum thickness of hair in the pony tail, and this method detracts from the visible volume in the pony tail by the amount of hair used to create the wrap at the base.

A variety of devices are commercially available to be used generally with hair styling. For example, the Tristar "HAIR-DINI" (Tristar of 1616 Duke Street, Laureldale, Pa. 19695) is a flexible apparatus with foam faces that can be shaped to hold and configure hair in various fashions. The "HAIR BAND-IT", available from Hair Band-It, P.O. Box 210428, Bedford, Tex. 76095, a current hair styling device bearing a patent number of U.S. Pat. No. 5,417,230, appears to be a tool that can assist a person to wrap their own hair around the elastic of their pony tail.

Revlon, Miami Lakes, Fla. 33014, markets a device called Revlon "SPARE HAIR" which appears to use an internal wire spine covered by artificial hair which could allow a user to wrap the artificial hair around the elastic creating the pony tail. It can also be used to add hair at any place on the user's head, if desired. The internal wire spine has flexible wire hooks at either end to assist in securing the device to the person's head. One use shown in advertising for "SPARE HAIR", is to wrap the elastic of a pony tail. Because it uses artificial hair, the user must match the artificial hair to the user's desired hair style and/or color. Also, the user must first secure the pony tail and then manipulate the wire spine and wire hooks, which is not easy or convenient.

However, none of the above-mentioned devices function both as the elastic to create the pony tail (i.e. bind the pony tail) and to create the look that the pony tail is wrapped in the person' own hair. Therefore, a need has been identified in the art. It would be advantageous to have the capability of creating and securing a pony tail and also wrap the elastic with what appears to be the user's own hair. Such a solution would not only be quick, but would not subject at least a portion of the user's hair to the trauma and stress of using it to create the wrap. Furthermore, it would be easier to change hair styles and give more options for hairstyles. This would eliminate substantial amounts of preparation time. Normally, a good job of wrapping the elastic with one's own hair requires a trip to the hair salon, which involves substantial time and cost.

U.S. Pat. No. 541,125 to Simonson is entitled "Hair Structure" and discloses one or more rings of what he calls elastic or flexible material such as very thin spring steel, or brass, or whale bone. Hair is sewed, or tied, or secured to entirely enclose and conceal the foundation, i.e. the ring or rings. The ring or rings are in turn secured in a parting of the user's hair close to the head by pins or placed over a knot of the user's hair. The user's own intact hair is then dressed in with the artificial hair to create a foundation and appearance of fuller hair or more volume in the user's hair.

U.S. Pat. No. 5,465,741 to Dvorak is entitled "Hair Wrap Device" and discloses a fabric sheet having an elastic band attached to one end. The elastic band is secured around a user's pony tail. The fabric wrap hangs down in the direction of the pony tail, is wrapped around it, and secured by what are called lace members. Neither of the above patents

5,899,211

**3**

discloses or suggests an integrated elastic loop/artificial hair combination for securing and wrapping the base of a pony tail. Simonson's ring would not operate if it where an elastic loop that is flexible, foldable, twistable, and stretchable. Its ring is a foundation, a base or support, over which the artificial hair and the user's intact hair are laid and dressed. Dvorak has no teaching of use of artificial hair, but rather is limited to a cloth wrap along a substantial length of the user's pony tail, secured by laces.

It is therefore a principle object of the present invention to provide an apparatus and method of wrapping the elastic of a pony tail or similar hair arrangement with hair, and more specifically, artificial hair or other than the user's own hair, that improves over or solves the problems and deficiencies in the art.

Further objects, features and advantages of the present invention include an apparatus and method which:
1. is economical to manufacture.
2. is durable over repeated and long use.
3. is quick and easy to use without assistance.
4. is adaptable to a variety of hair styles, characteristics, and uses.
5. is non-complex in structure and use.

These and other objects, features, and advantages will become more apparent with reference to the accompanying specification and claims.

SUMMARY OF THE INVENTION

The present invention is an apparatus and method for creating the look of the user's own intact hair as the wrapping and securing of the user's pony tail. The method comprises creating and securing a pony tail or similar hair configuration of the user with artificial hair, other than the user's own intact hair connected and then wrapped about the area of creation and securement of the pony tail, to cover the area of creation and securement of the pony tail, also called the base of the pony tail.

The apparatus comprises a length of artificial hair, other than the user's intact hair, having a plurality of individual hair strands. First ends of the strands are connected to a pony tail securing member, one example being a loop of elastic material. The opposite or distal ends of the strands can be free or can include a second securing member; one example being a conventional hair pin or clamp.

The method and apparatus allow the user to both create and secure the pony tail and cover the area of securement with a simulation of the user's own intact hair and conceal the true method of creating and securing the pony tail.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a preferred embodiment of the invention.

FIG. 2 is a diagrammatic depiction of a first or preliminary stage of use of the apparatus of FIG. 1 with a user's pony tail.

FIG. 3 is a diagrammatic depiction of a second or completed stage of use of the apparatus of FIG. 1.

FIG. 4 is similar to FIG. 1 but shows an alternative embodiment to that of FIG. 1.

FIG. 5 is similar to FIG. 1 but shows an alternative embodiment to that of FIGS. 1 and 4.

FIG. 6 is an enlarged diagrammatic view of a method of securement of opposite ends of the artificial hair in the embodiment of FIG. 1.

FIG. 7 is a partial sectional side elevation view of FIG. 6, taken along line 7—7 of FIG. 6.

**4**

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

To provide a better understanding of the invention, which is defined solely by the claims appended hereto, exemplary embodiments of the invention will now be described in detail. Frequent reference will be taken to the drawings. Reference numerals are used in the drawings to indicate certain parts or locations. The same reference numerals will be used to indicate the same parts or locations in all of the drawings, unless otherwise indicated.

FIG. 1 illustrates a device 10, according to the present invention, generally. An elastic loop 12, hereafter referred to as the elastic 12, is a conventional elastic member used for creating pony tails. Elastic 12 is essentially a strand, ring, or band of elastic, such as rubber, enclosed or covered by an elastic fabric and joined end-to-end into a continuous loop by connecting fastener 15 (usually a small metal clasp or clamp). Elastic 12 can be on the order of one and one-quarter inches in diameter in a normal non-extended state. Any part of it is stretchable, foldable and twistable in any direction. Any part of it or its whole is expandable to several times its normal length while at the same time being foldable and twistable. A length of artificial hair or some one else's separated natural hair, or other than the user's intact natural hair, generally indicated by reference numeral 14, is made up of a plurality of individual hair strands. For the present purposes, the term artificial hair is intended to include in its meaning any hair, natural, simulated or synthetic, which is not intact and growing on the particular user's head. One end (see reference numeral 16) of length 14 is fixed to elastic 12. In this example, end 16 of length 14 is secured to a mesh or net portion 18 (by weaving the strands thereto or otherwise). Mesh 18 is then tied to elastic 12 by thread 20, for example. Other ways are possible.

The strands at the other end 22 of length 14 are even and bound together and a hair pin or clamp 24 can be fixed by tied thread 25 or otherwise, to end 22. The strands at end 22 can be bound by wrapping them in a rubber band (see reference numeral 26), by gluing them together, or by other methods. The distal ends of the artificial hair are sewn or fastened together with a pin or clamp parallel to the flow of the hair.

Device 10 therefore has a portion 12 which functions to create and secure a user's pony tail, in the same way an elastic or rubber band would conventionally do so, but then includes a length 14 of artificial hair which extends from portion 12 and can then be wrapped around portion 12 to both conceal portion 12 and appear as if the user's own intact hair created and secured the user's pony tail in place.

FIGS. 2 and 3 illustrate the method according to the invention. In stage one (FIG. 2), a pony tail is created by gathering the user's hair in a fashion to preliminarily form a pony tail 30. The pony tail 30 is finally created and secured in place, here by using elastic 12 in a conventional manner. The pony tail 30 is inserted through the middle of elastic 12, which is then twisted. The pony tail 30 is then inserted through elastic 12 usually several more times so that elastic 12 is tightly wound around pony tail 30. At the end of stage one, the pony tail 30 is created and secured, and artificial hair length 14 simply hangs or extends from elastic 12, as shown at 14 in FIG. 2. Note that FIG. 2 shows elastic 12 wrapped twice at the base of the pony tail, but it could be once or more than two wraps depending on the size of elastic 12, the amount and thickness of the pony tail 30, and the tightness of the wrap.

Stage 2 (see FIG. 3) involves wrapping length 14 around the area of the creation and securement of the pony tail (its

5,899,211

| 5 | 6 |
|---|---|

base), here around elastic 12. The portion of length 14 proximal to elastic 12 is wrapped first, and then succeeding portions of length 14 until its distal end. Elastic 12 is concealed and it appears that hair 14 created and secured the pony tail in place. Finally, the user secures end 22 in place, wound around elastic 12, by opening the jaws of hair pin 24, inserting the outer ends of the jaws into, through, and/or around the wrapped length of hair 14, and closing the jaws.

In the preferred embodiment, length 14 is artificial hair available at or through a variety of locations or sources, all well known in the art. Artificial hair 14 can be made of synthetic chemical fibers, such as either modacrylic, vinyl chloride, polyester, or polyamide. Polyamide is considered superior in many respects and is available from International Hairgoods, Inc. (a subsidiary of Aderans), 5909 Baker Rd., STE 505, Minnetonka, Minn. 55345. Alternatively, actual human hair could be used, as could certain animal hairs.

It will be normally true, it is believed, that users will select a length of hair 14 that is compatible, if not very close to, the user's hair color. It will be appreciated that other hair characteristic options may be desirable by users, such as hair texture, length of section 14, amount of hair in length 14, straightness or curliness, etc. However, the invention is not limited to matching the user's natural hair characteristics to the artificial hair. The user may desire the artificial hair 14 to be somewhat different in characteristic(s), including color, to the user's natural characteristic(s).

FIGS. 4 and 5 illustrate other possible alternatives. In FIG. 4, it can be seen that length 14 is braided (for example, three or four strand braids, squared at the bottom). FIG. 5 shows that end 22 of length 14 does not necessarily have to be bound together, but rather could be free. The ends of the strands in end 22 could be used to secure end 22 in place, or a clamp or hair pin like discussed above, could do so.

The included preferred embodiments are given by way of example only, and not by way of limitation to the invention, which is solely described by the claims herein. Variations obvious to one skilled in the art will be included within the invention defined by the claims.

For example, elastics 12 are available and widely known and used for creating pony tails. It can be a conventional cloth-covered elastic ring approximately one and one-quarter inches in diameter in a normal, unextended state. The thickness of the elastic is approximately one-eighth inch in diameter. The inner material of the ring of elastic 12 is made of an elastic rubber material, and the surface can be, for example, nylon or polyester knitted cloth.

Synthetic hair extensions 14 are also well-known and available from a wide variety of commercial sources. They generally comprise synthetic hair strands secured at one end to a webbing or netting. Here, extensions 14 are on the order of seven or eight inches long or longer, but there is no precise limit or range. One example would be sixteen inches long by one-quarter inch wide, when the hair is bunched up. The free end of extension 14 is finished smooth. The ends are cut to a uniform length. Pin 24 can be a bobby pin, a double sided bobby pin, or other devices that could fix the ends of extension 14 in place when would around the base of the pony tail.

Extensions 14 could be available in a variety of hair colors and characteristics. The color of the elastic 12 can be matched or made similar to the color of the hair extension 14. The artificial hair strands of extension 14 can be of any suitable chemical fiber such as is used for artificial hair.

Webbing 18 can be made of synthetic materials suitable for use on a person's head. For example, nylon could be

used. It can be selected to be the same or close to the color of the artificial hair 14. Two pieces, for example each one square inch in dimension, can be used.

Thread 20 can be polyester cord the same or similar in color to hair 14, and two inches long. Clip or pin 24 is approximately two inches long, with a loop in one end and opposed jaws biased towards one another, but other lengths and configurations are possible. All parts of device 10 could be color coordinated or color matched to each other and to the user's intact hair.

Device 10 can be assembled and constructed as follows. Webbing 18 (one inch square, for example) is folded once over elastic 12. One end of the lock or extension of hair 14 is placed between the folded webbing 18 and extension 14 is perpendicular to a tangent drawn to the point on the elastic ring 12 in the center of the webbing 18 fold (i.e. the hair 14 points directly away form ring 12). Using thread 20 in a sewing machine, a stitch is repeated across the webbing and the hair to fasten the hair between the two sides of webbing 18. FIGS. 6 and 7 illustrate this in detail. Thus, at this point, one end of hair 14 is fastened securely to elastic ring 12.

Then, hair 14 can be bunched and secured at its opposite end. Alternatively, it could be slightly spread (see FIGS. 1, 4, and 5). A small piece of webbing (see 19 at FIGS. 6 and 7) like webbing 18 could be wrapped around that end. A small piece (e.g. two inches long) of polyester cord (like polyester thread or cord 20) could be threaded through the webbing at the free end of hair 14. (See FIGS. 6 and 7) Distal end of hair 14, polyester cord 20, and webbing 19 could be stitched or sewn together (see stitches 21 in FIGS. 6 and 7). A pin 24 could then be tied to the outer end of the cord to secure a pin 14 in place and have it always available. By using this method, no glue is used and hair extension 14 is secured at both ends. Alternatively, pin 24 could be fastened parallel to the hair 14 at or near its distal end, but not have a cord 20. Pin 24 could be tied to hair 14/webbing 19 or simply inserted in that orientation.

What is claimed is:

1. A removable hair piece comprising:
   a length of hair strands having a first end and a second end;
   an elastic loop which is stretchable, twistable, and foldable, having a diameter in a non-expanded state of on the order of 1" to 2" and a diameter of several inches in an expanded state so that it is sized and configured to surround and bind a pony tail in place;
   a connection securing the first end of the length of hair strands to a portion of the elastic loop so that the remainder of the elastic loop is free and available to surround and bind a pony tail.

2. The hair piece of claim 1 wherein the hair strands at the second end of the length are glued together.

3. The hair piece of claim 1 wherein the hair strands comprise hundreds of artificial hair strands.

4. The hair piece of claim 1 wherein the hair strands are synthetic.

5. The hair piece of claim 1 wherein the hair strands are selected from the set comprising synthetic, human, and animal hair.

6. The hair piece of claim 1 the hair strands are selected to match a characteristic of a user's own hair.

7. The hair piece of claim 6 wherein the characteristic is selected from the set comprising color, curliness, texture, and style.

8. The hair piece of claim 1 wherein the hair strands are braided.

5,899,211

7

**9.** The hair piece of claim 1 wherein the length is over five inches from first to second ends when fully extended.

**10.** The hair piece of claim 1 wherein the elastic loop is made of natural or artificial rubber and is covered by a stretchable fabric.

**11.** The hair piece of claim 1 wherein the connection comprises a webbing wrapped around the elastic loop and with the hair strands sewn into the webbing.

**12.** The hair piece of claim 11 wherein the webbing is secured to the elastic loop by thread or cord.

**13.** The hair piece of claim 1 further comprising a wrapping around the second end of the length securing the material in place.

**14.** A removable hair piece comprising:

a length of hair strands having a first end and a second end;

an elastic loop which is stretchable, twistable, and foldable;

a connection securing the first end of the length of hair strands to a portion of the elastic loop and further comprising a hair pin connected at or near the second end of the length of hair strands.

**15.** The hair piece of claim 14 wherein the hair pin is connected by a thread or cord at or near the second end of the length of hair strands.

**16.** An apparatus for securing and wrapping the base of a pony tail comprising:

a stretchable, twistable, and foldable elastic loop, having a diameter in a non-expanded state of on the order of 1" to 2" and a diameter of several inches in an expanded state so that it is sized and configured to surround and bind a pony tail in place;

8

a material connected to one portion of the elastic loop;

a collection of hair strands independent from a user's intact hair connected to the material so that the remainder of the elastic loop is free and available to surround and bind a pony tail;

so that the combination can be used both to secure the base of the pony tail with the elastic loop, and then wrap and conceal the elastic loop with the hair strands to give the appearance that the hair strands have secured the pony tail base.

**17.** A method of securing and wrapping the base of a pony tail formed with a user's intact hair comprising:

gathering at least a portion of the user's intact hair into a pony tail;

securing the base of the pony tail with a stretchable, twistable, and foldable elastic to which is connected an hair extension which is independent of the user's intact hair;

wrapping the artificial hair extension around the elastic securing the base of the pony tail.

**18.** The method of claim 17 further comprising pinning the hair extension in place.

**19.** The method of claim 17 wherein the color of the hair extension is selected to match the color of the user's hair.

**20.** The method of claim 17 wherein the hair extension is braided.

**21.** The method of claim 17 wherein a securing pin is attached to the hair extension.

\* \* \* \* \*

# EXHIBIT F





**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
           Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 09/108,980 | 07/01/98 | WARHURST | P  2947.5 |

PM82/0922

JOSEPH C. MASON
MASON & ASSOCIATES
17757 US HWY 19 N.
SUITE 500
CLEARWATER FL 33764

| EXAMINER |
|---|
| KRAMER,D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3652 | 5 |

DATE MAILED:   09/22/99

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev. 2/95)                                                                                      1- File Copy

| | Application No. 09/108,980 | Applicant(s) Warhurst et al. |
|---|---|---|
| **Office Action Summary** | Examiner Dean J. Kramer | Group Art Unit 3652 |

☐ Responsive to communication(s) filed on _____ .

☐ This action is **FINAL.**

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire _____ **3** _____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

   ☒ Claim(s) _1-24_____ is/are pending in the application.

      Of the above, claim(s) _____ is/are withdrawn from consideration.

   ☐ Claim(s) _____ is/are allowed.

   ☒ Claim(s) _1-4, 6, and 10-24_____ is/are rejected.

   ☒ Claim(s) _5 and 7-9_____ is/are objected to.

   ☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

   ☒ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

   ☒ The drawing(s) filed on ___ _Jul 10, 1998_ ___ is/are objected to by the Examiner.

   ☐ The proposed drawing correction, filed on _____ is ☐approved ☐disapproved.

   ☐ The specification is objected to by the Examiner.

   ☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

   ☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

      ☐ All ☐ Some* ☐None   of the CERTIFIED copies of the priority documents have been

         ☐ received.

         ☐ received in Application No. (Series Code/Serial Number) _____ .

         ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

      *Certified copies not received: _____ .

   ☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

   ☒ Notice of References Cited, PTO-892

   ☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). ___ 3 ___

   ☐ Interview Summary, PTO-413

   ☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

   ☐ Notice of Informal Patent Application, PTO-152

--- *SEE OFFICE ACTION ON THE FOLLOWING PAGES* ---

Application/Control Number: 09/108,980                                    Page 2

Art Unit: 3652

1.      Claims 4, 6, 10-19, and 21-24 are rejected under 35 U.S.C. 112, second paragraph, as

being indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

        Independent claim 10 and the claims that depend therefrom recite a "frame carrier", a

"carrier frame", a "frame", and a "carrier". It appears that all of these terms are referring to the

same structural element, but applicant should amend the claims to maintain a consistent wording

throughout the series of dependent claims. Likewise, regarding claims 4 and 24, it appears that

the phrase "frame carrier", as recited in line 1 of claim 4 and in line 3 of claim 24, should be

changed to --carrier frame-- in order to remain consistent with the terminology used in the claims

from which they depend.

        Further, there is no clear antecedent basis for "the upright elements" (claim 6, line 3 and

claim 23, lines 3 and 4), "the wheel" (claim 19, line 1), or "the rear and front upright members"

(claim 22, line 9).

2.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

        This application currently names joint inventors. In considering patentability of the claims

under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was

commonly owned at the time any inventions covered therein were made absent any evidence to

Application/Control Number: 09/108,980                                      Page 3

Art Unit: 3652

the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor

and invention dates of each claim that was not commonly owned at the time a later invention was

made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35

U.S.C. 102(f) or (g) prior art under 35 U.S.C. 103(a).

3.      Claims 1-3 and 20 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Dousset in view of Whitehouse.

        Dousset shows a container handling apparatus that contains all of the structural limitations

as broadly as recited in the above claims except that its carrier frame comprises two separate end-

fitted units rather than a single rectangular-shaped frame.

        However, Whitehouse shows a container handling device having a generally rectangular

carrier frame (see Figs. 1 and 6) for supporting a container at its four corners (80).

        Accordingly, it would have been obvious to one of ordinary skill in the art at the time the

invention was made to replace the two separate frame carriers of Dousset's assembly with a

unitary rectangular-shaped frame similar to that shown in the Whitehouse patent as an alternative

yet functionally equivalent means of handling a rectangular container having locking means at its

four lower corners.

        Regarding claim 20, it would have been an obvious matter of design choice to use a

gasoline engine as the power source for the hydraulic actuators since applicant has not specifically

disclosed that this particular type of engine solves any stated problem or is for any critical

Application/Control Number: 09/108,980                                Page 4

Art Unit: 3652

purpose, and it appears that the device would perform equally well with any well known type of

engine powering the actuators.

4.      Claims 5 and 7-9 are objected to as being dependent upon a rejected base claim, but would

be allowable if rewritten in independent form including all of the limitations of the base claim and

any intervening claims.

5.      Claims 4, 6, 11-19, 21, 23, and 24 would be allowable if rewritten to overcome the

rejection(s) under 35 U.S.C. 112, 2nd paragraph, set forth in this Office action and to include all of

the limitations of the base claim and any intervening claims.

6.      Claims 10 and 22 would be allowable if rewritten or amended to overcome the rejection(s)

under 35 U.S.C. 112, 2nd paragraph, set forth in this Office action.

7.      The drawings are objected to as failing to comply with 37 CFR 1.84(p)(5) because they do

not include the following reference sign(s) mentioned in the description: "78". Correction is

required.

8.      The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure.

        Back and Cox both show container handling devices having telescopically adjustable

upright members.

        The remaining cited references all show container handlers having wheels located at the

lower end of their upright members.

Application/Control Number: 09/108,980                                      Page 5

Art Unit: 3652

9.      Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Dean Kramer whose telephone number is (703) 308-2181.

DEAN J. KRAMER
PRIMARY EXAMINER

djk

September 20, 1999

### Notice of References Cited

| Application No. 09/108,980 | Applicant(s) Warhurst et al. | | |
|---|---|---|---|
| Examiner Dean J. Kramer | Group Art Unit 3652 | Page 1 of 1 | |

#### U.S. PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|
| A | 2,703,659 | 3-1955 | Hutchins | 414 | 498 |
| B | 3,135,407 | 6-1964 | Back | 414 | 498 |
| C | 3,744,652 | 7-1973 | Rieschel | 414 | 459 |
| D | 4,491,452 | 1-1985 | Matovich | 414 | 458 |
| E | 4,522,550 | 6-1985 | Whitehouse | 414 | 498 |
| F | 4,897,011 | 1-1990 | Brower | 414 | 459 |
| G | 5,417,540 | 5-1995 | Cox | 414 | 498 |
| H | 5,800,114 | 9-1998 | Secondi | 414 | 498 |
| I | | | | | |
| J | | | | | |
| K | | | | | |
| L | | | | | |
| M | | | | | |

#### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUBCLASS |
|---|---|---|---|---|---|---|
| N | | | | | | |
| O | | | | | | |
| P | | | | | | |
| Q | | | | | | |
| R | | | | | | |
| S | | | | | | |
| T | | | | | | |

#### NON-PATENT DOCUMENTS

| | DOCUMENT (Including Author, Title, Source, and Pertinent Pages) | DATE |
|---|---|---|
| U | | |
| V | | |
| W | | |
| X | | |

DOC. ID NO.:                                                          Sheet 4 of 6

| FORM PTO-1449<br>(REV. 7-80)<br>INFORMATION DISCLOSURE CITATION<br>IN AN APPLICATION<br><br>(Use several sheets if necessary) | ATTY. DOCKET NO.<br>2947.5 | SERIAL NO.<br>09/108,980 |
|---|---|---|

APPLICANT
Peter S. Warhurst, et al

| FILING DATE<br>07/01/98 | GROUP<br>3617 |
|---|---|

Part 9 Paper #3

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| DK | AA | 2,197,375 | 04/16/1940 | Dafnis | 104 | 48 | 07/27/1938 |
| DK | AB | 2,937,879 | 05/24/1960 | Lion | 280 | 13.21 | 07/03/1957 |
| DK | AC | 3,243,193 | 03/29/1966 | Fulmer, et al | 280 | 35 | 12/31/1962 |
| DK | AD | 3,541,598 | 11/17/1970 | Dousset | 214 | 392 | 04/02/1970 |
| DK | AE | 3,881,689 | 05/06/1975 | Bury, et al | 254 | 45 | 04/24/1974 |
| DK | AF | 4,297,068 | 10/27/1981 | Concha, et al | 414 | 458 | 09/21/1979 |
| RK | AG | 4,712,966 | 12/15/1987 | Gross | 414 | 458 | 11/08/1985 |
| DK | AH | 4,765,594 | 08/23/1988 | Riedl, et al | 254 | 45 | 11/15/1985 |
| DK | AI | 5,006,031 | 04/09/1991 | Fossing, et al | 414 | 458 | 07/12/1989 |

### FOREIGN PATENT DOCUMENTS

| | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION YES NO |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| |
|---|
| |
| |

| EXAMINER<br>D. Kramer | DATE CONSIDERED<br>9-17-99 |
|---|---|

J:\LHC\9809044.DOC

FORM PTO-948 (REV. 11-97)   U.S. DEPARTMENT OF COMMERCE - Patent and Trademark Office   Application No. 108980

## NOTICE OF DRAFTPERSON'S
## PATENT DRAWING REVIEW

The drawing filed (insert date) 7/10/98 are:

A. _____ not objected to by the Draftperson under 37 CFR 1.84 or 1.152.

B. _____ objected to by the Draftperson under 37 CFR 1.84 or 1.152 as indicated below. The Examiner will require submission of new, corrected drawings when necessary. Corrected drawings must be submitted according to the instructions on the back of this notice.

1. DRAWINGS. 37 CFR 1.84(a): Acceptable categories of drawings:
Black ink. Color.
_____ Color drawing are not acceptable until petition is granted. Fig.(s)
_____ Pencil and non black ink is not permitted. Fig(s)
2. PHOTOGRAPHS. 37 CFR 1.84(b)
_____ Photographs are not acceptable until petition is granted.
_____ 3 full-tone sets are required. Fig(s)
_____ Photographs not properly mounted (must bristol board or photographic double-weight paper). Fig(s)
_____ Poor quality (half-tone). Fig(s)
3. TYPE OF PAPER. 37 CFR 1.84(e)
_____ Paper not flexible, strong, white and durable. Fig.(s)
_____ Erasures, alterations, overwritings, interlineations, folds, copy machine marks not acceptable. (too thin)
_____ Mylar, vellum paper is not acceptable (too thin). Fig.(s)
4. SIZE OF PAPER. 37 CFR 1.84(F): Acceptable sizes:
_____ 21.0 cm by 29.7 cm (DIN size A4)
_____ 21.6 cm by 27.9 cm (8 1/2 x 11 inches)
_____ All drawings sheets not the same size. Sheet(s)
5. MARGINS. 37 CFR 18.4(g): Acceptable margins:
_____ Top 2.5 cm Left 2.5 cm Right 1.5 cm Bottom 1.0 cm SIZE: A4 Size
_____ Top 2.5 cm Left 2.5 cm Right 1.5 cm Bottom 1.0 cm SIZE: 8 1/2 x 11
_____ Margins not acceptable. Fig(s)
_____ Top (T) _____ Left (L)
_____ Right (R) _____ Bottom (B)
6. VIEWS. CFR 1.84(h)
REMINDER: Specification may require revision to correspond to drawing changes.
_____ Views connected by projection lines or lead lines. Fig.(s)
Partial views. 37 CFR 1.84(h)(2)
_____ Brackets needed to show figure as one entity. Fig.(s)
_____ Views not labeled separately or properly. Fig.(s)
_____ Enlarged view not labeled separately or properly. Fig.(s)

7. SECTIONAL VIEWS. 37 CFR 1.84(h)(3)
_____ Hatching not indicated for sectional portions of an object. Fig.(s)
_____ Sectional designation should be noted with Arabic or Roman numbers. Fig.(s)
8. ARRANGEMENT OF VIEWS. 37 CFR 1.84(i)
_____ Words do not appear on a horizontal, left-to-right fashion when page is either upright or turned, so that the top becomes the right side, except for graphs. Fig.(s)
_____ Views not on the same plane on drawing sheet. Fig.(s)
9. SCALE. 37 CFR 1.84(k)
_____ Scale not large enough to show mechansim without crowding when drawing is reduced in size to two-thirds in reproduction. Fig.(s)
10. CHARACTER OF LINES, NUMBERS, & LETTERS. 37 CFR 1.84(l)
_____ Lines, numbers & letters not uniformly thick and well defined, clean, durable and black (poor line quality). Fig.(s)
11. SHADING. 37 CFR 1.84(m)
_____ Solid black areas pale. Fig.(s)
_____ Solid black shading not permitted. Fig.(s)
_____ Shade lines, pale, rough and blurred. Fig.(s)
12. NUMBERS, LETTERS, & REFERENCE CHARACTERS. 37 CFR 1.48(p)
_____ Numbers and reference characters not plain and legible. Fig.(s)
_____ Figure legends are poor. Fig.(s)
_____ Numbers and reference characters not oriented in the same direction as the view. 37 CFR 1.84(p)(3) Fig.(s)
_____ English alphabet not used. 37 CFR 1.84(p)(3) Fig.(s)
_____ Numbers, letters and reference characters must be at least .32 cm (1/8 inch) in height. 37 CFR 1.84(p)(3) Fig.(s)
13. LEAD LINES. 37 CFR 1.84(q)
_____ Lead lines cross each other. Fig.(s)
_____ Lead lines missing. Fig.(s)
14. NUMBERING OF SHEETS OF DRAWINGS. 37 CFR 1.48(t)
_____ Sheets not numbered consecutively, and in Ababic numerals beginning with number 1. Fig.(s)
15. NUMBERING OF VIEWS. 37 CFR 1.84(u)
_____ Views not numbered consecutively, and in Abrabic numerals, beginning with number 1. Fig.(s)
16. CORRECTIONS. 37 CFR 1.84(w)
_____ Corrections not made from PTO-948 dated
17. DESIGN DRAWINGS. 37 CFR 1.152
_____ Surface shading shown not appropriate. Fig.(s)
_____ Solid black shading not used for color contrast. Fig.(s)

COMMENTS

REVIEWER _____ DATE 7/22/98 TELEPHONE NO. 305-8404
ATTACHMENT TO PAPER NO. 5
PTO COPY

# EXHIBIT G



#6/a
SW
11/30/9
fuor

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant: Warhurst et al.      )
                                )
S.N.: 09/108/980                )      Examiner: D. Kramer
                                )
Filed: July 1, 1998             )      Art Unit: 3652
                                )
For: AN APPARATUS FOR LIFTING,  )
     HANDLING AND TRANSPORTING  )
     A CONTAINER                )
                                )

Certificate of Express Mail Under 37 C.F.R. 1.10

"Express Mail" mailing label number: EL520883839US
Date of Deposit: November 23, 1999

    I hereby certify that this paper or fee is being deposited
with the United States Postal Service "Express Mail Post Office
to Addressee" service under 37 C.F.R. 1.10 on the date indicated
above and is addressed to the Assistant Commissioner for Patents
and Trademarks, Washington, DC  20231

Lia H. Costello
Lia H. Costello, L.A.

Box Fee Amendment
Assistant Commissioner for
  Patents and Trademarks
Washington, D.C.  20231

Dear Sir:

    In response to the nonfinal Examiner's Action mailed

September 22, 1999 (Paper No. 5), having a shortened statutory

period for response set to expire December 22, 1999, the above-

identified patent application is amended as follows:

11/29/1999 MBERHE  00000013 131992  09108980
01 FC:203        135.00 CH
02 FC:202         39.00 CH

1



AMENDMENT A
(37 C.F.R. §1.111)

IN THE SPECIFICATION:

Please amend the specification as follows, in accordance
with 37 C.F.R. 1.121(a):

On page 14, line 16, delete "ow" and insert instead
-- Now --.

IN THE CLAIMS:

Please amend Claims 1-2, 4-6, 10-15, 19, and 22-24 in the
manner indicated, in accordance with 37 C.F.R. 1.121(b), i.e.,
bracketed material is deleted from the claim and underscored
material is added to it.

1.    (Amended) An apparatus for lifting, handling and
transporting a container having right and left sides and front
and rear ends, the apparatus comprising:

        a carrier frame including right and left longitudinal
elements juxtaposed with the right and left sides, respectively,
of the container to be handled and transported, each longitudinal
element extending between opposite first and second ends, the
carrier frame having front and rear transverse elements
juxtaposed with the front and rear ends, respectively, of the
container to be handled and transported, each transverse element
extending between opposite right and left ends, the left ends of
the front and rear elements being adjacent to the first and
second ends, respectively, of the left longitudinal element, and
the right ends of the front and rear elements being adjacent to

the first and second ends, respectively, of the right
longitudinal element, the carrier frame further including a
plurality of generally vertical upright members, each upright
member extending between opposite upper and lower ends;

bearing means attached to each upright member lower
end, for ground bearing and relative movement of the upright
members with the ground;

elevating means for elevating and lowering the carrier
frame with respect to the ground;

[a transport vehicle having a platform suitable for
transporting the container and carrier frame simultaneously;]

positioning means connected to the carrier frame for
moving and positioning the carrier frame with respect to the
container, and for moving and positioning the carrier frame and
container together with respect to [the] a transport vehicle
having a platform when the container is to be loaded on to and
off from said transport vehicle;



supporting means connected to the carrier frame and to
the container for supporting the container to the frame; and

means for providing hydraulic power to actuators,

wherein the carrier frame is capable of being elevated
to be moved over the container and is capable of being lowered
around the container for attaching the carrier frame to the
container for subsequent lifting, handling and transporting of
the container.

2.    (Amended) The apparatus of claim 1 wherein the upright
members each further comprise a tubular fixed element attached to

3



the <u>carrier</u> frame and a tubular sliding element mounted for
sliding movement within the fixed element.

4.    (Amended) The apparatus of claim 1 wherein the [frame]
carrier <u>frame</u> includes a pair of guide wheels, each guide wheel
mounted for rotation on a generally vertical axis on an upright
member adjacent the rear transverse element, with the guide
wheels facing inward toward the container for engagement with the
container to facilitate positioning the carrier frame with the
container.

5.    (Amended) The apparatus of claim 1 wherein the front
and rear transverse elements are selectively adjustable in length
to allow expansion of the carrier frame to clear the <u>transport</u>
<u>vehicle</u> and the container for positioning and contraction of the
carrier frame into close juxtaposition with the <u>transport</u> vehicle
and the container.

7̶6̶.    (Amended) The apparatus of claim 1 wherein the
<u>transport</u> vehicle platform includes notches on either side to
receive and releasably retain the upright [elements] <u>members</u> upon
contraction of the carrier frame into close juxtaposition with
the vehicle for locking engagement of the carrier frame to the
<u>transport</u> vehicle platform.

1̶1̶2̶6̶.    (Amended) An apparatus for lifting, handling and
transporting a container having right and left sides and front
and rear ends, the apparatus comprising:

a [frame] carrier <u>frame</u> including right and left
longitudinal elements juxtaposed with the right and left sides,
respectively, of the container <u>to be handled and transported,</u>

4

each longitudinal element extending between opposite first and
second ends, the carrier frame having front and rear transverse
elements juxtaposed with the front and rear ends, respectively,
of the container to be handled and transported, each transverse
element extending between opposite right and left ends, the left
ends of the front and rear elements being adjacent to the first
and second ends, respectively, of the left longitudinal element,
and the right ends of the front and rear elements being adjacent
to the first and second ends, respectively, of the right
longitudinal element, the [frame] carrier frame further including
four generally vertical upright members, each upright member
extending between opposite upper and lower ends;



 wheels, attached to each upright member lower end, for
ground bearing and relative movement of the upright members with
the ground;

 elevating means for elevating and lowering the frame
with respect to the ground;

 [a transport vehicle having a platform suitable for
transporting the container and carrier frame simultaneously;]

 a winch and cable connected to the carrier frame for
moving and positioning the carrier frame with respect to the
container, and for moving and positioning the carrier frame and
container together with respect to the transport vehicle having a
platform when the container is to be loaded on to and off from
said transport vehicle;

 supporting means connected to the frame and to the
container for supporting the container by the frame; and

means for providing hydraulic power to actuators,

wherein the carrier frame is capable of being elevated to be moved over the container and is capable of being lowered around the container for attaching the carrier frame to the container for subsequent lifting, handling and transporting of the container.

14. (Amended) The apparatus of claim 10 wherein the upright members each further comprise a tubular fixed element attached to the carrier frame and a tubular sliding element mounted for sliding movement within the fixed element.

15. (Amended) The apparatus of claim 14, wherein the elevating means further comprises a plurality of actuators, each actuator mounted within an upright member, each actuator having opposite first and second ends, the first end being attached to the tubular fixed element of the upright member, the second end being attached to the upright member tubular sliding element, so that upon being actuated in an extending direction, the actuators will slideably extend the sliding element from within the fixed element in a telescoping manner to elevate the carrier frame, and upon being actuated in a retracting direction, the actuators will slideably retract the sliding element into the fixed element in a telescoping manner to lower the carrier frame.

16. (Amended) The apparatus of claim 10, wherein the [frame] carrier frame includes a pair of guide wheels, each guide wheel mounted for rotation on a generally vertical axis on an upright member adjacent the rear transverse element, with the guide wheels facing inward toward the container for engagement

6

with the container to facilitate positioning the carrier <u>frame</u>
with the container.

21. (Amended) The apparatus of claim 16 wherein the front
and rear transverse elements are selectively adjustable in
length, so as to allow expansion of the carrier frame to clear
the <u>transport</u> vehicle and the container for positioning, and
contraction of the carrier frame into close juxtaposition with
the <u>transport</u> vehicle and the container.

22. (Amended) The apparatus of claim 16 wherein the
<u>transport</u> vehicle platform includes notches on either side to
receive and releasably retain the upright members upon
contraction of the <u>carrier</u> frame into close juxtaposition with
~~the transport vehicle,~~ for locking engagement of the carrier
frame to the <u>transport</u> vehicle platform.

23. (Amended) The apparatus of claim [9] 10, wherein the
wheel attached to the upright member lower ends at the rear of
the [frame] carrier <u>frame</u> further comprise:

        a swivel connection between the wheel and the
corresponding lower end of the upright member;

        a hydraulic motor with a drive shaft for mounting a
sprocket gear; and

        a corresponding sprocket gear attached to the wheel for
connecting a sprocket chain between the hydraulic motor drive
shaft and the wheel.

24. (Amended) A method of lifting, handling and
transporting a container <u>on to and off from a transport vehicle</u>

having a cargo carrying platform, the method comprising the steps
of:

[positioning the container on a cargo-carrying
platform of a transport vehicle;]

positioning a carrier frame around the container on the
transport vehicle platform;

releasably attaching the carrier frame to the
container;

extending the rear and front upright members downward
into a ground-engaging position;

elevating the carrier frame with hydraulic means and
container above the transport vehicle platform;

expanding the carrier frame with hydraulic means to
clear the sides of the transport vehicle platform;

driving the transport vehicle out from under the
carrier frame and container;

lowering the carrier frame and container until the
container rests upon the ground;

releasing the carrier frame attachment from the
container;

activating a steering and mobility means for providing
driving power and directional control to wheels at the lower end
of the rear upright members;

directing the movement of the carrier frame away from
the container;

elevating the carrier frame to an elevation higher than
that of the transport vehicle platform;

8

moving and positioning the carrier frame over the transport vehicle platform;

deactivating the steering and mobility means;

retracting the carrier frame with hydraulic means to align the upright members in close proximity to the transport vehicle platform;

lowering the carrier frame to rest upon the transport vehicle platform;

retracting the upright members upward away from the ground-engaging position so that the transport vehicle is able to transport the carrier frame;

extending the upright members downward into a ground-engaging position;

elevating the carrier frame with hydraulic means above the transport vehicle platform;

expanding the carrier frame with hydraulic means to clear the sides of the transport vehicle platform;

activating a steering and mobility means for providing driving power and directional control to wheels at the lower end of the rear upright members;

directing the movement of the carrier frame away from the transport vehicle platform;

moving and positioning the carrier frame around the container;

lowering the carrier frame adjacent to the ground;

releasably attaching the carrier frame to the container;

9

elevating the carrier frame and container to an elevation higher than that of the transport vehicle platform;

moving and positioning the carrier frame and container over the transport vehicle platform;

deactivating the steering and mobility means;

retracting the carrier frame with hydraulic means to align the upright members in close proximity to the transport vehicle platform;

lowering the carrier frame and container to rest upon the transport vehicle platform; and

retracting the upright members upward away from the ground-engaging position so that the transport vehicle is able to transport the carrier frame and container.

10 28.    (Amended) The method of claim 28 further comprising the step of providing notches on either side of the transport vehicle platform for receiving and releasably retaining the upright [elements] members upon contraction of the carrier frame into close juxtaposition with the transport vehicle.

31 24.    (Amended) The method of claim 28, further comprising the steps of:

mounting guide wheels on both sides of the carrier frame [carrier] for engagement with the container; and guiding the carrier frame [carrier] into position around the container with the guide wheels.

ADD THE FOLLOWING NEW CLAIMS:

25. The apparatus of claim 1 wherein the container and the carrier frame may be transported simultaneously on the platform of the transport vehicle.

26. The apparatus of claim 1, wherein the bearing means are wheels.

27. The apparatus of claim 26, further comprising steering and mobility means at the upright member lower ends at the rear of the carrier frame.

28. The apparatus of claim 27, wherein the steering and mobility means and wheels attached to the upright member lower ends at the rear of the carrier frame further comprise:

a swivel connection between the wheel and the corresponding lower end of the upright member;

a hydraulic motor with a drive shaft for mounting a sprocket gear; and

a corresponding sprocket gear attached to the wheel for connecting a sprocket chain between the hydraulic motor drive shaft and the wheel.

29. The apparatus of claim 25 wherein the vehicle platform includes notches on either side to receive and releasably retain the upright members upon contraction of the carrier frame into close juxtaposition with the vehicle for locking engagement of the carrier frame to the vehicle platform.

30. The apparatus of claim 26 wherein the container and the carrier frame may be transported simultaneously on the platform of the transport vehicle.

11

31. The apparatus of claim 30 wherein the vehicle platform includes notches on either side to receive and releasably retain the upright members upon contraction of the carrier frame into close juxtaposition with the vehicle for locking engagement of the carrier frame to the vehicle platform.

32. An apparatus for lifting, handling and transporting a container having right and left sides and front and rear ends, the apparatus comprising:

a carrier frame including right and left longitudinal elements juxtaposed with the right and left sides, respectively, of the container to be handled and transported, each longitudinal element extending between opposite first and second ends, the carrier frame having front and rear transverse elements juxtaposed with the front and rear ends, respectively, of the container to be handled and transported, each transverse element extending between opposite right and left ends, the left ends of the front and rear elements being adjacent to the first and second ends, respectively, of the left longitudinal element, and the right ends of the front and rear elements being adjacent to the first and second ends, respectively, of the right longitudinal element, the carrier frame further including a plurality of generally vertical upright members, each upright member extending between opposite upper and lower ends;

the front and rear transverse elements being selectively adjustable in length to allow expansion of the carrier frame to clear the transport vehicle and the container

12

for positioning and contraction of the carrier frame into close
juxtaposition with the transport vehicle and the container;

bearing means attached to each upright member lower
end, for ground bearing and relative movement of the upright
members with the ground;

elevating means for elevating and lowering the carrier
frame with respect to the ground;

positioning means connected to the carrier frame for
moving and positioning the carrier frame with respect to the
container, and for moving and positioning the carrier frame and
container together with respect to the transport vehicle having a
platform when the container is to be loaded on to and off from
said transport vehicle;

supporting means connected to the carrier frame and to
the container for supporting the container to the frame; and

means for providing hydraulic power to actuators,

wherein the carrier frame is capable of being elevated
to be moved over the container and is capable of being lowered
around the container for attaching the carrier frame to the
container for subsequent lifting, handling and transporting of
the container.

33.  The apparatus of claim 32 wherein the upright members
each further comprise a tubular fixed element attached to the
carrier frame and a tubular sliding element mounted for sliding
movement within the fixed element.

34.  The apparatus of claim 33 wherein the elevating means
further comprises a plurality of actuators, each actuator mounted

13

within an upright member, each actuator having opposite first and
second ends, the first end being attached to the tubular fixed
element of the upright member, the second end being attached to
the upright member tubular sliding element, so that upon being
actuated in an extending direction, the actuators will slideably
extend the sliding element from within the fixed element in a
telescoping manner to elevate the carrier frame, and upon being
actuated in a retracting direction, the actuators will slideably
retract the sliding element into the fixed element in a
telescoping manner to lower the carrier frame.

35.   The apparatus of claim 32 wherein the carrier frame
includes a pair of guide wheels, each guide wheel mounted for
rotation on a generally vertical axis on an upright member
adjacent the rear transverse element, with the guide wheels
facing inward toward the container for engagement with the
container to facilitate positioning the carrier frame with the
container.

36.   The apparatus of claim 32 wherein the transport vehicle
platform includes notches on either side to receive and
releasably retain the upright members upon contraction of the
carrier frame into close juxtaposition with the vehicle for
locking engagement of the carrier frame to the transport vehicle
platform.

37.   The apparatus of claim 32, wherein each front and rear
transverse elements further comprise:

        a tubular fixed element;

a tubular sliding element mounted for sliding movement within the fixed element;

an actuator mounted within each front and rear transverse elements, the actuator having opposite first and second ends, the first end being attached to the fixed element, the second end being attached to the sliding element, so that upon being actuated in an expanding direction, the actuator will slideably extend the sliding element from within the fixed element in a telescoping manner to expand the carrier frame, and upon being actuated in a contracting direction, the actuator will slideably retract the sliding element into the fixed element in a telescoping manner to contract the carrier frame; and



wherein the actuators mounted within each front and rear end transverse elements are hydraulic cylinder type actuators.

38.  The apparatus of claim 37 wherein the actuators mounted within each front and transverse elements are electric motor driven screw type actuators.

39.  The apparatus of claim 32 wherein the supporting means include a plurality of chains, each chain being fixed on one end to the carrier frame and the other end of the chain in releasable engagement with the container.

IN THE DRAWINGS:

Please substitute the enclosed corrected Figs. 1-3 (red ink drawing changes) for the same Figures filed July 1, 1998.  A

Request For Approval of Proposed Drawing Changes is submitted
herewith as a separate paper as required under 37 C.F.R. §1.121.

REMARKS

Pursuant to 37 C.F.R. §1.111, reconsideration of the instant
application, as amended herewith, is respectfully requested.
Entry of the amendment is requested.

Claims 1-39 are presently pending before the Office, with
original Claims 1-2, 4-6, 10-15, 19, and 22-24 being amended
herein and Claims 25-39 being added herein.  No claims have been
canceled.  Applicants have amended the specification, the claims
and the drawings.  No new matter has been added.  Support for the
amendments can be found throughout the specification as
originally filed.  Applicants are not intending in any manner to
narrow the scope of the originally filed claims.

The Examiner's Action mailed September 22, 1999 (Paper No.
5) and the references cited therein have been carefully studied
by Applicants and the undersigned counsel.  The amendments
appearing above and these explanatory remarks are believed to be
fully responsive to the Action.  Accordingly, this important
patent application is believed to be in condition for allowance.

Relying on 35 U.S.C. §112, second paragraph, the Office has
rejected the subject matter of Claims 4, 6, 10-19 and 21-24 as
being indefinite for failing to particularly point out and
distinctly claim the subject matter which Applicants regard as
the invention.  The Examiner alleges that references to the
limitations regarding the frame, carrier frame, and the carrier

renders the claim language unclear.  In addition, the Examiner

alleges that there is no clear antecedent for "the upright

elements" in Claims 6 and 23, "the wheel" in claim 19, and "the

rear and front upright members" in Claim 22.  Applicants

respectfully traverse the rejection and request reconsideration.

Applicants submit that the rejected claims do define the

legal metes and bounds of the invention.  It is not the role of

the claims to enable one skilled in the art to reproduce the

invention but rather to define, for those skilled in the art the

legal metes and bounds of the invention.  Nevertheless, in order

to advance the case to allowance, Claims 1-2, 4-6, 10-15, 19, and

22-24 have been amended and new Claims 25-31 have been amended to

clarify the language of the limitations and to clarify the

antecedent basis for each claim limitation objected to by the

Examiner.

It is respectfully submitted that Claims 1-31, as presented

in this amendment, fully comply with 35 U.S.C. §112, second

paragraph.  Withdrawal of the rejection is respectfully

requested.

Relying on 35 U.S.C. §103(a), the Examiner has rejected the

subject matter of Claims 1-3 and 20 as obvious over Dousset in

view of Whitehouse.  Applicants respectfully traverse the

rejection and request reconsideration.

It is evident that Applicants' invention is decidedly

different from the teachings of the Dousset patent.  The Examiner

has clearly misconstrued the structure and the teachings of

Dousset.  Dousset teaches an apparatus which is designed to be

17

operative with specially designed containers so that spindles or pins 4,5 can be rigidly secured to the tubular uprights 6 for interconnecting with corresponding female connections on the container being handled.  The present invention can be used with any container.  No specially engineered container is required as thought by the Dousset reference.  As the Examiner acknowledges, the Dousset reference clearly lacks the teachings of the singular rectangular-shaped frame.  Further, being separate independent portals, the Dousset reference clearly lacks combined elevating and positioning means as thought by the present invention which allows the carrier frame to be elevated and positioned as a rectangular-shaped frame with respect to the container, the vehicle and the ground.  The apparatus of the present invention can elevate and maneuver with or without a container being attached.  The Dousset reference requires the container to be attached to have in effect a lift compatible to that of the present invention.  But even then, each portal stand has to be independently raised or lowered.  The present invention teaches uniformity in the handling, lifting and lowering of a container. Accordingly, the Examiner has not established a prima facie case of obviousness.

Regarding the Whitehouse reference, again the Examiner has clearly misconstrued the teachings and structure of the reference as there is no suggestion or teaching within the reference to combine the Whitehouse reference with the Dousset reference to arrive at the present invention.  The Whitehouse apparatus is a platform onto which the container must be initially handled by a

18

forklift or crane device for placement on the platform.  It is
intended only to relieve the uneconomical wasted use of a trailer
bed for storing containers temporarily.  The platform of
Whitehouse is tubular frame constructed, a portion of which
extends directly underneath a supported container.  See Fig. 1,
21 and 22.  Such a structure cannot physically be combined with
the Dousset structure to arrive with a structure that can be
moved over a container laying on the ground or on the bed of a
transport vehicle for use as contemplated by the present
invention.  The container would have to be first lifted by a
crane or forklift and then placed on top of the Whitehouse
longitudinal tubular cross members before any lifting and
maneuvering can take place.  Further, the lifting at each portal
would have to be carefully coordinated so that one side does not
lift more than the other so as to cause the container to tilt and
slide off the platform.  There is simply no practical reason to
even consider combining the references as such a combination
would nevertheless leave a user with the initial problem of
independently lifting the container on the platform, thereby
defeating the advantages taught by the present invention.
Without the aid of any forklift or crane, the apparatus of the
present invention is capable of handling containers resting on a
storage site such as a truck bed, a location on the ground or in
a storage warehouse, or elsewhere and maneuvering the container
to a different storage site.

     Clearly, in the absence of any suggestion to combine the
cited references, and further, in view of the absence of any

19

teaching whatsoever of how one skilled in the art would attempt to combine the cited references to arrive at the present invention, one skilled in the art would certainly <u>not</u> find ample motivation to use the portal stands of the Dousset patent and the platform frame of the Whitehouse patent to arrive at the present invention.

The Office has used the claimed invention as a reference against itself as if it had preceded itself in time. Legal authority invalidates such an analytical or reverse engineering approach to patent examination. It is <u>not</u> Applicants' burden to refute the Office's position that it would have been obvious to one of ordinary skill in this art at the time this invention was made to arrive at the present invention in view of the Dousset and Whitehouse patents. It is the burden of the <u>Office</u> to show some teaching or suggestion in the reference to support this allegation. <u>Uniroyal, Inc. v. Rudkin-Wiley Corp.</u>, 837 F.2d at 1051, 5 U.S.P.Q.2d at 1438-39 (Fed. Cir. 1988).

A finding by the Office that a claimed invention would have been obvious to one of ordinary skill in the art at the time the invention was made based merely upon finding similar elements in a prior art reference would be "contrary to statute and would defeat the congressional purpose in enacting Title 35." <u>Panduit Corp. v. Dennison Mfg. Co.</u>, 1 U.S.P.Q.2d 1593 at 1605 (Fed. Cir. 1987). Accordingly, Applicants respectfully submit that Claims 1-31 are patentable over the Dousset and Whitehouse patents under 35 U.S.C. §103. Withdrawal of the rejection is respectfully requested.

20

In addition, Applicants respectfully submit that the Examiner's legal reasoning is flawed. The knowledge of those skilled in the art is derived from the prior art, not from the Examiner's mental impression of what those skilled in the art might or might not know. It is the law as evidenced in Graham v. John Deere that is controlling. As enunciated by the Graham court, §103(a) requires a comparison of the claimed invention with the teachings of the prior art. Otherwise, the PTO could simply say "I'm skilled in the art. That claim is obvious." The rules and the law require that the Examiner point out where in the prior art lies applicant's claimed invention in the context of what those skilled in the art know. If it is not there, the public is not in possession of the invention, and, therefore, a rejection under §103(a) will not lie. There is simply no reasonable intrinsic or extrinsic justification for the proposed combination or modification. A prima facie case of obviousness has not been made.

Nevertheless, in order to advance the case to allowance, Applicants have amended the above noted claims to increase their specificity of language. Claims 1-24, as amended, along with new Claims 25-31 are patentable over the art of record. Accordingly, withdrawal of the rejection is respectfully requested.

New Claims 32-39 are based on a rewriting of Claim 1 combined with the limitations of Claim 5. These claims are presented in view of the indication of allowability by the Examiner in paragraph 4. of the Office Action.

21

Applicants note the Examiner's comments regarding the prior art made of record but not relied upon. Applicants however state that the noted prior art references do not anticipate the present invention nor do they render the present invention obvious.

CONCLUSION

As the Federal Circuit observed in <u>Orthopedic Equipment Co. v. United States</u>, 702 F.2d 1005, 217 U.S.P.Q. 193 (Fed. Cir. 1983):

> The question of nonobviousness is a simple one to ask, but difficult to answer ... The difficulty which attaches to all honest attempts to answer this question can be attributed to the strong temptation to rely on hindsight while undertaking this evaluation. It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness ...

Even though the initial claims in this important patent application were drawn to a new, useful and nonobvious invention, they have now been amended to increase their specificity and clarity of language. Applicants respectfully submit that Claims 1-39 are patentable over the art of record.

Thus, no estoppel has been created by these amendments. See <u>Mannesmann Demag Corp. v. Engineered Metal Products Co., Inc.</u>, 230 U.S.P.Q. 45 (Fed. Cir. 1986) (where a patentee's amendments were not required in response to an examiner's rejection, or critical to the allowance of the claims, no estoppel has been found) citing <u>Great Northern Corp. v. Davis Core & Pad Co.</u>, 782 F.2d 159, 228 U.S.P.Q. 356 (Fed. Cir. 1986) and <u>Datascope Corp.</u>

v. SMEC, Inc., 776 F.2d 320, 227 U.S.P.Q. 838 (Fed. Cir. 1985).

Also, see Insta-Foam Products Inc. v. Universal Foam Systems,

Inc. 15 U.S.P.Q.2d 1295 (Fed. Cir. 1990).

    A Notice of Allowance is earnestly solicited.

    If the Office is not fully persuaded as to the merits of

Applicant's position, or if an Examiner's Amendment would place

the pending claims in condition for allowance, a telephone call

to the undersigned at (727) 538-3800 would be appreciated.


        Very respectfully,


Dated: 11/23/99

        Dennis G. LaPointe
        Mason & Associates, P.A.
        17757 U.S. Hwy. 19 N., Suite 500
        Clearwater, FL 33764
        (727) 538-3800
        Reg. No. 40,693

23

# EXHIBIT H

MATLOCK LAW GROUP, PC
Anne-Leith Matlock (SBN 244351)
1485 Treat Blvd., Suite 200
Walnut Creek, CA 94597
Telephone: (925) 944-7131
Facsimile: (925) 944-7138

Attorneys for Plaintiff,
THE TONYTAIL COMPANY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE TONYTAIL COMPANY, INC., a
Delaware Corporation,

          Plaintiff,

    vs.

CONAIR, a Delaware Corporation; SCUNI
INTL., Ltd., Delaware Corporation; RITE AID,
a Delaware Corporation; L&N Sales &
Marketing, Inc., a Pennsylvania Corporation
and DOES 1-10, inclusive,

          Defendants.

Case No.:CV07-5895 BZ

PATENT DISCLOSURES of ASSERTED
CLAIMS and INFRINGEMENT
CONTENTIONS; DOCUMENT
PRODUCTION ACCOMPANYING
DISCLOSURES.

## DISCLOSURE OF ASSERTED CLIAMS AND INFRINGEMENT CONTENTIONS

    Plaintiff herein discloses the asserted claims and infringement contentions as required by
the Northern District of California Northern Rules. Two of the named opposing parties have not
yet appeared. Therefore, Scunci Intl., LTD. and L&N Sales and Marketing Inc. will be served

this disclosure when they appear.  P is serving this document on defendants, Conair and Rite Aid to their joint counsel of record, Tommas Fitspatric of ...

### 3-1(a): Infringed Claims

Plaintiff alleges the following claims from US Patent No.: 431,693 infringed by Defendants, Conair and Rite Aid:

1. The ornamental design for a hair ponytail band, as shown and described.

Plaintiff alleges the following claims from US Patent No.: D453,239 S infringed by Defendants, Conair and Rite Aid:

1. The ornamental design for a hair ponytail band, as shown and described.

Plaintiff alleges the following claim 4 from US Patent No.: 6,263,884 infringed by Defendants, Conair and Rite Aid:

4. A hair binding method, for use by a person having a ponytail having a ponytail end, for securing said ponytail, using a device comprising an elastic band having a pair of elastic band ends, synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends, the synthetic fiber ends joined to the elastic band ends to form a closed loop, comprising the steps of:

encircling the ponytail with the device by inserting the ponytail end through the closed
loop of said device;

tensioning the device around the ponytail by doubling up the device; and

1    covering the elastic band with the synthetic hair fibers so that the outward appearance of

2    the device is formed solely by the synthetic hair fibers.

3

4    Upon information and belief, in violation of 35 U.S.C. §271 (a), §271(b), and/or §271(c),

5    Defendants, Conair and Rite Aid, have infringed directly and continue to infringe the U.S. Patent

6    6,263,884 B1 (hereinafter "the '884 patent") by practicing claim 4 of the '884 in consumer use of

7    infringing product Ponytailer product line, including but not limited to the "Scunci Ponytailer."

8    Upon information and belief, in violation of 35 U.S.C. §§271 (a), 271(b), and/or 271(c),

9    Defendants, Conair and Rite Aid, have infringed directly and/or indirectly and continue to

10   infringe, the '884 utility patent by practicing claim 4 of the '884 patent in manufacture, use,

11   offering or sale, and/or importation and exportation of the infringing product Ponytailer product

12   line, including but not limited to the "Scunci Ponytailer."

13   Upon information and belief and in violation of 35 U.S.C. §271, Defendants, Conair and

14   Rite Aid, have infringed and are continuing to infringe Claim 4 of the '884 utility patent by

15   actively inducing the infringement by others of the '884 patent through the manufacture, use,

16   offering for sale, sale and/or importation and exportation of the infringing product Ponytailer

17   product line, including but not limited to the "Scunci Ponytailer."

18   Upon information and belief, Defendants, Conair and Rite Aid, have willfully infringed

19   Claim 4 of the '884 utility patent.

20   Upon information and belief, Defendants, Conair and Rite Aid, by their manufacture and

21   sale of the Scunci infringing products, have offered said infringing devices for sale to the general

22   public and into the stream of commerce, for their use in practicing the process patented by

23   Plaintiff, constituting a material part of plaintiff's invention.

24

25

1        Upon information and belief, Defendants, Conair and Rite Aid, were not authorized to

2  make, sell or distribute any infringing devices which fall within one or more claims of the '884

3  utility patent.

4

5  Plaintiff alleges the following claim 5 from US Patent No.: 6,263,884 infringed by Defendants,

6  Conair and Rite Aid:

7

8        5. The hair binding method as recited in claim 4, wherein the step of doubling up the

9        device further comprises repeatedly:

10        Twisting the closed loop to form a secondary loop; and inserting the ponytail end through

11        the secondary loop.

12

13        Upon information and belief, in violation of 35 U.S.C. §271 (a), §271(b), and/or §271(c),

14  Defendants, Conair and Rite Aid, have infringed directly and continue to infringe the U.S. Patent

15  6,263,884 B1 (hereinafter "the '884 patent") by practicing claim 5 of the '884 in consumer use of

16  infringing product Ponytailer product line, including but not limited to the "Scunci Ponytailer."

17        Upon information and belief, in violation of 35 U.S.C. §§271 (a), 271(b), and/or 271(c),

18  Defendants, Conair and Rite Aid, have infringed directly and/or indirectly and continue to

19  infringe, the '884 utility patent by practicing claim 5 of the '884 patent in manufacture, use,

20  offering or sale, and/or importation and exportation of the infringing product Ponytailer product

21  line, including but not limited to the "Scunci Ponytailer."

22        Upon information and belief and in violation of 35 U.S.C. §271, Defendants, Conair and

23  Rite Aid, have infringed and are continuing to infringe Claim 5 of the '884 utility patent by

24  actively inducing the infringement by others of the '884 patent through the manufacture, use,

25

1  offering for sale, sale and/or importation and exportation of the infringing product Ponytailer

2  product line, including but not limited to the "Scunci Ponytailer."

3       Upon information and belief, Defendants, Conair and Rite Aid, have willfully infringed

4  Claim 4 of the '884 utility patent.

5       Upon information and belief, Defendants, Conair and Rite Aid, by their manufacture and

6  sale of the Scunci infringing products, have offered said infringing devices for sale to the general

7  public and into the stream of commerce, for their use in practicing the process patented by

8  Plaintiff, constituting a material part of plaintiff's invention.

9       Upon information and belief, Defendants, Conair and Rite Aid, were not authorized to

10 make, sell or distribute any infringing devices which fall within one or more claims of the '884

11 utility patent.

12

13

14       **3-1(b): Accused Instrumentalities**

15 US Patent No.: 431,693, Claim 1.

16       Upon reasonable investigation, Plaintiff is aware of Scunci brand faux hair ponytail

17 holders, style numbers 28021 and 28022.  Upon information and belief, Defendants, Conair and

18 Rite Aid, their agents and assigns are currently manufacturing, selling, or offering to sell faux

19 hair ponytail holders in addition to aforementioned style numbers.

20

21 US Patent No.: D453,239 S, Claim 1.

22       Upon reasonable investigation, Plaintiff is aware of Scunci brand faux hair ponytail

23 holders, style numbers 28021 and 28022.  Upon information and belief, Defendants, Conair and

24 Rite Aid, their agents and … are currently manufacturing, selling, or offering to sell faux hair

25 ponytail holders in addition to aforementioned style numbers.

US Patent No.: 6,263,884, Claim 4.

Upon reasonable investigation, Plaintiff is aware of Scunci brand faux hair ponytail holders, style numbers 28021 and 28022. Upon information and belief, Defendants, Conair and Rite Aid, their agents and ... are currently manufacturing, selling, or offering to sell faux hair ponytail holders in addition to aforementioned style numbers.

US Patent No.: 6,263,884, Claim 5.

Upon reasonable investigation, Plaintiff is aware of Scunci brand faux hair ponytail holders, style numbers 28021 and 28022. Upon information and belief, Defendants, Conair and Rite Aid, their agents and ... are currently manufacturing, selling, or offering to sell faux hair ponytail holders in addition to aforementioned style numbers.


### 3-1(c): Claim Chart

Please see attached claim chart for US Patent No.: 6,263,884, Claims 4 and 5. Note per case management conference with Judge Alsup on February 21, 2008, the design patents, 431,693 and D453,239 S, do not require claim construction.


### 3-1(d): Acts of Infringement

US Patent No.: 431,693, Claim 1.

Upon information and belief, in violation of 35 U.S.C. §§ 281, 282, and/or 284 Defendants have infringed directly and/or indirectly and still continue to infringe, U.S. Patent D 413,693 (hereinafter "the 'D693 patent") by practicing the claim of the 'D693 in manufacture, use, offering or sale, and/or importation and exportation of the "Hair Ponytail Band."

On September 7, 1999, Patent No. D 413,693 was duly and legally issued by the United States Patent and Trademark Office after having been examined according to law. Said patent was issued for the ornamental design for a hair ponytail band, as shown and described. A true and correct copy of the patent is attached hereto as Exhibit "A" and incorporated by reference.

Plaintiff is the owner by assignment of the 'D693 patent.

During the term of the D413,693 patent, Defendants have had notice of the D413,693 patent and thus became aware of the patent and its direct application to the Scunci Ponytailer infringing product line, but failed to comply with the duty of care to avoid infringement.

The "Hair Ponytail Band" is Plaintiff's product that embodies the 'D693 Patent.

Upon information and belief, Defendants have sold and/or offered to sell infringing devices falling within the scope of the claim of the 'D693 Patent in violation of Plaintiff's rights, thereby infringing the 'D693 Patent. Such infringing products include devices being sold by the defendants using the mark "Scunci" and such as the "Ponytailer" product line.

Upon information and belief, Defendants and their successors in interest have had and continue to have notice of the existence of the 'D693 Patent due to its previously executed 2003 settlement and license agreement with Plaintiff, and despite such notice continue to willfully, wantonly and deliberately engage in acts of infringement as that term is defined in Title 35 U.S.C. §281, without regard to the 'D693, and will continue to do so unless otherwise enjoined by this court.

Plaintiff has been and will continue to be damaged by the infringing conduct of Defendants in an amount to be established upon proper proof at trial.

Upon information and belief, Defendants have, since at least as early as 2007, used, offered for sale and sold a ponytail holder infringing product covered by the claims of the 'D693 Patent under 35 U.S.C. §281.

1      Upon information and belief, the defendants have used, offered for sale and sold a

2  ponytail holder infringing product substantially similar in ornamental appearance and

3  misappropriating the 'D693 Patent's point of novelty.

4      Upon information and belief, the infringing devices were manufactured in whole or in

5  part by Scunci, Intl., Ltd., a corporation that was previously controlled and wholly owned by

6  defendant L&N Sales & Marketing, Inc., and presently controlled and wholly owned by

7  Defendant Conair, Inc.

8      Upon information and belief, Scunci's infringing products have been distributed to

9  defendant Rite Aid, by defendants' agents and/or employees or persons or companies with which

10  defendants Conair/Scunci have a contractual relationship for the purpose of distributing the

11  infringing products.  Scunci infringing products have been entered into commerce and have been

12  offered for sale and sold by Defendants and/or their affiliates in California and within this

13  judicial district.

14

15  US Patent No.: D453,239 S, Claim 1.

16      Upon information and belief, in violation of 35 U.S.C. §281, Defendants have infringed

17  directly and/or indirectly and still continue to infringe, U.S. Patent D 453,239 S (hereinafter "the

18  'D239 patent") by practicing the claims of the 'D239 in manufacture, use, offering for sale, sale

19  and/or importation and exportation of the "Ponytail Holder."

20      On January 29, 2002, Patent No. D453, 239 S was duly and legally issued by the United

21  States Patent and Trademark Office after having been examined according to law.  Said patent

22  was issued for the ornamental design for a hair ponytail band, as shown and described.  A true

23  and correct copy of 'D239 the patent is attached hereto as Exhibit B and incorporated by

24  reference.

25      "Hair Ponytail Holder" is Plaintiff's device that embodies the 'D239 Patent.

1          Upon information and belief, Defendants have sold and/or offered to sell infringing

2     devices falling within the scope of the claims of the 'D239 Patent in violation of Plaintiff's

3     rights, thereby infringing the 'D239 Patent. Such infringing devices include infringing devices

4     being sold by the defendants using the mark "Scunci" and such as "Ponytailer" product line.

5          Upon information and belief, Defendants have had and continue to have notice of the

6     existence of the 'D239 Patent and despite such notice continue to willfully, wantonly and

7     deliberately engage in acts of infringement as that term is defined in Title 35 U.S.C. §271 (a),

8     271(b), and/or 271(c), without regard to the 'D239, and will continue to do so unless otherwise

9     enjoined by this court.

10          Plaintiff has been and will continue to be damaged by the infringing conduct of

11     Defendants in an amount to be established upon proper proof at trial.

12          Upon information and belief, Defendants have, since at least as early as 2007, used,

13     offered for sale and sold a ponytail holder infringing product covered by the claim of the 'D239

14     Patent under 35 U.S.C. §281.

15          Upon information and belief, the defendants have used, offered for sale and sold a

16     ponytail holder infringing products substantially similar in ornamental appearance and with

17     features that misappropriate the 'D239 Patent's point of novelty.

18          Upon information and belief, the infringing product was manufactured in whole or in part

19     by Scunci, Intl., Ltd., a corporation that was previously controlled and wholly owned by

20     defendant L&N Sales & Marketing, Inc, and presently controlled and wholly owned by

21     Defendant Conair, Inc.

22          Upon information and belief, the Scunci infringing device has been distributed to

23     defendant Rite Aid by defendants' agents and/or employees or persons or companies with which

24     defendants Conair and Scunci have a contractual relationship for the purposes of infringing

25     device distribution. The Scunci infringing device has been entered into commerce and has been

1   offered for sale and sold by Defendants and/or their affiliates in California and within this

2   judicial district.

3

4   US Patent No.: 6,263,884, Claim 4.

5       Upon information and belief, in violation of 35 U.S.C. §271 (a), §271(b), and/or §271(c),

6   Defendants, Conair and Rite Aid, have infringed directly and continue to infringe the U.S. Patent

7   6,263,884 B1 (hereinafter "the '884 patent") by practicing claim 4 of the '884 in consumer use of

8   infringing product Ponytailer product line, including but not limited to the "Scunci Ponytailer."

9       Upon information and belief, in violation of 35 U.S.C. §§271 (a), 271(b), and/or 271(c),

10  Defendants, Conair and Rite Aid, have infringed directly and/or indirectly and continue to

11  infringe, the '884 utility patent by practicing claim 4 of the '884 patent in manufacture, use,

12  offering or sale, and/or importation and exportation of the infringing product Ponytailer product

13  line, including but not limited to the "Scunci Ponytailer."

14      Upon information and belief and in violation of 35 U.S.C. §271, Defendants, Conair and

15  Rite Aid, have infringed and are continuing to infringe Claim 4 of the '884 utility patent by

16  actively inducing the infringement by others of the '884 patent through the manufacture, use,

17  offering for sale, sale and/or importation and exportation of the infringing product Ponytailer

18  product line, including but not limited to the "Scunci Ponytailer."

19      Upon information and belief, Defendants, Conair and Rite Aid, have willfully infringed

20  Claim 4 of the '884 utility patent.

21      Upon information and belief, Defendants, Conair and Rite Aid, by their manufacture and

22  sale of the Scunci infringing products, have offered said infringing devices for sale to the general

23  public and into the stream of commerce, for their use in practicing the process patented by

24  Plaintiff, constituting a material part of plaintiff's invention.

25

1    Upon information and belief, Defendants, Conair and Rite Aid, were not authorized to

2    make, sell or distribute any infringing devices which fall within one or more claims of the '884

3    utility patent.

4

5    US Patent No.: 6,263,884, Claim 5.

6    Upon information and belief, in violation of 35 U.S.C. §271 (a), §271(b), and/or §271(c),

7    Defendants, Conair and Rite Aid, have infringed directly and continue to infringe the U.S. Patent

8    6,263,884 B1 (hereinafter "the '884 patent") by practicing claim 5 of the '884 in consumer use of

9    infringing product Ponytailer product line, including but not limited to the "Scunci Ponytailer."

10    Upon information and belief, in violation of 35 U.S.C. §§271 (a), 271(b), and/or 271(c),

11    Defendants, Conair and Rite Aid, have infringed directly and/or indirectly and continue to

12    infringe, the '884 utility patent by practicing claim 5 of the '884 patent in manufacture, use,

13    offering or sale, and/or importation and exportation of the infringing product Ponytailer product

14    line, including but not limited to the "Scunci Ponytailer."

15    Upon information and belief and in violation of 35 U.S.C. §271, Defendants, Conair and

16    Rite Aid, have infringed and are continuing to infringe Claim 5 of the '884 utility patent by

17    actively inducing the infringement by others of the '884 patent through the manufacture, use,

18    offering for sale, sale and/or importation and exportation of the infringing product Ponytailer

19    product line, including but not limited to the "Scunci Ponytailer."

20    Upon information and belief, Defendants, Conair and Rite Aid, have willfully infringed

21    Claim 4 of the '884 utility patent.

22    Upon information and belief, Defendants, Conair and Rite Aid, by their manufacture and

23    sale of the Scunci infringing products, have offered said infringing devices for sale to the general

24    public and into the stream of commerce, for their use in practicing the process patented by

25    Plaintiff, constituting a material part of plaintiff's invention.

Upon information and belief, Defendants, Conair and Rite Aid, were not authorized to make, sell or distribute any infringing devices which fall within one or more claims of the '884 utility patent.

### 3-1(e): Doctrine of Equivalents

Each limitation of each asserted claims, US Patent No. 431,693, Claim 1, US Patent No. D453,239 S, Claim 1 and US Patent No. 6,263,884, Claims 4 and 5 are literally present and are not alleged to be present under the doctrine of equivalents.

### 3-1(f): Priority Date of Earlier Application

Not Applicable.

### 3-1(g): Preservation of the Right to Rely on Plaintiff's Own Product(s)

Plaintiff wishes to reserve the right to rely, for any purpose, and asserts that The Tonytail® Ponytail Wrap and related holders practice the claimed invention of Plaintiff's asserted claims 4 and 5 of US Patent No. 6,263,884 and related US design patents, D453,239 S and D413,693.

### 3-1(h): Willful Infringement

Upon information and belief, Defendants have had and continue to have notice of the existence of the 'D239 Patent and despite such notice continue to willfully, wantonly and deliberately engage in acts of infringement as that term is defined in Title 35 U.S.C. §271 (a), 271(b), and/or 271(c), without regard to the 'D239, and will continue to do so unless otherwise enjoined by this court.

Upon information and belief, Defendants and its successors in interest have had and continue to have notice of the existence of the '884 Patent due to its previously executed 2003 settlement and license agreement with Plaintiff and despite such notice continue to willfully,

1   wantonly and deliberately engage in acts of infringement as that term is defined in Title 35

2   U.S.C. §281, without regard to the '884, and will continue to do so unless otherwise enjoined by

3   this court.

## DOCUMENT PRODUCTION ACCOMPANYING DISCLOSURE

### 3-2(a)

6   Plaintiff asserts no documents exist evidencing discussion with, disclosure to, or other

7   manner of providing to a third party, or sale of or offer to sell, or any public use of the claimed

8   inventions prior to the date of application for Plaintiff's inventions.

9

### 3-2(b)

11   Plaintiff shall make available for inspection and copying documents evidencing the

12   conception, reduction to practice, design and development of each claimed invention, which

13   were created on or before the date of application for US Design Patent Nos. D 413,693 and

14   D453,239 S and US Patent No. 6,263,884.

15

### 3-2(c)

17   Please find attached a copy of the file history for each of US Design Patent Nos. D

18   413,693 and D453,239 S and US Patent No. 6,263,884.

19

20

### 3-2(d)

22   Please find attached a copy of the Notice of Recordation for each of US Design Patent

23   Nos. D 413,693 and D453,239 S and US Patent No. 6,263,884.

24

25

## CERTIFICATE OF SERVICE

1

2 I, Victoria X. Griswold, declare:

3 I am a citizen of the United States and am employed in the County of Contra

4 Costa, State of California. I am over the age of 18 years and am not a party to the

5 within action. My business address is Matlock Law Group, A Professional Corporation,

6 1485 Treat Blvd., Suite 200, Walnut Creek, CA 94597. I am personally familiar with

7 the business practice of Matlock Law Group, A Professional Corporation.

8 On February 29, 2009, following ordinary business practice, I caused service of

9 the following documents:

10

11 **PROPOSED ORDER REGARDING SCHEDULE FOR CLAIM
CONSTRUCTION; PATENT DISCLOSURES; AND DOCUMENT
PRODUCTION ACCOMPANYING DISCLOSURE**

12

13

14 to be completed by:

15

16 Mail (Document Production), and  Facsimile service to:

17 Thomas F. Fitzpatrick
Goodwin Procter LLP

18 181 Lytton Avenue
Palo Alto, CA 94301

19 Facsimile: 650 853-1038

20 I declare under penalty of perjury under the laws of the United States that the

21 above is true and correct and that this declaration was executed at Walnut Creek,

22 California.

23

24

25 DATED: February 29, 2008

26 Victoria X. Griswold

27

28

# EXHIBIT I



White's
Accused Handle Design



Gorham's
Patented Handle Design

