1  THOMAS F. FITZPATRICK
   GOODWIN PROCTER LLP
2  135 Commonwealth Drive
   Menlo Park, California 94025
3  Telephone: 650-752-3100
   Facsimile: 650-853-1038
4  E-Mail: TFitzpatrick@goodwinprocter.com

5  Attorneys For Defendants
   CONAIR CORPORATION and RITE AID HDQTRS. CORP.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE TONYTAIL COMPANY, INC., | Case No. 3:07-cv-05895-WHA |
| *Plaintiff,* | **DEFENDANTS CONAIR CORPORATION'S AND RITE AID HDQTRS. CORP.'S REPLY IN SUPPORT OF THEIR OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| CONAIR CORPORATION, SCUNCI INT'L, LTD., RITE AID HDQTRS. CORP., L&N SALES & MARKETING, INC., and DOES, 1 – 10, inclusive, | Date: May 28, 2008<br>Time: 1:30 p.m.<br>Dept: Courtroom, 19th Floor<br>Judge: Hon. William H. Alsup |
| *Defendants.* | |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................................1

II. ARGUMENT .................................................................................................................1

    A. The Invention is Described Consistently Throughout the '884 Patent and Prosecution History, and the Claims At Issue Must Be Construed In Light of Those Descriptions ..................................................................................1

    B. Defendants' Proposed Constructions of the Disputed Terms Are True to the Patentee's Consistent Description of the Claimed Invention ...................4

        1. The "elastic band" of the claimed device must be construed to have two ends "not joined to one another" ...........................................5

        2. The term "synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends" means synthetic hair fibers whose two ends are not joined to one another ..................................................................................................6

        3. According to the patentee's own words, the claim term "the synthetic hair fiber ends joined to the elastic band ends" must be limited to a device "where one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends." .......................................7

        4. The claim term "to form a closed loop" should be construed to mean "to form a single, unbroken ring…" .............................................9

        5. The construction of the claim term "covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers…" must be considered in context ..................................................................11

        6. Defendants' construction of "...encircling the ponytail with the device by inserting the ponytail through the closed loop of said device…" prevents confusing the term "device" with "elastic band" ...........................................................................................................12

    C. To the Extent the Court Considers the '239 Design Patent, the Court Should Adopt Defendants' Construction ........................................................12

III. CONCLUSION ............................................................................................................14

# TABLE OF AUTHORITIES

Page

**Cases**

*Alan Tracy, Inc. v. Trans Globe Imports, Inc.*,
    60 F.3d 840 (Table) (Fed. Cir. 1995) ................................................................................. 13

*Amini Innovation Corp. v. Anthony Cal., Inc.*,
    439 F.3d 1365 (Fed. Cir. 2006) .......................................................................................... 13

*Anheuser-Busch Cos., Inc. v. Crown Cork & Seal Techs.*,
    121 Fed.Appx. 388 (Fed. Cir. 2004) ................................................................................... 13

*Antonious v. Spalding & Evenflo Co's., Inc.*,
    217 F.3d 849 (Table – unpub. Fed. Cir. 1999) ................................................................... 13

*Arminak and Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
    501 F.3d 1314 (Fed. Cir. 2007) .......................................................................................... 13

*Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc.*,
    393 F.3d 1378 (Fed. Cir. 2005) .......................................................................................... 13

*Colida v. Ericsson, Inc.*,
    93 Fed.Appx. 220 (Fed. Cir. 2004) ..................................................................................... 13

*Colida v. Sharp Elecs. Corp.*,
    125 Fed.Appx. 993 (Fed. Cir. 2005) ................................................................................... 13

*Durling v. Spectrum Furniture, Co. Inc.*,
    101 F.3d 100 (Fed. Cir. 1996) ............................................................................................ 13

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir. 1988) ............................................................................................ 4

*Egyptian Goddess, Inc. v. Swisa, Inc.*
    498 F.3d 1354 (Fed. Cir. 2007) .......................................................................................... 13

*Elmer v. ICC Fabricating, Inc.*,
    67 F.3d 1571 (Fed. Cir. 1995) ............................................................................................ 13

*Gorham Co. v. White*,
    81 U.S. 511 (1872) ............................................................................................................. 12

*Microsoft Corp. v. Multi-Tech Sys. Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ............................................................................................ 4

*Minka Lighting, Inc. v. Craftmade Intern., Inc.*,
    93 Fed. Appx. 214 (Fed. Cir. 2004) .................................................................................... 13

*Nichia Corp. v. Seoul Semiconductor Co., Ltd.*,
    No. C-06-0162 MMC, 2007 WL 2428040 (N.D. Cal. August 22, 2007) .......................... 13

1

**TABLE OF AUTHORITIES (con't)**

2                                                                                                                                     <u>Page</u>

3  *OddzOn Prods., Inc. v. Just Toys, Inc.*,
     122 F.3d 1396 (Fed. Cir. 1997) ................................................................................................ 13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

Tonytail's proposed claim constructions for claims 4 and 5 of the '884 Patent seek to broaden the scope of the claims far beyond the reach mandated by each and every description of the invention found in the intrinsic evidence. The claims themselves, the specification, and the prosecution history <u>consistently</u> describe the same features of the device used in the method at issue. Nevertheless, Tonytail requests the Court to dismiss these descriptions and instead consider "possible" embodiments of the invention found nowhere except in Tonytail's briefs. Even Tonytail cannot claim these "possible" embodiments find any support the patent itself. Instead, Tonytail cites <u>its own counsel's declaration</u> in support of its positions. *See* Tonytail Company, Inc.'s Response in Opposition to Defendants'[sic] Conair Corporation's and Rite Aid HDGTRS[sic] Corp.'s Opening Claim Construction Brief ("Tonytail's Opposition Brief") at 2. Tonytail's proposed constructions are in fact so divorced from the intrinsic evidence that Tonytail actually <u>re-draws</u> the patent's figures to support its positions. These examples of self-serving and deceptive "support" merely underscore the fact that the actual figures in the patent do not contemplate or cover Tonytail's "possible" embodiments, and by extension, the accused devices. *See* Tonytail Company, Inc.'s Opening Claim Construction Brief at Attachment 5. In contrast, Conair and Rite Aid's proposed constructions stay true to the consistent descriptions of the invention found in the intrinsic evidence. Accordingly, Defendants' proposed claim constructions should be adopted.

## II. ARGUMENT

### A. The Invention is Described Consistently Throughout the '884 Patent and Prosecution History, and the Claims At Issue Must Be Construed In Light of Those Descriptions

The patentee describes the device and method of claims 4 and 5 consistently each and every time. In the "Summary of the Invention" portion of the '884 Patent, the specification discloses that the invention uses,

> . . . a device comprising synthetic hair fibers joined to an elastic band to form a closed loop. The synthetic hair fibers are joined to the elastic band with a pair of connectors.

Column 1, lines 53-57. The patent then explains exactly how the synthetic hair fibers are joined to the synthetic hair fiber ends:

> The elastic band 12 has a pair of elastic band ends 12E. The synthetic hair fibers 14 are all of substantially the same length, and collectively have a pair of synthetic hair fiber ends 14E. <u>A pair of connectors 16 are used to permanently join each one of the elastic band ends 12E to one of the hair fiber ends 14E. Accordingly, the synthetic hair fibers 14 and elastic band 12S together form a closed loop</u>.

Column 2, lines 26-32 (emphasis added). The specification goes on to describe the invention as not just requiring that the synthetic hair fiber ends are joined to the elastic band ends – but rather – the synthetic hair fiber ends are "fused" to the elastic band ends. In particular, the patent states:

> One of the elastic band ends 12E is inserted into one of the connector open ends 18, and one of the synthetic hair fiber ends 14E is inserted into the other connector open end 18E. Once inside the connector, <u>the synthetic hair fibers and elastic band are fused therein</u> using heat, adhesives, chemicals, mechanical friction, or any other suitable means.

Column 2, lines 46-52 (emphasis added). This structure is confirmed by every one of the four figures described in the specification. Indeed, the figures uniformly show synthetic hair fiber ends permanently joined – or "fused" – to elastic band ends to form a closed loop, as shown below.



FIG. 1



FIG. 2

Should someone reading the '884 Patent have any question as to whether the patent contemplates a device where, for example, only one end of the synthetic hair fibers is permanently joined to the elastic band, the patentee unambiguously answers such a question by explaining the scope of the claimed invention in the Background of the Invention section of the '884 Patent. In particular, the patentee states:

> U.S. Pat. No. 5,899,211 to Brown discloses an apparatus and method for securing a ponytail. Brown uses a device which employs an elastic loop which can secure around a ponytail, and a length of hair which is attached to the elastic loop at one end, but is free at its opposite end.
>
> While these units may be suitable for the particular purpose employed, or for general use, they would not be as suitable for the purposes of the present invention as disclosed hereafter.

Col. 1, lines 31 – 39.

The specification then teaches precisely what the "closed loop" is and how it is used. The specification describes the closed loop as a single continuous loop formed by the elastic band ends being permanently joined to the hair fibers such that the closed loop can be tensioned: "[s]ince <u>the elastic band portion forms a continuous loop with the less stretchable synthetic hair fibers</u>, the tensioned elastic band acts to pull the synthetic hair fibers tightly around the ponytail 52," Column 3, lines 7-10 (emphasis added). Referring to Figure 3, the patent describes how the closed loop is used, in particular: ". . . by inserting the ponytail end 54 through the closed loop of the binding device 10 so that the binding device 10 fully encircles the ponytail 52. At this point, the closed loop fits loosely over the ponytail 52," Column 2, lines 60-63.

To the extent that the reader has any remaining questions as to the configuration of the invention, the '884's prosecution history confirms that the patentee viewed its invention as being limited to a device formed by each of a pair of elastic band ends that are each permanently joined to each of a pair of synthetic hair fiber ends. In response to the examiner's office action, the patentee took the opportunity to explain its invention further, by stating:

> An agreement was reached that amending claim 1 to recited [sic] that <u>one</u> of the elastic band ends is permanently joined with one of the synthetic hair ends, and that <u>the other of the elastic band ends is permanently joined with the other of the synthetic fiber ends</u> would help clarify the claims and ensure that they do not inadvertently read upon Naidor. Accordingly, such amendment is made herein.

- 3 -

Response to Office Action of October 4, 2008 dated October 17, 2008 (Declaration of Thomas F. Fitzpatrick in Support of Defendants Conair Corporation's and Rite Aid HDQTR's Opening Claim Construction Brief, Exhibit E) at 13; *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1438 (Fed. Cir. 1988) ("Regardless of the examiner's motives, arguments made during prosecution shed light on what the applicant meant by its various terms.")  The patentee's statement here is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention.

These statements from the claims, the specification and the prosecution history unambiguously reflect the patentee's own understanding of the invention as being limited to a device having a pair of elastic band ends each permanently joined to a corresponding pair of synthetic hair fiber ends to form a closed loop.  These statements are not limited to describing a preferred embodiment, but more broadly describe the overall invention of the patent.  As the Federal Circuit has advised, the Court should take the patentee at its word and not construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the Patent Office. *Microsoft Corp. v. Multi-Tech Sys. Inc.,* 357 F.3d 1340 (Fed. Cir. 2004).

### B. Defendants' Proposed Constructions of the Disputed Terms Are True to the Patentee's Consistent Description of the Claimed Invention

Tonytail's approach to claim construction requires the Court to consider each disputed term in a vacuum – separate and apart from the other claim terms and the intrinsic evidence.  Tonytail requests the Court to construe these terms in the hope that if each term on its own is afforded a broader construction than the intrinsic evidence allows, then – and only then - can Tonytail legitimately argue that the claims have a scope (broader than that contemplated by the patent itself) to cover the accused products.  Tonytail's approach must be rejected.

As discussed in Conair and Rite Aid's Opening Claim Construction Brief, this Court need not provide a construction that sets forth the metes and bounds of every disputed term in the '884 patent – rather, to be in a position to resolve the question of infringement, the Court can merely conclude that the '884 Patent does not include "a length of hair which is attached to the elastic loop at one end, but is free at its opposite end." Col. 1, lines 34 – 35.  This construction is supported by the patentee's own

- 4 -

statements in the specification and prosecution history. Claims 4 and 5 of the '884 Patent cannot, as a matter of law, be construed to cover a ponytail binding device like the one disclosed in the disavowed Brown '211 Patent which has an elastic band attached to only one end of a length of synthetic hair. Defendants' proposed constructions consider each of the disputed terms in context, and thus, remain true to the patentee's consistent description of the invention as described above.

### 1. The "elastic band" of the claimed device must be construed to have two ends "not joined to one another"

This claim term should be construed to be limited to a device where the elastic material's ends are not joined to one another (but rather, joined to corresponding synthetic hair fiber ends). Tonytail argues that this construction impermissibly imports limitations from the "preferred embodiment" of the specification into the claim. Yet, according to Tonytail's own logic, Tonytail's proposed construction of this term, namely, "an elastic band whose two ends serve to join together and encircle," not only impermissibly imports limitations into the claim language – it imports limitations found nowhere in the intrinsic evidence. Neither the claim language, nor the specification permits such an interpretation.

Defendants' proposed construction of the claim term is taken directly from the plain language of Claim 4 which recites

> using a device comprising an elastic band having a pair of elastic band ends, synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends, the synthetic hair fiber ends joined to the elastic band ends to form a closed loop.

Col. 4, lines 17-21. Defendants' construction is also illustrated by each and every one of the four figures of the '884 Patent, and is further supported by the specification's uniform description of the elastic band as having elastic band ends not joined to one another, but rather, joined to synthetic hair fiber ends. *See* Col. 1, lines 53-57; Col. 2, lines 54-56; Col, 3, lines 7-10. Tonytail cannot claim that any figure – nor any description thereof in the specification – shows an elastic band whose band ends are joined together (much less joined together to encircle) as Tonytail proposes.

For example, the hair binding device of reference numeral **10** of Fig. 1 of the '884 Patent has an elastic band **12** where "[a] pair of connectors **16** are used to permanently join each one of the

- 5 -

1  elastic band ends **12E** to one of the hair fiber ends **14E**. Accordingly, the synthetic hair fibers **14** and
2  elastic band **12S** together form a closed loop." Col. 2, lines 29 – 32 (emphasis added). As a result,
3  this claim term cannot be construed as Tonytail proposes – to cover a hair binding device having an
4  elastic band whose ends "serve to join together and encircle" because, according to the specification's
5  teaching, the ends must be permanently joined to the synthetic hair fiber ends. Additionally,
6  Tonytail's so-called "support" for its construction describing band ends joined together and
7  "encircling," is – as Tonytail describes – a "possible" embodiment contemplated only by Tonytail's
8  counsel and not the patentee. Tonytail's Response in Opposition at 2.

9  Whether or not the Court finds a single embodiment, nowhere in the patent is there any
10 definition, any description, any usage, any embodiment or even any suggestion that somehow each of
11 a pair of elastic band ends can be attached to anything other than each of a pair of synthetic hair fiber
12 ends. There is simply no disclosure in the specification for a hair binding device having an elastic
13 band or cord whose ends are joined to one another as Tonytail urges. The disclosure describes one
14 device whose band ends are not joined to one another but are instead joined at both ends to
15 corresponding synthetic hair fiber ends. The claims must therefore be limited to such a device.

**2.   The term "synthetic hair fibers having an appearance similar to the ponytail and having a pair of synthetic hair fiber ends" means synthetic hair fibers whose two ends are not joined to one another**

18 Like the "elastic band…" claim term discussed above, the "synthetic hair fiber ends having an
19 appearance similar to the ponytail and having a pair of synthetic hair fiber ends" term should be
20 construed to be limited to synthetic hair fibers having an appearance similar to the ponytail whose two
21 ends are not joined to one another (but rather, joined to elastic band ends).

22 Contrary to Tonytail's proposed construction, the claims and the specification of the '884
23 Patent disclose <u>no embodiment</u> where the synthetic hair fiber ends are joined to one another. In fact,
24 every depiction and description found in the patent shows just the opposite. *See*, *e.g.,* Figs. 1 – 4 of
25 the '884 Patent. Like the "elastic band…" claim term, Tonytail cites only its own counsel's imaginary
26 embodiment as support for its proposed construction. As a result, this claim term cannot be construed
27 to cover a hair binding device having synthetic hair ends joined to one another.

28

      **3.    According to the patentee's own words, the claim term "the synthetic hair fiber ends joined to the elastic band ends" must be limited to a device "where one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends."**

      The correct construction of this phrase is limited to a device "wherein one of the elastic band ends is permanently joined with one of the synthetic hair fiber ends, and the other of the elastic band ends is permanently joined with the other of the synthetic hair fiber ends." This proposed construction quotes the patentee's <u>exact words</u> *verbatim* from the prosecution history, and thus, such a construction could not better convey the patentee's own understanding of the invention.

      Tonytail, in contrast, proposes a construction where the elastic band ends are somehow selectively or temporarily joined to the synthetic hair fiber ends to "take on a closed loop shape." This argument must fail for at least four reasons.

      First, Tonytail's argument that "joined" and "permanently joined" are separate terms with separate and distinct meanings flies in the face of the specification and common sense. Indeed, the patent itself uses the very words "joined," "permanently joined," and "fused" interchangeably to describe the exact same configuration of the device. Tonytail wants to improperly broaden the scope of the claim beyond the disclosure of the '884 Patent by asking the Court to construe the term "joined" to mean something other than "permanently joined" or "fused" – despite the uniform descriptions throughout the patent and prosecution history discussed above. Moreover, the word "permanently" is the patentee's own term, used in the specification and relied upon during prosecution to distinguish the most fundamental description of the invention from the prior art. The patent not only uses the term "permanently" in the prosecution, but every depiction of the invention uniformly shows elastic band ends permanently joined – or "fused" – to corresponding synthetic hair fiber ends. *See* Figs. 1 – 4 of the '884 Patent. In both the specification of the '884 Patent and prosecution history, the claimed device requires <u>permanently joining the elastic band ends to the synthetic hair fiber ends,</u> Col. 2, lines 29 – 31 (emphasis added).

      Second, Tonytail argues that the "Summary of the Invention" section of the patent describes a device having elastic band ends joined to synthetic hair fiber ends without using the word "permanently," and thus, the terms "joined" and "permanently joined" must have two separate and

- 7 -

distinct meanings in the context of the invention. This argument completely ignores the very next sentence of that section contradicting such an interpretation. Specifically, Tonytail's cited language states: "a device comprising synthetic hair fibers joined to an elastic band to form a closed loop," Col. 1, line 54 – 56. The very next line states: "The synthetic hair fibers are joined to the elastic band with a pair of connectors," *Id.* at 56 – 57. The specification teaches one skilled in the art exactly how the connectors are used to join the elastic band end to the synthetic hair fibers. In particular: "[a] pair of connectors 16 are used <u>to permanently join</u> each one of the elastic band ends 12E to one of the hair fiber ends 14," Col. 2, lines 29 – 32 (emphasis added). The unambiguous language of the specification thus contradicts Tonytail's argument and supports Defendants' construction that the elastic band ends are permanently joined to the synthetic hair fiber ends.

Third, as discussed in Defendants' Opening Claim Construction Brief, Tonytail's position is wholly inconsistent with the patentee's explicit disavowal of the device described in the Brown '211 Patent – a device described by the '884 Patent itself as having a synthetic hair fiber end selectively or temporarily joined to the elastic band. If each of the elastic band ends of the '884 Patent was not permanently attached to each of the synthetic hair fiber ends, the claimed device would cover the prior art device of the Brown '211 Patent; a device where an elastic band is permanently attached <u>to only one end</u> of a length of synthetic hair fibers. Ignoring this point, Tonytail disregards the patentee's uniform depiction and description of its own invention in both the specification and prosecution history and in fact seeks to write out limitations from the claim.

Fourth, Tonytail has not and cannot point to any description or figure in the '884 Patent teaching one skilled in the art to use a ponytail binding device having elastic band ends selectively or temporarily joined to synthetic hair fiber ends. Indeed, Tonytail's Response in Opposition once again cites only to imaginary embodiments created by counsel in support of its position. Tonytail's Response in Opposition at 11. As discussed in Defendants' Response in Opposition to Tonytail Company, Inc.'s Opening Claim Construction Brief ("Defendants' Response"), these embodiments – found nowhere in the '884 Patent – do not represent any disclosed embodiments of the invention at issue. Thus, they are improperly presented in Tonytail's Brief.

1    In contrast, Defendants' construction tracks the language of the specification of the '884 Patent. Defendants' position mirrors the patentee's intent, as graphically shown in Figs. 1 – 4 of the '884 Patent and described in the specification. Specifically, "[a] pair of connectors 16 are used to <u>permanently join</u> each one of the elastic band ends 12E to one of the hair fiber ends 14E. Accordingly, <u>the synthetic hair fibers 14 and elastic band 12S together form a closed loop</u>," Col. 2, lines 29 – 31 (emphasis added). As discussed above, this construction is confirmed by the patentee's use of the term "permanently joined" to distinguish the most fundamental description of the invention from the prior art and the term "fused" to describe how the elastic band ends are joined to the synthetic hair fiber ends. Thus, the intrinsic evidence clearly conveys the concept of elastic band ends permanently joined to corresponding synthetic hair fiber ends. In light of the weight of the intrinsic evidence, Defendants' proposed construction – which uses the patentee's own words in the context of the invention – should be adopted.

### 4. The claim term "to form a closed loop" should be construed to mean "to form a single, unbroken ring…"

The claim term "to form a closed loop" means "to form a single, unbroken ring." Defendants proposed construction tracks the patent's language. The patent states: "[e]lastic bands are generally in the shape of a <u>ring</u>," at Col. 1, lines 22 – 23 (emphasis added), and "the elastic band portion forms a <u>continuous</u> loop with the . . . synthetic hair fibers," at Col. 3, line 7 - 9 (emphasis added). Tonytail, in contrast, asks the Court to construe this claim term to mean "to take on a closed loop shape." Tonytail's intentionally vague construction impermissibly reads the disclosed embodiment right out of the claim.

As discussed above, the specification consistently teaches precisely what the "closed loop" is and how it is used. The specification describes the closed loop as a single continuous loop formed by the elastic band ends being permanently joined to the hair fibers such that the closed loop can be tensioned: "[s]ince <u>the elastic band portion forms a continuous loop with the less stretchable synthetic hair fibers</u>, the tensioned elastic band acts to pull the synthetic hair fibers tightly around the ponytail 52," Column 3, lines 7-10 (emphasis added). Referring to Figure 3, the patent describes how the closed loop is used, in particular: ". . . by inserting the ponytail end 54 through <u>the</u> closed loop of the

- 9 -

1  binding device 10 so that the binding device 10 fully encircles the ponytail 52. At this point, the closed
2  loop fits loosely over the ponytail 52," Column 2, lines 60-63 (emphasis added).

3        Tonytail's vague and overly broad construction of "form a closed loop" as "take on a closed
4  loop shape" is not supported by the claims or the specification.  Tonytail argues once again that its
5  imaginary embodiment (created by counsel) – *i.e.*, "joining all ends (elastic band and synthetic fibers)
6  in order to practice the claim 4 method" to form some sort of figure "8" shape – supports its
7  construction.  Tonytail's Response in Opposition at 19.  In reality, Tonytail's proposed construction
8  requires the Court to read the disclosed embodiment – a device having elastic band ends permanently
9  joined to synthetic hair fiber ends <u>to form a</u> closed loop – right out of the claim.  Nowhere in the
10 specification is there any definition, any description, any usage, any embodiment, nor even a
11 suggestion that a "closed loop" is anything but a single, continuous loop formed by the pair of elastic
12 band ends being permanently joined to the corresponding pair of hair fiber ends.

13       Tonytail's argument and construction is also inconsistent with the remaining steps of the claim.
14 If this claim term contemplated anything but a single, continuous loop, the later step of "inserting the
15 ponytail end through <u>the closed loop of the binding device</u>" would be meaningless.  Which of the
16 closed loop shapes does Tonytail imagine someone inserting his or her ponytail through before
17 continuing with the remaining steps of Claims 4 and 5?  One does not have to be skilled in any art to
18 understand what a closed loop means, particularly in light of the patent's use of that term.  Tonytail's
19 argument that the closed loop is not limited to a single closed loop must therefore be rejected.
20 Moreover, Tonytail's proposed construction regarding closed loop is deliberately vague.  What the
21 claim and all of the intrinsic evidence require is <u>to form</u> a closed loop – simply taking on a "closed
22 loop shape" is not enough.  Finally, Tonytail's proposed construction ignores the patentee's significant
23 statements made on the face of the patent and during prosecution.  For example, Tonytail's proposed
24 construction would permit claims 4 and 5 of the '884 Patent to read on devices described in the Brown
25 '211 Patent – prior art that the patentee explicitly and unequivocally disavowed.[1]

---

[1] Recognizing the factual errors it made in its Opening Brief, Tonytail now admits that the patent describes the loop as "continuous," and uses the term "ring."

- 10 -

1  Tonytail's Response in Opposition at 17. Defendants' proposed construction, in contrast, follows the clear, consistent meaning of "closed loop" as described in the patent – namely, a continuous, unbroken ring. Thus, Defendants' proposed construction – using the patent's own words – should be adopted.

### 5. The construction of the claim term "covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers…" must be considered in context

This claim term should be construed in the context of the overall claim and the specification of the '884 Patent. The specification of the '884 Patent states:

> Since the elastic band portion forms a continuous loop with the less stretchable synthetic hair fibers, the tensioned elastic band acts to pull the synthetic hair fibers tightly around the ponytail 52.
>
> . . .
> . . . the synthetic hair fibers 14 may be pulled over the elastic band to conceal the elastic band and the connectors, so that the outward appearance of the binding device 10 is provided solely by the synthetic hair fibers, as seen in FIG. 4.

Col. 3, lines 7 – 10 and 15 – 19. The specification thus teaches that the entire "continuous loop" (or ring), made up of the elastic band and synthetic hair fibers together, can be tensioned around the ponytail since the elastic band "acts to pull the synthetic hair fibers tightly around the ponytail," *id*. Since both the elastic band and synthetic hair fibers are simply permanently joined parts of the overall continuous ring, the disputed claim term must mean "adjusting the ring so the outward appearance of the ring is formed only by synthetic hair fibers…" Tonytail's proposed construction "…so that the outward appearance of the device is formed <u>singly, to the exclusion of all else</u>, by the hair fibers," lacks support in the intrinsic evidence and should be rejected.

Whether the Court decides to adopt the term "covering" or "adjusting," this step must be construed in the context of the claim and the description provided in the specification quoted above, namely, the device – formed by permanently joining the elastic band ends to the synthetic hair fiber ends – is doubled around the ponytail, and thereafter, the synthetic hair fibers are arranged to cover the elastic band. The claimed step of "covering the elastic band with the synthetic hair fibers so that the outward appearance of the device is formed solely by the synthetic hair fibers" cannot be construed as

- 11 -

separate and apart from the limitations set forth in the earlier portion of the claim, in particular, "synthetic hair fibers joined to elastic band ends to form a closed loop."

### 6. Defendants' construction of "...encircling the ponytail with the device by inserting the ponytail through the closed loop of said device…" prevents confusing the term "device" with "elastic band"

To the extent the Court considers this claim term proposed by Tonytail, it should be construed in the context of the rest of the claim. Without question, the context of the claim requires that the "closed loop" referred to in this portion of the claim be the same "closed loop" described earlier in the claim, and throughout the patent -- a closed loop formed by joining two synthetic hair fiber ends to two corresponding elastic band ends. Defendants have referred to the closed loop structure as a continuous (as taught by the patentee) or unbroken ring. Thus, Defendants' proposed construction of the term "encircling the ponytail with the device by inserting the ponytail through the closed loop of said device…" is "inserting the ponytail end through the ring so that the ring encircles the ponytail."

As discussed in Defendants' Response in Opposition, Tonytail cannot reasonably claim the accused products infringe this claim unless it urges that "the closed loop" in this instance means *any* closed loop shape. Indeed, Tonytail will argue that the "closed loop" in this instance means "an elastic band." It does not. In the context of the claim, the "closed loop" referred to in this claim term is the same closed loop described earlier in the claim. Accordingly, this claim term must include the same "closed loop," or continuous ring, as described earlier in the claim.

### C. To the Extent the Court Considers the '239 Design Patent, the Court Should Adopt Defendants' Construction

In Defendants' Opening Claim Construction Brief, Defendants took care to suggest that in the interest of resolving this case, the Court may consider construing the claim of one of the two asserted design patents, the '239 Patent. Tonytail has responded by asking this court not to construe either of the asserted design patents but offered its own constructions of both. Defendants continue to believe that a proper claim construction of the '239 design patent will allow the Court to resolve this dispute by summary judgment.

Tonytail's Response in Opposition spends nearly five pages discussing the so-called *Gorham* rule from *Gorham Co. v. White*, 81 U.S. 511 (1872). The *Gorham* rule, however, applies to an

infringement analysis. Tonytail also asserts – twice – that "over 100 years of controlling Supreme Court precedent" do not mandate a Court prepare a written description of the visual impression created by a design patent as part of claim construction. This argument ignores more than a decade of Federal Circuit precedent. *Durling v. Spectrum Furniture, Co. Inc.*, 101 F.3d 100 (Fed. Cir. 1996); *Alan Tracy, Inc. v. Trans Globe Imports, Inc.*, 60 F.3d 840 (Table) (Fed. Cir. 1995); *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571 (Fed. Cir. 1995).[2] Plaintiff's argument to the contrary is misplaced. The Federal Circuit said in *Durling:* "[u]nlike the readily available verbal description of the invention and of the prior art that exists in a utility patent cased, a design patent case presents the judge only with visual descriptions. Given the lack of visual language, <u>the trial court must first translate these visual descriptions into words</u>…From this translation, the parties and appellate courts can discern the internal reasoning employed by the trial court to reach its decision as to whether or not a prior art design is basically the same as the claimed design," 101 F.3d 100 (emphasis added). Thus, in interpreting the scope of a design patent, the trial judge should consider the features shown in the figures and any prosecution history to produce a clear claim construction for the jury and the parties. *Id.*

Tonytail's proposed constructions do not provide any reader a description of the visual impression made by the figures of the patents. Tonytail's description will not aid the Court, the parties, or a jury. Defendants' proposed construction for the '239 Patent is clear and consistent, describing the design as depicted. Accordingly, Defendants' proposed construction should be adopted by the Court.

---

[2] *See, e.g., Arminak and Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314 (Fed. Cir. 2007); *Egyptian Goddess, Inc. v. Swisa, Inc.* 498 F.3d 1354 (Fed. Cir. 2007); *Amini Innovation Corp. v. Anthony Cal., Inc.,* 439 F.3d 1365 (Fed. Cir. 2006); *Colida v. Sharp Elecs. Corp.,* 125 Fed.Appx. 993 (Fed. Cir. 2005); *Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc.*, 393 F.3d 1378 (Fed. Cir. 2005); *Anheuser-Busch Cos., Inc. v. Crown Cork & Seal Techs.*, 121 Fed.Appx. 388 (Fed. Cir. 2004); *Colida v. Ericsson, Inc.*, 93 Fed.Appx. 220 (Fed. Cir. 2004); *Minka Lighting, Inc. v. Craftmade Intern., Inc.*, 93 Fed. Appx. 214 (Fed. Cir. 2004); *Antonious v. Spalding & Evenflo Co's., Inc.*, 217 F.3d 849 (Table – unpub. Fed. Cir. 1999); *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396 (Fed. Cir. 1997); *Nichia Corp. v. Seoul Semiconductor Co., Ltd.,* No. C-06-0162 MMC, 2007 WL 2428040 (N.D. Cal. August 22, 2007).

**III.    CONCLUSION**

Conair's and Rite Aid's proposed constructions stay true to the principles of claim construction, the purpose of the patent, the context of the claims and the guidance provided by the specification and prosecution history. Accordingly, the Court should adopt Conair's and Rite-Aid's proposed constructions.

Dated: May 23, 2008

CONAIR CORPORATION AND RITE AID HDQTRS. CORP.

By its attorneys,

/s/ Thomas F. Fitzpatrick
Thomas F. Fitzpatrick
tfitzpatrick@goodwinprocter.com
GOODWIN PROCTER LLP
135 Commonwealth Drive
Menlo Park, California 94025
Tel.: 650-752-3144
Fax: 650-853-1038